# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

ELECTRONIC FRONTIER, )
FOUNDATION )
) Civil Action No. C 10cv04892 (SI)
Plaintiff, )
) SECOND DECLARATION OF
v. ) DAVID M. HARDY, SECTION CHIEF,
) FBI RECORD MANAGEMENT
DEPARTMENT OF JUSTICE, ) DIVISION, RECORDS/INFORMATION
FEDERAL BUREAU OF ) DISSEMINATION SECTION
INVESTIGATION, AND DRUG )
ENFORCEMENT ADMINISTRATION, )
)
Defendants. )

1.      I am currently the Section Chief of the Record/Information Dissemination Section

("RIDS"), Records Management Division ("RMD"), formerly at Federal Bureau of Investigation

Headquarters ("FBIHQ") in Washington, D.C., and currently relocated to Winchester, Virginia. I

have held this position since August 1, 2002. Prior to my joining the FBI, from May 1, 2001 to

July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that

capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures,

appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy

Judge Advocate at various commands and routinely worked with FOIA matters. I am also an

attorney who has been licensed to practice law in the State of Texas since 1980.

2.      In my official capacity as Section Chief of RIDS, I supervise approximately 277

employees who staff a total of ten (10) FBIHQ units and two field operational service center

units whose collective mission is to effectively plan, develop, direct, and manage responses to

requests for access to FBI records and information pursuant to the FOIA as amended by the

OPEN Government Act of 2007 and the OPEN FOIA Act of 2009; Privacy Act; Executive Order

1

13526, Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith. My responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order ("E.O.") 13526,[1] and the preparation of declarations in support of Exemption 1 claims under the FOIA.[2] I have been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to E.O. Order 13526, §§ 1.3 and 3.1.

3.      Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am am familiar with the Complaint in the above titled action, the pleadings regarding plaintiff's Motion for Partial Summary Judgment filed January 6, 2011, and this Court's March 3, 2011 Order establishing a rolling processing schedule for plaintiffs "Lynch request." The statements I make hereinafter are made on the basis of my own personal knowledge, review of FBI records and the seven (7) interim releases made by FBI in this case, and information acquired by me in the performance of my official duties as Section Chief of RIDS.

4.      This declaration supplements information previously provided in my 1st Hardy declaration, dated January 25, 2011, submitted in response to plaintiff's Motion for Partial Summary Judgement, wherein plaintiff sought an Order from the Court directing the FBI to expedite processing of its "Lynch request," as well as to process and disclose records in response

---

[1] The classified information in this case was reviewed in accordance with E.O. 13526 of December 29, 2009.

[2] 5 U.S.C. § 552 (b)(1).

2

1

2    to its "Cardozo request." The First Hardy declaration provided the Court and plaintiff with an

3    explanation of the FBI's record-keeping system and the procedures used to expeditiously search

4    for, collect, and process records potentially responsive to both of plaintiff's FOIA requests, up

5    through the date it was signed, January 25, 2011. The FBI submits this declaration in support of

6    its Motion for Summary Judgement, and to provide the Court and plaintiff with justification for

7    the withholding of information from its FOIA/PA releases to plaintiff, in accordance with

8    Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), and pursuant to FOIA Exemptions 1, 2, 3, 4, 5,

9    6, 7(C), 7(A), 7(D) and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(2), (b)(3), (b)(4), (b)(5), (b)(6),

10    (b)(7)(C), (b)(7)(A), (b)(7)(D), and (b)(7)(E).

11 **HISTORY OF PLAINTIFF'S FOIA REQUESTS**

12    5.    By faxed letter dated May 21, 2009, hereafter "Cardozo request," plaintiff requested all

13    agency records from 2007 to date that describe the Going Dark Program, all Privacy Impact

14    Assessments prepared for the Going Dark Program, and all System of Records Notices

15    ("SORNs") that discuss or describe the Going Dark Program. See Exhibit A, First Hardy

16    declaration, for a true and correct copy of the Cardozo request.

17    6.    By faxed letter dated September 28, 2010, hereafter "Lynch request," plaintiff made a

18    broad, six-item request generally seeking information about FBI's problems and limitations

19    encountered in the surveillance of communications systems or networks. See Exhibit K, First

20    Hardy declaration, for a true and correct copy of the Lynch request.

21 **SUPPLEMENTAL PROCEDURAL HISTORY**[3]

22    7.    By letter dated January 18, 2011, the FBI advised plaintiff that material responsive to the

23    Cardozo request was being reviewed by a FOIA analyst, that sensitive national security

24    information contained therein was undergoing review, and that exemptions allowed by the

25

26    _____

27    [3] See First Hardy declaration for administrative trail for both FOIA requests as of January 25, 2011, filing date.

28 3

1

2  FOIA/PA would then be applied. (See Exhibit A.).[4]

3  8.       In a letter dated February 7, 2011, plaintiff was provided with the first interim release

4  response to the Cardozo request.  (See Exhibit B.)  The FBI processed a total of 474 pages, and

5  released 18 pages in full, 315 pages in part, and withheld 141 pages in full.  See Exhibit M,

6  Bates pages 1-474.  The FBI inserted deleted page sheets as a substitute for the 141 pages

7  withheld in full in order to provide further explanation and detail concerning those pages.  Each

8  page of Exhibit M, Bates pages 1-474, is consecutively Bates-stamped at the bottom center of

9  each page and labeled "EFF/Cardozo-1" through "EFF/Cardozo-474." The exemptions asserted

10  by the FBI as grounds for non-disclosure of portions of , or in some instances, entire documents

11  are FOIA Exemptions  2, 5, 6, 7(C), 7(D) and 7(E), 5 U.S.C. §§ 552 (b)(2), (b)(5), (b)(6),

12  (b)(7)(C), (b)(7)(D), and (b)(7)(E).

13  9.       Defendant Drug Enforcement Administration ("DEA") located 192 pages of FBI

14  information in it records while processing the Lynch request and forwarded it to the FBI for

15  direct response to plaintiff.  In a letter dated March 11, 2011, plaintiff was provided the first

16  direct-referral response to the Lynch request.  (See Exhibit C.)  The FBI processed the192 pages

17  of referred documents, and withheld all 192 pages in full.  See Exhibit N, Bates pages 1241-

18  1432.  The FBI inserted deleted page sheets as a substitute for the 192 pages withheld in full in

19  order to provide further explanation and detail concerning those pages.  Each page of Exhibit N,

20  Bates pages 1241-1432, is consecutively Bates-stamped at the bottom center of each page and

21  labeled "EFF/Lynch-1241" through "EFF/Lynch-1432." The exemptions asserted by the FBI as

22  grounds for non-disclosure of the entire 192 referred pages were FOIA Exemptions 2, 5, 6, 7(C),

23  and 7(E), 5 U.S.C. §§ 552 (b)(2), (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).

24  10.      In a letter dated March 16, 2011, plaintiff was provided the second interim release

25

26  _____

27  [4] The January 18, 2011, status update was inadvertently left out of the Exhibit's to the First Hardy
   declaration, which covered correspondence up through January 25, 2011.

28                                                  4

1

2   response to the Cardozo request. (See **Exhibit D.**) The FBI processed a total of 479 pages, and

3   released 17 pages in full, 125 pages in part, and withheld 337 pages in full. **See Exhibit M,**

4   Bates pages 475-953. The FBI inserted deleted page sheets as a substitute for the 337 pages

5   withheld in full in order to provide further explanation and detail concerning those pages. Each

6   page of Exhibit M, Bates pages 475-953, is consecutively Bates-stamped at the bottom center of

7   each page and labeled "EFF/Cardozo-475" through "EFF/Cardozo-953." The exemptions

8   asserted by the FBI as grounds for non-disclosure of portions of, or in some instances, entire

9   documents are FOIA Exemptions 1, 2, 4, 5, 6, 7(C), 7(D) and 7(E), 5 U.S.C. §§ 552 (b)(1),

10  (b)(2), (b)(4), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

11  11.    In a letter dated April 1, 2011, plaintiff was provided the first interim release response to

12  the Lynch request. (See **Exhibit E.**) The FBI processed a total of 289 pages, and released 161

13  pages in full, or in part, and withheld 128 pages in full. **See Exhibit N,** Bates pages 1-289.[5] The

14  FBI inserted deleted page sheets as a substitute for the 128 pages withheld in full in order to

15  provide further explanation and detail concerning those pages. Each page of Exhibit N, Bates

16  pages 1-289, is consecutively Bates-stamped at the bottom center of each page and labeled

17  "EFF/Lynch-1" through "EFF/Lynch-289." The exemptions asserted by the FBI as grounds for

18  non-disclosure of portions of, or in some instances, entire documents are FOIA Exemptions 1, 2,

19  3, 5, 6, 7(C), 7(A), 7(D) and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(2), (b)(3), (b)(5), (b)(6), (b)(7)(C),

20  (b)(7)(A), (b)(7)(D), and (b)(7)(E).

21  12.    Defendant DEA subsequently located another 21 pages of FBI information in its records

22  while processing the Lynch request and forwarded it to the FBI for direct response to plaintiff. In

23  a letter dated April 1, 2011, plaintiff was provided the second direct-referral response to the

24  Lynch request. (See **Exhibit F.**) The FBI processed the 21 pages of referred documents, and

25

26      [5] In preparing Exhibit N the FBI noticed that the second page of a 12 page EC was inadvertently missing

27  from the original FOIA release. The FBI is releasing this page, in part, as Bates page EFF/Lynch 275a.

28                                                   5

withheld all 21 pages in full. **See Exhibit N**, Bates pages 1433-1453. The FBI inserted deleted page sheets as a substitute for the 21 pages withheld in full in order to provide further explanation and detail concerning those pages. Each page of Exhibit N, Bates pages 1433-1453, is consecutively Bates-stamped at the bottom center of each page and labeled "EFF/Lynch-1433" through "EFF/Lynch-1453." The exemptions asserted by the FBI as grounds for non-disclosure of the entire 21 referred documents were FOIA Exemptions 2, 5, and 7(E), 5 U.S.C. §§ 552 (b)(2), (b)(5), and (b)(7)(E).

13.    The Criminal Division of the Department of Justice ("DOJ/CRM") located 8 pages of FBI information in its records while processing the Lynch request and forwarded it to the FBI for direct response to plaintiff. In a letter dated April 22, 2011, plaintiff was provided the third direct-referral response to the Lynch request. (**See Exhibit G.**) The FBI processed the 8 pages of referred documents, and withheld 4 pages in full, and released 4 pages in part. See **Exhibit N**, Bates pages 1500-1507. The FBI inserted deleted page sheets as a substitute for the 4 pages withheld in full in order to provide further explanation and detail concerning those pages. Each page of Exhibit N, Bates pages 1500-1507, is consecutively Bates-stamped at the bottom center of each page and labeled "EFF/Lynch-1500" through "EFF/Lynch-1507." The exemptions asserted by the FBI as grounds for non-disclosure of portions of, or in some instances, entire documents are FOIA Exemptions 5, 6, and 7(C), 5 U.S.C. §§ 552 (b)(5),(b)(6) and (b)(7)(C).

14.    Defendant DEA subsequently located yet another 19 pages of FBI information in its records while processing the Lynch request and forwarded the material to the FBI for direct response to plaintiff. In a letter dated April 22, 2011, plaintiff was provided the fourth direct-referral response to the Lynch request. (**See Exhibit G.**) The FBI processed the 19 pages of referred documents, and withheld 6 pages in full, and released 13 pages in full or in part. **See Exhibit N**, Bates pages 1454-1472. The FBI inserted deleted page sheets as a substitute for the 6 pages withheld in full in order to provide further explanation and detail concerning those pages.

Each page of Exhibit N, Bates pages 1454-1472, is consecutively Bates-stamped at the bottom center of each page and labeled "EFF/Lynch-1454" through "EFF/Lynch-1472." The exemptions asserted by the FBI as grounds for non-disclosure of portions of, or in some instances, entire documents are FOIA Exemptions 5, 6, and 7(C), 5 U.S.C. §§ 552 (b)(5),(b)(6) and (b)(7)(C).

15.     In a letter dated April 29, 2011, plaintiff was provided the second interim release response to the Lynch request. (**See Exhibit H.**) The FBI processed a total of 77 pages, and released 7 pages in full, or in part, and withheld 70 pages in full. **See Exhibit N**, Bates pages 290-366. The FBI inserted deleted page sheets as a substitute for the 70 pages withheld in full in order to provide further explanation and detail concerning those pages. Each page of Exhibit N, Bates pages 290-366, is consecutively Bates-stamped at the bottom center of each page and labeled "EFF/Lynch-290" through "EFF/Lynch-366." The exemptions asserted by the FBI as grounds for non-disclosure of portions of, or in some instances, entire documents are FOIA Exemptions 1, 5, 6, 7(C), and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).

16.     In a letter dated May 31, 2011, Plaintiff was provided the third interim release response to the Lynch request. (**See Exhibit I.**) The FBI processed a total of 437 pages, and released 15 pages in full, or in part, and withheld 422 pages in full. **See Exhibit N**, Bates pages 367-802. The FBI inserted deleted page sheets as a substitute for the 422 pages withheld in full in order to provide further explanation and detail concerning those pages. Each page of Exhibit N, Bates pages 367-802, is consecutively Bates-stamped at the bottom center of each page and labeled "EFF/Lynch-367" through "EFF/Lynch-802." The exemptions asserted by the FBI as grounds for non-disclosure of portions of , or in some instances, entire documents are FOIA Exemptions 5, 6, 7(C), and 7(E), 5 U.S.C. §§ 552 (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).

17.     In a letter dated June 30, 2011, Plaintiff was provided the fourth interim release response to the Lynch request. (**See Exhibit J.**) The FBI processed a total of 440 pages, and has released 9 pages in full, or in part, and withheld 431 pages in full. **See Exhibit N**, Bates pages 803-1240.

1

2  The FBI inserted deleted page sheets as a substitute for the 431 pages withheld in full in order to

3  provide further explanation and detail concerning those pages. Each page of Exhibit N, Bates

4  pages 803-1240, is consecutively Bates-stamped at the bottom center of each page and labeled

5  "EFF/Lynch-803" through "EFF/Lynch-1240." The exemptions asserted by the FBI as grounds

6  for non-disclosure of portions of, or in some instances, entire documents are FOIA Exemptions

7  1, 3, 5, 6, 7(C), 7(A), 7(D), and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(C),

8  (b)(7)(A), (b)(7)(D), and (b)(7)(E).

9  18.      In a series of five separate letters to plaintiff, each dated July 6, 2011, and consisting of

10  direct-referral responses fifth through the ninth to the Lynch request, the FBI provided additional

11  material referred to it from defendants DEA and DOJ/CRM for direct response to plaintiff. (**See**

12  **Exhibit K.**) This material was received serially by FBI, but all released to plaintiff by letter on

13  July 6, 2011. DEA initially located 11 pages of FBI information in its records while processing

14  the Lynch request. In its letter, FBI advised plaintiff that these 11 pages were exempt from

15  disclosure in their entirety under FOIA Exemptions 5, and 7(E), 5 U.S.C. §§ 552 (b)(5), and

16  (b)(7)(E). Defendant DEA subsequently located 16 additional pages of FBI information in its

17  records while processing the Lynch request. In its letter, FBI advised plaintiff that these 16 pages

18  were exempt from disclosure in their entirety under FOIA Exemptions 5, and 7(E), 5 U.S.C. §§

19  552 (b)(5), and (b)(7)(E).   Defendant DOJ/CRM initially located 21 pages of FBI information in

20  its records while processing the Lynch request. In its letter, FBI advised plaintiff that 2 of these

21  21 pages were being released in full or in part. Deletions made in the 2 released pages, and the

22  remaining 19 pages withheld in full, were exempt from disclosure in there entirety under FOIA

23  Exemptions 5, 6, 7(C), and 7(E), 5 U.S.C. §§ 552 (b)(5),(b)(6), (b)(7)(C), and (b)(7)(E).

24  Defendant DOJ/CRM subsequently located 1 additional page of FBI information in its records

25  while processing the Lynch request. In its letter, FBI advised plaintiff that the 1 page was being

26  released in part. Deletions made in the 1 released page were exempt from disclosure under FOIA

27

28

Exemptions 5, 6, 7(C), and 7(D), 5 U.S.C. §§ 552 (b)(5),(b)(6), (b)(7)(C), and (b)(7)(D).  Finally, Defendant DOJ/CRM located 44 additional pages of FBI information in its records while processing the Lynch request.  FBI advised plaintiff that the 44 pages of referred material were exempt from disclosure in there entirety under FOIA Exemptions 1, 5, 6, 7(A), 7(C), and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), and (b)(7)(E).  **See Exhibit N**, Bates pages 1473-1499, and 1508-1573.  The FBI inserted deleted page sheets as a substitute for the 90 pages withheld in full in order to provide further explanation and detail concerning those pages. Each page of Exhibit N, Bates pages 1473-1499, and 1508-1573, is consecutively Bates-stamped at the bottom center of each page and labeled "EFF/Lynch-1473" through "EFF/Lynch-1499, and "EFF/Lynch-1508" through "EFF/Lynch-1573."

19.     In a letter dated November 21, 2011, plaintiff was provided the third interim release response to the Cardozo request.[6]  **(See Exhibit L.)**  The FBI processed a total of 135 pages, and released 4 pages in full, 15 pages in part, and withheld 116 pages in full.  **See Exhibit M**, Bates pages 954-1088.  The FBI inserted deleted page sheets as a substitute for the 116 pages withheld in full in order to provide further explanation and detail concerning those pages.  Each page of Exhibit M, Bates pages 954-1088, is consecutively Bates-stamped at the bottom center of each page and labeled "EFF/Cardozo-954" through "EFF/Cardozo-1088."  The exemptions asserted by the FBI as grounds for non-disclosure of portions of, or in some instances, entire documents are FOIA Exemptions 1, 5, 6, 7(C), and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).

## ADDITIONAL SEARCH - LYNCH REQUEST

20.     Because the subject of the Lynch request did not readily lend itself to a Central Records

---

[6] In preparing Exhibit M the FBI noticed that certain attachments from OTD's Response, Sections 1-3, either could not be properly 'married' up with a corresponding e-mail, or were inadvertently overlooked during the original FOIA processing.  This November 21, 2011, supplemental FOIA release for the Cardozo request, was made to rectify this situation.

System ("CRS") search (See First Hardy Decl. ¶ 5-10 for CRS definition) the FBI determined that a more individualized inquiry (outside the CRS system) of certain FBI divisions and FBI offices reasonably likely to have potentially responsive records was appropriate.  RIDS circulated an initial Electronic Communication ("EC") on November 8, 2010 to FBIHQ divisions and offices most likely to possess responsive records, asking that they search for records.  After additional FBI offices were subsequently identified as also likely to have potentially responsive material, a second search EC was circulated on January 10, 2011, and a third search EC was circulated on March 2, 2011.  Each EC requested that the recipients conduct a thorough search for any potentially responsive documents in response to the Lynch request.[7]

## RELEASE OF MATERIAL AND JUSTIFICATION OF DELETED MATERIAL - DOCUMENT CATEGORY GROUPS

21.     This declaration is accompanied by, and incorporates by reference, two Vaughn Indices (*hereinafter "Cardozo Index or Lynch Index"*), each providing a detailed description of the withheld material within each document category group, further broken-down into sub-groupings where necessary.  Each *Index* specifies the relevant page ranges, dates of records (if any), applicable exemptions applied to the pages within the groupings, and describes the action taken with respect to each responsive page: withheld in full (WIF) or released in part (RIP).  The balance of any pages not described in an *Index* were released in full.  The *Cardozo Index* is attached hereto as **Exhibit O** and the *Lynch Index* is attached hereto as **Exhibit P**.  The document categories and sub-categories groupings were created for the ease of the court and the plaintiff, and the documents are indexed and categorized by the Division/Office from which they were received.  There is no substantive reason for the categorization.  The document categories and sub-categories groups are:

---

[7] A copy of Plaintiff's September 28, 2010, FOIA request was incorporated into the text of all three EC's to insure accuracy of the search.

| Category | General Description |
|----------|--------------------|
| 1A | FBI Office of Public Affairs (OPA) Response (Cardozo Request). |
| 1B | FBI Office of Congressional Affairs (OCA) Response (Cardozo Request). |
| 1C | FBI Operational Technology Division (OTD) Response, Section 1 and 3 (Cardozo Request). |
| 1D | FBI Office of General Counsel (OGC) Response (Cardozo Request). |
| 1E | FBI Operational Technology Division (OTD) Response, Section 2 (Cardozo Request). |
| 1F | FBI Operational Technology Division (OTD) Response, Section 4 (Cardozo Request). |
| 2A | FBI Operational Technology Division (OTD) Response, Sections 1-3 (Lynch Request). |
| 2B | FBI Cyber Division (CD) Response (Lynch Request). |
| 2C | FBI Counter Terrorism Division (CTD) Response on (Lynch Request). |
| 2D | FBI Office of the General Counsel (OGC) Response (Lynch Request). |
| 2E | FBI Counter-Intelligence Division (CI) Response (Lynch Request). |
| 2F | FBI Office of Congressional Affairs (OCA) Response (Lynch Request). |
| 2G | FBI Director's Office (DO) Un-classified CD Response (Lynch Request). |
| 2H | FBI Director's Office (DO) Classified CD Response (Lynch Request). |
| 2I | FBI Direct-Referral Responses to plaintiff - DEA referrals (Lynch Request) |
| 2J | FBI Direct-Referral Responses to plaintiff - DOJ/CRM referrals (Lynch Request) |

22.     The FBI has made every effort to provide plaintiff with all material in the public domain and with all reasonably segregable portions of releasable material.  Moreover, the FBI has taken all reasonable efforts to ensure that no segregable, nonexempt portions were withheld from plaintiff.

1

2 **WITHHELD MATERIAL: OVERVIEW OF EXEMPTIONS APPLIED**

3   23.     To avoid repetition in the explanation, justification, and harm analysis of the withheld

4 material in discussion of the document categories and sub-categories which follow, the FBI will

5 first address certain threshold matters and several types of information or documents that were

6 uniformly withheld under the same exemption(s) and/or justifications throughout all processing

7 categories.  Where necessary to explain withholdings, more particularized justifications are

8 contained in the category-by-category discussion which follows.  The commonly applied

9 exemptions and matters throughout the categories are as follows:

10 **EXEMPTION (b)(1) - CLASSIFIED INFORMATION**

11   24.     The FBI's analysis of the withholding of classified information contained in these

12 documents is based on the standards articulated in the FOIA statute, 5 U.S.C. § 552 (b)(1).

13 Exemption (b)(1) protects from disclosure those records that are: "(a) specifically authorized

14 under criteria established by an Executive Order to be kept secret in the interest of national

15 defense or foreign policy; and (b) are in fact properly classified pursuant to Executive Order."  In

16 this case the FBI has asserted Exemption (b)(1) to protect information whose release would

17 reveal intelligence activities or sources and could be expected to cause serious damage to

18 national security; or reveal foreign relations or foreign activities of the United States, including

19 confidential sources, which could be expected to cause serious damage to national security.

20   25.     The information withheld in this case pursuant to Exemption (b)(1) was examined in light

21 of the body of information available to me concerning the national security defense of the United

22 States.  This information was not examined in isolation.  Instead, each piece of information was

23 evaluated with careful consideration given to the impact that disclosure of this information will

24 have on other sensitive information contained elsewhere in the United States intelligence

25 community's files, including the secrecy of that other information.  Equal consideration was

26 given to the impact that other information either in the public domain or likely known or

27

28                                                     12

suspected by present or potential adversaries of the United States, would have upon the information I examined, and upon attempts by a hostile entity to analyze such information.

26.     In those instances where, in my judgment, the disclosure of this information could reasonably be expected to cause serious damage to the national security, and its withholding outweighed the benefit of disclosure, I exercised my prerogative as an original classification authority and designated that information as classified in the interest of national security at the "Secret" level, and invoked Exemption (b)(1) to prevent disclosure.   Likewise, the justifications for the withheld classified information were prepared with the intent that they be read with consideration given to the context in which the classified information is found.  This context includes not only the surrounding unclassified information, but also other information already in the public domain, as well as information likely known or suspected by hostile intelligence entities.  It is my judgment that any greater specificity in the descriptions and justifications set forth with respect to the intelligence activities (including special activities), intelligence sources or methods, or foreign relations and activities of the United States, to include confidential sources, could reasonably be expected to jeopardize the national security of the United States, and as a result, all information appearing in these documents has been appropriately classified pursuant to E.O. 13526, and withheld pursuant to Exemption (b)(1).[8]

27.     Before I consider an Exemption (b)(1) claim for withholding agency records, I determine whether the information in those records is information that satisfies the requirements of E.O. 13526.  For information to be properly classified, and thus properly withheld from disclosure pursuant to Exemption (b)(1), the information must meet the requirements set forth in E.O. 13526, § 1.1 (a):

              (1) an original classification authority is classifying the information;

---

[8]   Section 6.1 (cc) of E.O. 13526, defines "National Security" as "the national defense or foreign relations of the United States."

(2) the information is owned by, produced by or for, or is under the control of the United States Government;

(3) the information falls within one or more of the categories of information listed in § 1.4 of this order;

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

28.     As I will explain in further detail below, in my role as an original classification authority, I have determined that the information withheld in this case pursuant to Exemption (b)(1) is under the control of the United States Government, is classified, and requires classification marking at the "Secret" level, since the unauthorized disclosure of this information reasonably could be expected to cause serious damage ("Secret") to national security.  See E.O. 13526, § 1.2 (a)(2).  In addition to these substantive requirements, certain procedural and administrative requirements of E.O. 13526 must be followed before information can be considered to be properly classified, such as proper identification and marking of documents.  I made certain that all procedural requirements of E.O. 13526, were followed in order to ensure that the information was properly classified.  I made certain that:

(a) each document was marked as required and stamped with the proper classification designation;

(b) each document was marked to indicate clearly which portions are classified and which portions are exempt from declassification as set forth in E.O. 135269, § 1.5 (b);

(c) the prohibitions and limitations on classification specified in E.O. 135269, § 1.7, were adhered to;

(d) the declassification policies set forth in E.O. 13526, §§ 3.1 and 3.3 were followed; and

14

(e) any reasonably segregable portion of these classified documents that did not meet the standards for classification under E.O. 13526, were declassified and marked for release, unless withholding was otherwise warranted under applicable law.

29.     With the above requirements in mind, I personally and independently examined the information withheld from plaintiff in this case pursuant to FOIA Exemption (b)(1). I determined that the classified information continues to warrant classification at the "Secret" level, respectively, and is exempt from disclosure pursuant to E.O. 13526, § 1.4, category (c) intelligence activities (including covert action), intelligence sources or methods; and category (d) foreign relations, or foreign activities of the United States, including confidential sources.

30.     E.O. 13526, § 1.4 (c), exempts "intelligence activities (including special activities), intelligence sources or methods, or cryptology from disclosure." The information withheld pursuant to Exemption (b)(1) consists of classified procedures and methods of intelligence-gathering utilized by the FBI to gather intelligence information.   An intelligence activity or method has two characteristics.  First, the intelligence activity and information generated by it is needed by U.S. Intelligence/Counterintelligence agencies to carry out their missions.  Second, confidentiality must be maintained with respect to the activity if the viability, productivity, and usefulness of that information is to be preserved.  The classification redactions have been asserted to protect from disclosure information that would reveal the actual intelligence activities utilized by the FBI against specific targets of foreign counterintelligence investigations or operations; or disclosure of intelligence gathering capabilities of the activities directed at specific targets.  The intelligence activities detailed in the withheld information are effective means for the FBI to gather, store, or disseminate intelligence information.  The criteria applied and priorities assigned in these records are used in the FBI's present intelligence or counterintelligence investigations in accordance with the Attorney General's guidelines on FBI intelligence or counterintelligence investigations.

31.    The information in these documents concerning intelligence activities is very specific in nature and known to very few individuals.  Disclosure of the specific information which describes these intelligence activities would reveal that they are still used by the FBI today to gather intelligence information, and could reasonably be expected to cause serious damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discover the current intelligence activities used; (2) disclosure would reveal or determine the criteria used --and priorities assigned to--current intelligence or counterintelligence investigations, (3) disclosure would reveal the Intelligence Community's (IC's) ongoing, sensitive work towards creating a decentralized communication medium which will facilitate the sharing of information and enhance collaboration efforts across the IC; and (4) disclosure will highlight the exact data collection and ELSUR capabilities shortfalls that the IC are encountering during National Security investigations due to technology advancements in communication system platforms, and encryption applications.    Hostile entities could then develop countermeasures which could severely disrupt the FBI and the IC's intelligence-gathering capabilities.  This would severely damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws.  The FBI protected the identity of intelligence sources or methods specific to intelligence activities because disclosure reasonably could be expected to cause serious damage to the national security.

32.    Section 1.4 (d) of E.O. 13526, protects information from disclosure if its release would reveal foreign relations or foreign activities of the United States, including confidential sources. Information that affects the foreign relations of the United States, much like foreign government information, does not lose its sensitivity with the passage of time. The delicate liaisons established between and among the United States and foreign governments could be severely damaged should the United States disclose such information from these investigations.  As a result, such information must be handled with care so as to not jeopardize the fragile

16

relationships which exist among the United States and certain foreign governments. The unauthorized disclosure of information concerning foreign relations or foreign activities of the United States can reasonably be expected to lead to diplomatic or economic retaliation against the United States; identify the target, scope or time frame of intelligence activities of the United States in or about a foreign country, which may result in the curtailment or cessation of these activities; enable hostile entities to assess United States intelligence-gathering activities in or about a foreign country and devise countermeasures against these activities; or compromise cooperative foreign sources which may jeopardize their safety and curtail the flow of information from these sources. As a result, I have determined that this information is properly classified at the "Secret" level, properly withheld pursuant to E.O. 13526, §1.4 (d), and exempt from disclosure pursuant to Exemption (b)(1).

## EXEMPTION (b)(2) - INFORMATION RELATED SOLELY TO THE INTERNAL PERSONNEL RULES AND PRACTICES OF AN AGENCY

33.    5 U.S.C. § 552 (b)(2) exempts from disclosure information "related solely to the internal personnel rules and practices of an agency." Until March 6, 2011, Exemption 2 encompassed two distinct categories of internal agency records: those involving trivial administrative matters of no public interest ("Low 2"), and those more substantial in nature, the disclosure of which would risk circumvention of a statute or regulation ("High 2"). The U.S. Supreme Court's March 7, 2011, decision in Milner v. Department of the Navy, 131 S.Ct. 1259 (2011), eliminated the distinction between Low 2 and High 2, and narrowed the application of Exemption 2 to those records which relate to employee relations and human resource issues.

34.    As a result of the Milner decision the FBI has determined that, in this case, it will continue to assert Exemption (b)(2), at times in conjunction with Exemptions (b)(6) and (b)(7)(C), for internal, non-public telephone numbers associated with particular FBI personnel. In addition, the FBI originally asserted Exemption 2 ("High"), in conjunction with Exemption

17

(b)(7)(E), to protect investigative techniques and procedures. With the narrowing of the application of Exemption (b)(2) to those records which relate to employee relations and human resource issues, the FBI has determined that, in those instances where Exemption (b)(2) has been asserted in conjunction with Exemption (b)(7)(E), the use of Exemption (b)(2) is now withdrawn.

## EXEMPTION (b)(3) - INFORMATION PROTECTED BY STATUTE

35.     Through the application of Exemption (b)(3) the FBI has withheld information pertaining to the authorization of interception of wire, oral, or electronic communications, information that would reveal the installation and/or investigation and use of a pen register or trap and trace device, information pertaining to the use of FISA information acquired from electronic surveillance, and information pertaining to wiretap requests and the contents of any wire, oral, or electronic communication obtained through wiretaps.

36.     5 U.S.C. § 552 (b)(3) exempts from disclosure information from the following types of records:

> information specifically exempted from disclosure by statute ...
> provided that such statute (A) requires that the matters be withheld
> from the public in such a manner as to leave no discretion on the
> issue, or (B) establishes particular criteria for withholding or refers
> to particular type of matters to be withheld.

37.     In this case the FBI has asserted Exemption (b)(3), at times in conjunction with Exemption (b)(1), to withhold information pursuant to 18 U.S.C. § 2516, which protects from disclosure information pertaining to the authorization of interception of wire, oral, or electronic communications. The Attorney General may authorize an application to a Federal Judge, requesting to intercept wire or oral communications by the FBI when such interception may provide or has provided evidence of a crime, e.g., Charter 37 (Espionage); Charter 90 (Protection of Trade Secrets); and Chapter 105 (Sabotage). Where documents at issue contain information, that, if disclosed, would reveal information pertaining to the authorization of interception of wire,

18

oral, or electronic communications, that information is protected from disclosure by Exemption (b)(3), at times in conjunction with Exemption (b)(1).

38.     The FBI has also asserted Exemption (b)(3), at times in conjunction with Exemption (b)(1), to withhold information pursuant to 18 U.S.C. § 3123(d), the Pen Register Act, which protects from disclosure information pertaining to certain court "order(s) authorizing or approving the installation and use of a pen register or a trap and trace devise;" and information pertaining to "the existence of the pen register or trap and trace device or the existence of the investigation." Where documents at issue contain information, that, if disclosed, would reveal the existence or use of a pen register or trap and trace device, or reveal the existence of an investigation involving a pen register or trap and trace device, that information is protected from disclosure by Exemption (b)(3), at times in conjunction with Exemption (b)(1).

39.     In addition, the FBI has asserted Exemption (b)(3), at times in conjunction with (b)(1), to withhold information pursuant to 50 U.S.C. § 1806, which protects from disclosure information pertaining to the use of FISA information acquired from electronic surveillance. Where documents at issue contain information, that, if disclosed, would reveal the use of FISA information acquired from electronic surveillance, that information is protected from disclosure by both Exemption (b)(3), at times in conjunction with Exemption (b)(1).

40.     Finally, the FBI has asserted Exemption (b)(3), at times in conjunction with Exemption (b)(1), to withhold information pursuant to 18 U.S.C. § 2510, et. seq., Title III of the Omnibus Crime Control and Safe Streets Act, which protects from disclosure information pertaining to wiretap requests and the contents of any wire, oral, or electronic communication obtained through wiretaps. Where documents at issue contain information, that, if disclosed, would reveal, information pertaining to wiretap requests and the contents of any wire, oral, or electronic communication obtained through wiretaps, that information is protected from disclosure by both Exemption (b)(3), at times in conjunction with Exemption (b)(1).

19

1

2

3

## EXEMPTION (b)(4) - TRADE SECRETS AND COMMERCIAL OR FINANCIAL INFORMATION

4  41.   Exemption 4 protects "trade secrets and commercial or financial information obtained

5  from a corporation or electronic communication service providers [that are] privileged or

6  confidential." See 5 U.S.C. § 552(b)(4).  This exemption is intended to protect the interests of

7  both the government and submitters of information.  Its very existence encourages submitters to

8  voluntarily furnish useful commercial or financial information to the government and provides

9  the government with an assurance that required submissions will be reliable.  The exemption also

10  affords protection to those submitters who are required to furnish commercial or financial

11  information to the government by safeguarding them from the competitive disadvantages that

12  could result from disclosure.  In this case, Exemption (b)(4) has been asserted to protect

13  proprietary contractual information provided to the FBI by an contractor.  The release of

14  proprietary contractual information would impair the FBI's ability to obtain similar products or

15  services from this, and other contractors in the future.

16  ## EXEMPTION (b)(5) PRIVILEGED INFORMATION

17  42.   Exemption 5 allows the FBI to protect information contained in "inter-agency or intra-

18  agency memorandums or letters which would not be available by law to a party other than an

19  agency in litigation with the agency."  This exemption has been construed to exempt those

20  documents or information normally privileged in the civil discovery context, including, as is the

21  case here, the attorney-client privilege and the deliberative process privilege.  Generally, the

22  attorney-client privilege protects confidential communications between an attorney and his client

23  relating to a legal matter for which the client has sought professional advice.  This privilege

24  encompasses any opinions given by an attorney to his client based upon and reflecting those

25  facts, as well as communications between attorneys that reflect client-supplied information.  The

26  deliberative process privilege protects the internal deliberations of the government by exempting

27

28                                              20

material that contains opinions, advice, evaluations, deliberations, policy formulation, proposals, conclusions or recommendations.

43.     The deliberative process privilege protects the internal deliberations of an agency by exempting from release recommendations, drafts, analyses, speculation and other non-factual information prepared in anticipation of agency decision-making.  The general purpose of the deliberative process privilege is to prevent injury to the quality of agency decisions.  Thus, material that contains or was prepared in connection with the formulation of opinions, advice, evaluations, deliberations, policy formulation, proposals, conclusions or recommendations may properly be withheld.  Release of this type of information would have an inhibitive effect upon the development of policy and administrative direction of an agency because it would chill the full and frank discussion between agency personnel regarding a decision.  If agency personnel knew that their preliminary opinions, evaluations and comments would be released for public consumption, they might be more circumspect in what they put in writing, and thereby, impede a candid discussion of the issues surrounding a decision.

44.     Exemption 5 protects certain inter-agency, and intra-agency documents under the deliberative process privilege to prevent the premature disclosure of proposed policies, avoid public confusion generated by unadopted rationales/decisions, and to maintain the integrity of the agency decision-making process by encouraging open, candid discussions.  By their very nature as draft documents, the documents are pre-decisional, preliminary versions of what may later become a final document in whole or in part, or they remain drafts that never mature into final form as the material may be withdrawn or discarded during the decision-making process.  In fact, the process by which a draft evolves into a final document is itself a deliberative process.

45.     By way of illustration, in this case, there are 1,809 responsive Bates pages consisting of draft documents, presentations, talking points, discussion papers and/or e-mails that function as drafts.  The draft material within the document processing categories is replete with edits, strike-

21

through and other formatting changes, marginal suggestions and comments, and/or embedded questions regarding content. Drafts are specifically identified in the category-by-category discussion below and the attached *Cardozo and Lynch Indices* as the drafts relate to different policy formulation or decision-making processes. Except where factual, final product, or public source information could be segregated for release, the deliberative process privilege was commonly applied to the remaining draft documents, presentations, talking points, discussion papers, and/or emails that functioned as drafts, as the release of such would seriously impede FBI's ability to foster candid discussions, proposals, and debate both internally within FBI, and between FBI and DOJ as needed for efficient and proper policy formulation and decision making. Disclosure would have a profound chilling effect across all FBI decision-making processes as agency personnel would be less inclined to produce and circulate drafts for consideration and comment.

46.     Talking points or discussion papers are routinely used within FBI as preparatory tools for executives, management, and designated agency representatives in multiple decision-making processes and forums both internally and to prepare FBI personnel for interaction with Congress, local, state, and federal law enforcement agencies, other agencies, and private individuals or companies. In terms of function, these papers are inherently predecisional and deliberative as they are preparatory in nature and do not reflect final agency actions as the officials or working groups relying on the papers may disregard or modify these advisory papers in full or in part. In terms of content, the papers reflect what the author has determined, in his or her judgement, are issues worthy of discussion or consideration by the superior, or in the working group context, by the other working group participants. In this regard, the papers contain the opinions, suggestions, recommendations, and analysis of the subordinate employees or working group participants who draft them. As such, the release of these papers would adversely impact the quality of policy decision-making within the FBI as well as the development of FBI positions, recommendations,

22

and advice to be presented externally, since disclosure would discourage the use of, and chill candid discussion within, such talking points or discussion papers. Moreover, release of such preparatory materials would only confuse the public as they do not reflect final agency action or decision. This justification applies to all FBI talking point or discussion issue papers identified herein; and to the extent more particularized descriptions of function, content, or harm are necessary; they are included in the category-by-category discussion, below.

47.     As a whole, the redactions taken pursuant to Exemption (b)(5), the deliberative process privilege, reflect an internal, on-going dialogue among and between FBI and DOJ personnel with regard to the FBI's development of the "Going Dark Initiative," which entails a five-prong strategic approach to address the identified lawful intercept capability gap (Cardozo request), and limitations to FBI's ability to conduct lawful surveillance on communications systems or networks, and proposed amendments to the Communications for Law Enforcement Act ("CALEA") (Lynch request).  This dialogue is both (a) "predecisional" - antecedent to the adoption of agency policy, and (b) "deliberative" - the numerous talking points, discussion papers, presentations, and/or e-mail trails and exchanges reflect a continuous set of deliberations, including the give and take of the consultative process, with regard to the shaping and evaluation of the FBI's policies and program development.

48.     The FBI has appropriately asserted Exemption (b)(5), the deliberative process privilege, to protect these candid internal discussions concerning these evolving policies and procedures. The release of the redacted information is likely to chill full, frank, and open internal discussions -- a chilling effect which is all the more dangerous given the important national security interest at stake -- the prevention of the FBI from "Going Dark" on its lawful use of intercept capabilities in both counterterrorism and counterintelligence investigations.  As a result, the FBI has appropriately withheld information pursuant to Exemption (b)(5), deliberative process.

23

49.     Exemption (b)(5) has also been asserted, at times, to protect material covered by the attorney-client privilege. The attorney-client privilege is appropriately asserted when legal advice of any kind is sought from a professional legal adviser in his or her capacity as such, and the communications relating to that purpose are made in confidence by the client. The communications are permanently protected from disclosure by the client or by the legal adviser unless the attorney-client protection is waived. This privilege encompasses confidential communications made to the attorney not only by decision-making personnel but also by lower-echelon employees who possess information relevant to an attorney's advice-rendering function. Disclosure of the two-way communications between FBI attorneys and their clients would impede the full disclosure of all of the information that relates to the client's reasons for seeking legal advice, which is necessary if the professional mission is to be accomplished.

## EXEMPTION (b)(7) THRESHOLD

50.     Exemption (b)(7) of the FOIA protects from mandatory disclosure records or information compiled for law enforcement purposes, but only to the extent that disclosure could reasonably be expected to cause one of the harms enumerated in the subpart of the exemption. See 5 U.S.C. § 552 (b)(7). In this case, the harm that could reasonably be expected to result from disclosure concerns invasion of personal privacy, and revealing the identity of confidential sources.

51.     Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency.

52.     The FBI is a law enforcement agency whose mission is to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state,

24

municipal, and international agencies and partners. The FBI focuses on threats that challenge the foundations of American society or involve dangers too large or complex for any local or state authority to handle alone. In executing its priorities, the FBI produces and uses intelligence to protect the nation from threats and to bring to justice those who violate the law.

53.     The FBI collects intelligence to further case investigations, to follow threat leads, to help respond to requests from Law Enforcement (LE), and members of the IC, or to improve its understanding of a particular issue. These activities must have a proper purpose, and may not be initiated based solely on activities protected by the First Amendment, including speech and affiliation with a particular religion. Intelligence is collected through activities such as interviews, physical surveillance, wiretaps, searches, and undercover operations. Which techniques can be used in a particular situation depends on the type of investigation, available information justifying the investigation, and specific authorizations. This is determined by the Constitution, federal laws and regulations, Attorney General Guidelines, and internal FBI policy.

54.     While identifying, analyzing, and reviewing technical, legal, policy, and resource impediments to the FBI's electronic intercept operations, and its development of a five-prong strategic approach to address an identified lawful intercept capability gap, the FBI reviewed on-going classified national security investigations, involving material exempted by statute, to see where ELSUR capability limitations adversely affected the effectiveness of an investigation overall. The intelligence information discussed in these documents, as well as the investigation of potential violations of federal law, fall squarely within the law enforcement duties of the FBI. Developmental projects such as the "Going Dark Initiative," and the FBI's five-prong strategic approach to enhance its lawful intercept ELSUR capabilities, which include 1) modernization/amending existing laws (e.g. CALEA), regulations, and assistance mandates, 2) enhancing authorities to protect industry proprietary and LE sensitive lawful intercept information, equipment and techniques, 3) enhancing LE agencies coordination leveraging

25

technical expertise of FBI with other LE entities, 4) enhancing lawful intercept cooperation between communications industries, and LEA's with a "One Voice" approach, and 5) seeking new federal funding to bolster lawful intercept capabilities, all are efforts that readily meets the threshold requirement of Exemption (b)(7).

## EXEMPTIONS (b)(6) and (b)(7)(C)

55.     5 U.S.C. § 552 (b)(6) exempts from disclosure:

personnel and medical files and similar files when the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy

Similarly, 5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information...could reasonably be expected to constitute an unwarranted invasion of personal privacy.[1]

56.     In this case, the FBI has asserted Exemptions (b)(6) and (b)(7)(C), which protect against clearly unwarranted and unwarranted invasions of personal privacy, for names and/or identifying information pertaining to FBI Special Agents (SAs) and Professional Support Personnel; names and/or identifying information of third parties merely mentioned; names and/or identifying information of non-FBI Federal government personnel and/or FBI contractors; names and/or identifying information of third parties who were of investigative interest; names and/or identifying information of third parties who provided information to the FBI; names and/or identifying information of corporate officers in the communication industry; names and/or identifying information of intelligence officers of a Foreign Intelligence Agency who provided

---

[1] The practice of the FBI to assert Exemption (b)(6) in conjunction with (b)(7)(C). Although the balancing test for (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" and the test for (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. The privacy interests are balanced against the public's interest in disclosure under the analysis of both exemptions.

tactical advice and intelligence concerning on-going investigations; and to withhold the names and/or identifying information of local and state law enforcement employees.

57.    When withholding information pursuant to these exemptions, the FBI is required to balance the privacy interests of the individuals mentioned in these records against any public interest in disclosure.  In asserting these exemptions, each item of information has been scrutinized to determine the nature and strength of the privacy interest in every individual whose name and/or identifying information appears in the documents at issue.  In conducting this analysis, the public interest in disclosure of this information is determined by whether the information in question would shed light on the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners.  In this case, the FBI concluded that the information should be withheld under Exemptions (b)(6) and (b)(7), and determined that the individuals' privacy interests were not outweighed by any public interest in disclosure.

58.    Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2), have been asserted to protect the names, and identifying information of FBI Special Agents (SAs) who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in these records.  In addition, at times they may have been tasked to consult, using their extensive knowledge of investigative techniques and procedures, on internal FBI strategic developmental projects (e.g., National Electronic Surveillance Strategy).  The SAs mentioned did not choose their assignments.  Publicity, adverse or otherwise, regarding any particular investigation, or special projects involving SAs may seriously impair the SAs' effectiveness in conducting future investigations, or consultations.  This privacy consideration also protects SAs from unnecessary, unofficial questioning as to the conduct of an investigation, whether or not they are currently employed by the FBI.

59.     FBI SAs conduct official inquiries into violations of various criminal statutes and

national security cases, and may consult on developmental projects.  They come into contact with

all strata of society, conducting searches and making arrests, all of which result in reasonable but

nonetheless serious disturbances to individuals and their lives.  It is possible for an individual

targeted by such law enforcement actions to carry a grudge which may last for years, and to seek

revenge on the agents and other federal employees involved in the investigation.  The publicity

associated with the release of these SAs identities, in connection with a particular investigation,

or internal strategic developmental project, could trigger hostility toward a particular employee,

or pressure of attempted bribery, to obtain intelligence.  There is no public interest to be served

by disclosing the identities of these employees, and/or contractors, to the public.  Accordingly,

the FBI determined that SAs whose names and identifying information appear in these

documents, maintain a substantial privacy interest in not having their identities disclosed.

60.     The names, and identifying information of FBI Professional Support personnel are also

withheld pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).

Professional Support personnel are assigned to handle tasks related to official criminal

investigations, and/or internal strategic developmental projects (e.g., National Electronic

Surveillance Strategy), as reflected in the documents responsive to Plaintiff's request.  They

were, and possibly are, in positions of access to information regarding official law enforcement

investigations, and special internal strategic developmental projects, and therefore could become

targets of harassing inquiries for unauthorized access to investigations, or internal developmental

projects (e.g., National Electronic Surveillance Strategy), if their identities were released, similar

to those harms articulated previously for SAs.  These Professional Support personnel maintain

substantial privacy interests in not having their identities disclosed.

61.     The FBI next examined the records at issue to determine whether there was any

28

public interest that outweighed the substantial privacy interests of the FBI SAs and Professional Support personnel. The FBI could not identify any discernible public interest. The disclosure of the names of FBI SAs and Professional Support personnel would not demonstrate how the FBI performs its mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners. Thus, disclosure of the names, and identifying information of these employees would constitute a "clearly unwarranted and an unwarranted invasion of their personal privacy;"[2] therefore, the FBI has properly asserted Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).

62. Exemptions (b)(6) and (b)(7)(C) have been asserted to protect the names and identifying information of third parties that were merely mentioned in the documents responsive to plaintiff's request. These individuals are not of investigative interest to the FBI. Release of this type of information about private citizens, without notarized authorizations permitting such a release violates individuals legitimate privacy interests. If the FBI disclosed their names and/or other personal information, the disclosure would reveal that these third parties were at one time connected with an FBI investigation, or developmental project, in some way. Disclosure of their identities could subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them.

63. The FBI also examined the records at issue to determine whether there was any public interest that outweighed the substantial privacy interests of the third parties merely mentioned in

---

[2] For the convenience of the Court, rather than repeat the phrase "clearly unwarranted invasion of personal privacy under the standard of Exemption 6 and an unwarranted invasion of personal privacy under the standard of Exemption 7C" every time we assert these two Privacy Exemptions we will simply use the phrase "clearly unwarranted and unwarranted invasion of personal privacy" to refer to both standards.

the responsive records. The FBI could not identify any discernible public interest. In particular, the FBI could not determine how the disclosure of such names, and/or identifying information of these individuals would shed any light on the operations and activities of the FBI. Thus, the FBI determined that these individuals' privacy interests outweighed any public interest in disclosure, and that disclosure of the names and/or identifying information of the third parties merely mentioned would constitute a "clearly unwarranted and unwarranted invasion of personal privacy." The FBI properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C).

64.    Exemptions (b)(6) and (b)(7)(C) have been asserted to protect the names of non-FBI federal government employees, such as employee's working with the Drug Enforcement Agency (DEA), Office of Deputy Attorney General (ODAG), Assistant United States Attorneys (AUSA), Executive Office for United States Attorney (USAEO), Justice Management Division (JMD), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), National Security Division (NSD), Criminal Division (CRM), Office of Legal Policy (OLP), Immigration and Customs Enforcement (ICE), United States Secret Service (USSS), United States Marshals Service (USMS), and Congressional Staffers, or contractors employed by the FBI. Publicity (adverse or otherwise) regarding any particular investigation they have been assigned, or internal FBI strategic developmental project (e.g., National Electronic Surveillance Strategy) they may be contracted to help develop, may seriously prejudice their effectiveness in conducting other investigations, or internal developmental projects. The privacy consideration is also to protect these federal employees, and/or contractors, as individuals, from unnecessary, unofficial questioning as to the course of an investigation or internal developmental project, whether or not they are currently employed by the FBI as contractors, or with Other Government Agencies (OGA's). These employees may have to conduct official inquiries into violations of National Security, or help develop strategic plans, like developing ways to enhance ELSUR capabilities. They come into

contact with all strata of society, conducing searches, research, and making inquiries, all of which result in reasonable but nonetheless serious disturbances to people and their lives. It is possible for an individual targeted by these OGA's to carry a grudge which may last for years, and to seek revenge on the investigators and other federal employees involved in a particular investigation. Foreign governments, or criminal enterprises may threaten, or pressure FBI contractors with bribery, searching for intelligence that may benefit their countries or criminal enterprises. The publicity associated with the release of these OGA employee's, and/or contractors identities, in connection with a particular investigation, or internal FBI strategic developmental project, could trigger hostility toward a particular employee, or pressure of bribery, to obtain intelligence. There is no public interest to be served by disclosing the identities of these employees, and/or contractors, to the public. Thus, disclosure of this information would constitute a "clearly unwarranted and unwarranted invasion of their personal privacy."

65.     The FBI examined the records at issue to determine whether there was any public interest that outweighed the substantial privacy interests of these OGA employees, and/or contractors, referenced in the responsive records. The FBI could not identify any discernible public interest. In particular, the FBI could not determine how the disclosure of the names, and/or identifying information of these individuals would shed light on the operations and activities of the FBI. Thus, the FBI determined that the OGA employees, and/or FBI contractors, privacy interests outweighed any public interest in disclosure, and that disclosure of the names and identifying information of the OGA employees, and/or FBI contractors, would constitute a clearly unwarranted and unwarranted invasion of privacy. There is no public interest to be served in releasing the identities of these individuals. Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C).

66.     Exemptions (b)(6) and (b)(7)(C) have been asserted to protect the names and/or identifying information of third-party individuals who were of investigative interest to the FBI

31

and/or other law enforcement agencies.  Identifying information withheld concerning these third

parties includes addresses, dates of birth, social security numbers, and other personal

information.  Any link to a law enforcement investigation carries a strong negative connotation

and a stigma.  Release of the identities of these individuals to the public could subject them to

harassment or embarrassment, as well as undue public attention.  Accordingly, the FBI has

determined that these individuals maintain a substantial privacy interest in not having their

identities disclosed.  In making a determination whether to release the names and personal

information concerning these third parties, the public's interest in disclosure was balanced against

the individual's right to privacy.  The FBI determined that this information would not enlighten

the public on how the FBI conducts its internal operations and investigations.  Accordingly, the

FBI concluded that the disclosure of this information would constitute a "clearly unwarranted and

unwarranted invasion of their personal privacy."  The FBI properly withheld this information

pursuant to Exemptions (b)(6) and (b)(7)(C).

67.     Exemptions (b)(6) and (b)(7)(C) have been asserted to protect the names and identifying

information (investigation intelligence) of third parties who provided information to the FBI.

Disclosure of the identity of these third parties would have a detrimental effect on the current and

future cooperation of other individuals willing to provide information to the FBI inasmuch as

they would have little or no faith in the FBI's ability to maintain their information in confidence.

Thus, the names and any specific information provided by these third parties, which could

ultimately identify them, has been protected.

68.     The FBI examined the records at issue to determine whether there is any public interest

that outweighed the substantial privacy interests of the individuals who provided information to

the FBI referenced in the responsive records.  The FBI could not identify any discernible public

interest.  In particular, the FBI determined that disclosure of the names of these individuals

would shed no light on the internal operations and activities of the FBI.  Thus, the FBI

outweighed any public interest in disclosure, and that disclosure of the names and/or identifying information of these individuals would constitute a "clearly unwarranted and unwarranted invasion of personal privacy." The FBI properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C).

69.     Exemptions (b)(6) and (b)(7)(C) have been asserted to protect the names and identifying information of corporate officers in the communication industry that were merely mentioned in the documents responsive to plaintiff's request, or mentioned in possible connection to a future FBI investigation. These individuals are not of investigative interest to the FBI, but were identified in connection with a sensitive internal FBI development project (e.g., National Electronic Surveillance Strategy), or mentioned in possible connection to a future investigation. Release of this type of information about private citizens, without notarized authorizations permitting such a release violates individuals legitimate privacy interests. If the FBI disclosed their names and/or other personal information, the disclosure would reveal that these third parties were at one time connected with an FBI investigation, or internal developmental project, in some way. Disclosure of their identities could subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them.

70.     The FBI also examined the records at issue to determine whether there was any public interest that outweighed the substantial privacy interests of the corporate employees merely mentioned in the responsive records. The FBI could not identify any discernible public interest. In particular, the FBI could not determine how the disclosure of such names, and/or identifying information of these individuals would shed any light on the operations and activities of the FBI. Thus, the FBI determined that these individuals' privacy interests outweighed any public interest in disclosure, and that disclosure of the names and/or identifying information of the third parties merely mentioned would constitute a "clearly unwarranted and unwarranted invasion of personal

33

privacy." The FBI properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C).

71. Exemptions (b)(6), and (b)(7)(C), in conjunction with (b)(7)(D), and (b)(1), have also been asserted to withhold the names and identifying information of intelligence officers of a Foreign Intelligence Agency who provided tactical advice and intelligence concerning on-going investigations. The confidentiality of the identities of these foreign intelligence officers is given under an express assurance of confidentiality according to the Foreign Government Information Classification Guide #1 (G-1 Guide), issued in accordance with E.O. 13526, Information Security Oversight Office (ISOO), the FBI Security Policy Manual, and the designated Original Classification Authority (OCA) of the Executive Assistant Director, National Security Branch. During the course of the FBI's intelligence investigations it received information from intelligence officers of a foreign government regarding on-going investigations. The FBI has many agreements with foreign governments under which security and/or criminal law enforcement information is exchanged. The agreements specify the extent of confidentiality requested by the respective foreign government entity. In this case, the FBI has express confidentiality agreements with this foreign government and/or foreign law enforcement entity which provided information to the FBI during the conduct of intelligence investigations, to protect the identity of its intelligence officers. The FBI's agreements with this law enforcement entity provides express assurance that the FBI will not disclose their identity, the identity of their intelligence officers, as well as the information that they provided to the FBI. If the FBI were to disclose the identities of these foreign governments, the names of their intelligence officers, and the information provided by foreign law enforcement entities under an express assurance of confidentiality, such a disclosure would have a chilling effect on the FBI's relationship with these entities. Furthermore, the disclosure would have a chilling effect on the FBI's relationship with other foreign law enforcement agencies which have entered into similar agreements with the

FBI. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(6), and (b)(7)(C), in conjunction with (b)(7)(D), and (b)(1).

72.     In addition, Exemptions (b)(6) and (b)(7)(C) have been asserted to withhold the names and identifying information of local law and state law enforcement employees, such as employee's working with the Jefferson County Sheriff's Office Louisville, KY, National Sheriff's Association (NSA), San Jose Police Department, New York State Police, New Jersey State Police, San Bernardino Sherries Department, Las Vegas, Metro Police Department, International Association of Chefs of Police (IACP), Major Cities Chiefs (MCC), Fairfax County Police Department, Virginia, and DuPage County Sheriffs Office, Wheaton, IL. These employees were acting in their official capacity, and attended the Law Enforcement Executive Forum, June 25, 2009, to discuss state and local law enforcement challenges relating to lawful intercepts, and technological advancements in the communication industry that are out-pacing LE intercept capabilities. The rationale for protecting the identities of FBI SAs discussed in ¶¶58-59, supra, applies with equal force to the names of these local and state law enforcement employees. Release of the identity of these law enforcement employees could subject these individuals to unnecessary and unwelcome harassment, and inquires into LE challenges, which would constitute an unwarranted invasion of privacy. The FBI could identify no discernible public interest in the disclosure of this information because the disclosure of the names of local and state law enforcement employees would not shed light on the operations and activities of the FBI. Accordingly, the FBI concluded that the disclosure of this information would constitute a clearly unwarranted and an unwarranted invasion of their personal privacy. The FBI properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C).

## EXEMPTION (b)(7)(A) PENDING LAW ENFORCEMENT PROCEEDINGS

73.     5 U.S.C. § 552 (b)(7)(A) exempts from disclosure:

> records or information compiled for law enforcement purposes, but
> only to the extent that the production of such law enforcement
> records or information . . . could reasonably be expected to
> interfere with enforcement proceedings.

74.     Application of this exemption requires:  the existence of law enforcement records (discussed ¶¶51-54, supra); a pending or prospective law enforcement proceeding; and a determination that release of the information could reasonably be expected to interfere with the enforcement proceeding.  The nature of plaintiff's request resulted in the identification of a significant amount of information about, or related to, FBI criminal cases.  FBI routinely gathered, cited to, and summarized examples of surveillance difficulties or limitations derived from actual FBI cases for myriad purposes; including the formulation of policy, legislative proposals, changes to operational techniques, development of criminal intelligence, and training of law enforcement personnel.  Exemption (b)(7)(A), at times in conjunction with (b)(1), was uniformly applied to withhold information contained throughout the processing categories where pages either summarize, discuss, or relate to FBI criminal cases which remain in an open or active status.   The release of such information would reveal the scope, direction, nature and pace of the investigations as well as reveal information that could harm prospective and/or ongoing government prosecutions in these matters.  If the information is released, the individuals and/or entities, who are of investigative interest in the cases could use the information to develop alibis, take steps to circumvent the law, create factitious defenses or intimidate, harass or harm potential witnesses. The FBI properly withheld this information pursuant to Exemption (b)(7)(A).

## EXEMPTION (b)(7)(D) CONFIDENTIAL SOURCE INFORMATION

75.     5 U.S.C. § 552 (b)(7)(D) provides protection for:

> records or information compiled for law enforcement purposes, but
> only to the extent that the production of such law enforcement
> records or information ... could reasonably be expected to disclose
> the identity of a confidential source, included a State, local or

36

> foreign agency or authority or any private institution which
> furnished information on a confidential basis, and, in the case of a
> record or information compiled by a criminal law enforcement
> authority in the course of a criminal investigation or by an agency
> conducting a lawful national security intelligence investigation,
> information furnished by a confidential source.

76.   In this case, Exemption (b)(7)(D), at times in conjunction with (b)(1), has been asserted to withhold information provided to the FBI by commercial/private companies and other non-government entities under circumstances from which an assurance of confidentiality may be implied, and to protect the names and identifying information pertaining to a foreign government and/or foreign law enforcement entities which provided information to the FBI.

77.   During the course of the FBI's intelligence investigations, mentioned at times throughout the responsive documents, certain commercial/private companies provided information to the FBI relating to the subjects of these investigations.  To disclose the fact that these companies provided information to the FBI during the course of an investigation could harm the commercial interests of these enterprises by deterring the public from employing their services.  In addition, such a disclosure has wider implications.  If the FBI disclosed the identities of confidential sources that provide information to the FBI on a continuing basis, that revelation would have a chilling effect on the activities and cooperation of other current or potential future FBI confidential sources.

78.   Although these companies were under a legal obligation to provide information to the FBI in connection with ongoing investigations, an implied assurance of confidentiality was nevertheless critical to ensuring that these companies did not unnecessarily resist that obligation, thereby increasing the FBI's burden of obtaining important lawfully-available investigative material.  For instance, given that these companies would pay a high price if it were known that they were providing information about their customers to the FBI, it is likely that companies, though lacking grounds to do so, would nevertheless avail themselves of legal options to resist

cooperation if their confidentiality could not otherwise be assured. It is only with the understanding of complete confidentiality that full cooperation of such sources can be enlisted, and only through this confidence that these sources can be persuaded to continue to fully cooperate in providing valuable assistance in the future. Fairness dictates that when cooperation is compelled that every effort is made to protect the confidentiality of the source when severe economic consequences may result. The information pertaining to some of these on-going investigations is at times classified, and to provide more detail regarding these sources may reveal the very information that the FBI is attempting to protect. The FBI has released as much segregable information as possible without disclosing these sources' identities.

79.    In addition, as part of the FBI's Going Dark Initiative, also known as the National Electronic Surveillance Strategy, the FBI worked to enhance its lawful intercept cooperation between the communications industry and LEA's with a "One Voice" approach. The FBI's goal was to establish a relationship and commitment for ongoing cooperation on legal and technical discussions in anticipation of future investigation requirements for the use of lawful intercepts. Technical advancements in the wireless communications industry are developing faster than law enforcement can develop lawful technical intercept solutions. Legal issues concerning the communications industry compliance requirements to CALEA, and Foreign Intelligence Surveillance Act ("FISA") orders, have led to the need to amend, or offer new legislation, in order to make this compliance easier. The discussion of these issues, and shortfalls encountered in the collection, retention, and use of the intelligence data provided by Internet Service Provider's ("ISP's") in response to FISA orders must require confidentiality. The FBI has properly withheld this information pursuant to Exemption (b)(7)(D), at times in conjunction with (b)(1).

80.    In addition, Exemption (b)(7)(D), at times in conjunction with (b)(1), has been asserted to withhold information provided to the FBI by a foreign government and/or foreign law

enforcement entity under an express assurance of confidentiality according to the Foreign Government Information Classification Guide #1 (G-1 Guide), issued in accordance with E.O. 13526, Information Security Oversight Office (ISOO), the FBI Security Policy Manual, and the designated Original Classification Authority (OCA) of the Executive Assistant Director, National Security Branch. During the course of the FBI's intelligence investigations it received information from a foreign government regarding on-going investigations. The FBI has many agreements with foreign governments under which security and/or criminal law enforcement information is exchanged. The agreements specify the extent of confidentiality requested by the respective foreign government entity. In some circumstances, a foreign government or entity may request confidentiality for its identity and information provided, while in other circumstances, a foreign government or entity might request classification for both its identity and information provided, and yet a third foreign government or entity may request that its information be protected while it does not object to the disclosure of its relationship and interaction with the FBI.

81.     In this case, the FBI has express confidentiality agreements with these foreign governments and/or foreign law enforcement entities which provided information to the FBI during the conduct of intelligence investigations. The FBI's agreements with these law enforcement entities provides express assurance that the FBI will not disclose their identities, as well as the information that they provided to the FBI. If the FBI were to disclose the identities and the information provided by these foreign law enforcement entities under an express assurance of confidentiality, such a disclosure would have a chilling effect on the FBI's relationship with these entities. Furthermore, the disclosure would have a chilling effect on the FBI's relationship with other foreign law enforcement agencies which have entered into similar agreements with the FBI. The FBI has properly withheld this information pursuant to Exemption (b)(7)(D), at times in conjunction with (b)(1).

39

## EXEMPTION (b)(7)(E) INVESTIGATIVE TECHNIQUES AND PROCEDURES

82.   5 U.S.C. § 552 (b)(7)(E) provides for the withholding of:

        law enforcement records which would disclose techniques and
        procedures for law enforcement investigations or prosecutions,
        or would disclose guidelines for law enforcement investigations
        or prosecutions if such disclosure could reasonably be expected
        to risk circumvention of the law.

83.   Given the nature of both request, it is not surprising that Exemption 7E applies in full or in part to 1,650 responsive Bates pages of the over-all 2,662 pages as indicated in the attached *Cardozo and Lynch Indices*. Specifically, plaintiffs' requests seek information concerning the law enforcement technique(s) of electronic or communications surveillance focused on problems which hamper FBI's ability to successfully intercept communications systems and networks. The material details possible operational, legal, and procedural changes to the use, or enhancement of, investigative techniques that would the ensure ELSUR capabilities are effective and productive. As such, the responsive pages are replete with detailed information regarding the employment of specific surveillance techniques, the procedures employed by FBI, DOJ, and other law enforcement agencies for the conduct of such surveillance; the difficulties, vulnerabilities, and /or limitations of conducting such surveillance in technical and specific carrier/service-provider contexts; and the exploitation of such vulnerabilities or limitations by criminal and terrorists elements, and child pornography predators. The responsive pages also include guidance on how to conduct investigations of communications systems or networks to work around intercept difficulties and/or how to employ countermeasures to intercept evasion practices employed by criminal and terrorist elements, and child pornography predators.

84.   Accordingly, the release of this detailed information about surveillance techniques and associated problems or vulnerabilities would provide violators a road map for successful law enforcement circumvention. Criminal and terrorist elements would gain valuable insight about

the conduct of law enforcement surveillance operations and the exploitation of capability weaknesses that would enable them to structure their criminal enterprise and terrorist formulating communications in a manner to evade lawful intercept and/or thwart investigative efforts. This harm justification applies to all 7E designated information herein which is supplemented where necessary in the below category-by-category section. The FBI has properly withheld this information pursuant to Exemption (b)(7)(E).

## EXPLANATION OF WITHHELD MATERIAL FOR EACH DOCUMENT CATEGORY GROUPING

## CATEGORY 1A - OFFICE OF PUBLIC AFFAIRS RESPONSE (CARDOZO)

85.     Category 1A contains 66 responsive pages, consisting of internal e-mail chains between FBI divisions in response to a request from a media outlet for a definition of "Going Dark." Of these 66 pages, 65 have been released in part and 1 has been released in full. The FBI's Office of Technology Division (OTD) went on record as defining "Going Dark" as the program name given to the FBI's efforts to utilize innovative technology; foster cooperation with industry; and assist our state, local, and tribal law enforcement partners in a collaborative effort to close the growing gap between lawful interception requirements and our capabilities. The term applies to the research and development of new tools, technical support and training initiatives.

86.     Exemption (b)(2). At times in conjunction with (b)(6), and (b)(7)(C), Exemption (b)(2) has been asserted in Category 1A documents to protect internal, non-public telephone numbers associated with particular FBI personnel. These internal, non-public telephone numbers are used by FBI personnel while they are working on significant national security and criminal investigations. Disclosure of these internal, non-public telephone numbers could subject these individuals to harassing telephone calls, which could disrupt official business (including impeding the ability of Special Agents to conduct and conclude functions related to the law enforcement investigations in a timely manner). With the narrowing of the application of

Exemption (b)(2) to those records which relate to employee relations and human resource issues, the FBI has determined that, in those instances where Exemption (b)(2) has been asserted in conjunction with Exemption (b)(7)(E), the use of Exemption (b)(2) is now withdrawn. Accordingly, because disclosure of these internal, non-public telephone numbers could impede the FBI's effectiveness and may risk circumvention of the law, the FBI has properly withheld this information pursuant to Exemption (b)(2), at times in conjunction with (b)(6) and (b)(7)(C).

87.    Exemption (b)(5). Exemption (b)(5) has been asserted in Category 1A documents to protect the deliberative process privilege. The deliberative process privilege protects the internal deliberations of an agency by exempting from release recommendations, drafts, analyses, speculation and other non-factual information prepared in anticipation of agency decision-making. The general purpose of the deliberative process privilege is to prevent injury to the quality of agency decisions. Thus, material that contains or was prepared in connection with the formulation of opinions, advice, evaluations, deliberations, policy formulation, proposals, conclusions or recommendations may properly be withheld. If agency personnel knew that their preliminary opinions, evaluations and comments would be released for public consumption, they might be more circumspect in what they put in writing, and thereby, impede a candid discussion of the issues surrounding a decision. The protected material involved a back-and-forth discussion about how to respond to a media outlet for a definition of "Going Dark." Because disclosure of these deliberative, pre-decisional discussions would have an inhibiting effect upon the development of policy and the administrative direction of the FBI, the FBI has properly withheld this information pursuant to Exemption (b)(5).

88.    Exemptions (b)(6) and (b)(7)(C). At times in conjunction with (b)(2), Exemptions (b)(6) and (b)(7)(C) have been asserted in Category 1A documents to protect the names, and identifying information of FBI Special Agents (SAs) who were responsible for conducting, supervising,

42

and/or maintaining the investigative activities reported in these records, or who were consulted on sensitive internal FBI strategic developmental projects (e.g., National Electronic Surveillance Strategy). The SAs mentioned did not choose their assignments. The publicity associated with the release of these SAs' identities, in connection with a particular investigation, or internal developmental project, could trigger hostility toward a particular employee, or pressure of attempted bribery, to obtain intelligence. Publicity, adverse or otherwise, regarding any particular investigation conducted by SAs may seriously impair the SAs effectiveness in conducting future investigations, or consultations. This privacy consideration also protects SAs from unnecessary, unofficial questioning as to the conduct of an investigation, or internal developmental project, whether or not they are currently employed by the FBI. The names of FBI Professional Support personnel are also withheld in Category 1A documents pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2). Professional Support personnel are assigned to handle tasks related to official criminal investigations, and/or internal developmental projects (e.g., National Electronic Surveillance Strategy), as reflected in the documents responsive to plaintiff's request. They were, and possibly are, in positions of access to information regarding official law enforcement investigations, and special internal developmental projects, and therefore could become targets of harassing inquiries for unauthorized access to investigations, or internal developmental projects, if their identities were released, similar to those harms articulated previously for SAs. These Professional Support personnel maintain substantial privacy interests in not having their identities disclosed. Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).

89.     Exemptions (b)(6) and (b)(7)(C). At times Exemptions (b)(6), and (b)(7)(C) have also been asserted in Category 1A documents to protect the names and identifying information of third parties that were merely mentioned in the documents responsive to plaintiff's request.

43

These individuals are not of investigative interest to the FBI. Release of this type of information about private citizens, without notarized authorizations permitting such a release violates individuals legitimate privacy interests. If the FBI disclosed their names and/or other personal information, the disclosure would reveal that these third parties were at one time connected with an FBI investigation, or FBI internal strategic developmental project (e.g., National Electronic Surveillance Strategy), in some way. Disclosure of their identities could subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them. Thus, the FBI determined that these individuals' privacy interests outweighed any public interest in disclosure, and that disclosure of the names and/or identifying information of the third parties merely mentioned would constitute a "clearly unwarranted and unwarranted invasion of personal privacy." Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C).

90.     Exemption (b)(7)(E). Exemption (b)(7)(E) has been asserted in Category 1A documents to protect law enforcement records that would disclose techniques and procedures for law enforcement investigations or prosecutions, and that would disclose guidelines for law enforcement investigations and prosecutions. Plaintiff's requests seeks information concerning the law enforcement technique(s) of electronic or communications surveillance focused on problems which hamper FBI's ability to successfully intercept communications systems and networks, and details on preventing the FBI from "Going Dark." The responsive material details difficulties encountered by law enforcement in conducting electronic surveillance and discusses possible operational, legal, and procedural changes to the use, or enhancement of, investigative techniques that would ensure ELSUR capabilities are effective and productive. Accordingly, the release of this detailed information about surveillance techniques and associated problems or vulnerabilities would provide violators a road map for successful law enforcement circumvention. Criminal and terrorist elements would gain valuable insight about the conduct of

law enforcement surveillance operations and the exploitation of capability weaknesses that would enable them to structure their criminal enterprise and terrorist formulating communications in a manner to evade lawful intercept and/or thwart investigative efforts.  Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(E).

## CATEGORY 1B - FBI OFFICE OF CONGRESSIONAL AFFAIRS (OCA) RESPONSE (CARDOZO)

91.     Category 1B contains 179 responsive Bates pages consisting of internal deliberative e-mail chains w/attachments, talking points, and discussion papers concerning the FBI's strategic policy development process relating to surveillance challenges posed by emerging technologies. This material also includes assessments and opinions concerning surveillance challenges faced by the FBI and the law enforcement community, as well as various recommendations, proposals, and advice on multi-point strategies or actions FBI should, or could, adopt, pursue, or consider in order to resolve these challenges.  The material includes internal discussions between FBI and DOJ on proposals to change policy, legislation, resources, and FBI operational techniques/procedures as well as detailed identification, analysis, and discussion of technical, legal, policy, and resource impediments to FBI electronic intercept operations.  Some of the material is edited "redline" versions of proposed legislation, and internal discussion of proposals for amending CALEA to enhance ELSUR capabilities.  A few pages of the material contain summary briefings prepared by OCA staff members after meetings with Congressman, Senators, and/or congressional staffers concerning budget discussions and sharing updates on topics such as "Going Dark Initiative."  Of these 179 Bates pages, 141 pages have been withheld in full, 23 pages released in part, and 15 released in full.

92.     Exemption (b)(2).  At times in conjunction with (b)(6), and (b)(7)(C), Exemption (b)(2) has been asserted in Category 1B documents to protect internal, non-public telephone numbers associated with particular FBI personnel.  These internal, non-public telephone numbers are used

by FBI personnel while they are working on significant national security and criminal investigations. Disclosure of these internal, non-public telephone numbers could subject these individuals to harassing telephone calls, which could disrupt official business (including impeding the ability of Special Agents to conduct and conclude functions related to the law enforcement investigations in a timely manner). With the narrowing of the application of Exemption (b)(2) to those records which relate to employee relations and human resource issues, the FBI has determined that, in those instances where Exemption (b)(2) has been asserted in conjunction with Exemption (b)(7)(E), the use of Exemption (b)(2) is now withdrawn. Accordingly, because disclosure of these internal, non-public telephone numbers could impede the FBI's effectiveness and may risk circumvention of the law, the FBI has properly withheld this information pursuant to Exemption (b)(2), at times in conjunction with (b)(6) and (b)(7)(C).

93.     Exemption (b)(5). Exemption (b)(5) has been asserted in 143 of the 179 Category 1B documents to protect the deliberative process privilege. The deliberative process privilege protects the internal deliberations of an agency by exempting from release recommendations, drafts, analyses, speculation and other non-factual information prepared in anticipation of agency decision-making. The general purpose of the deliberative process privilege is to prevent injury to the quality of agency decisions. The protected material contained draft deliberative talking points and discussion papers, and internal e-mail chains w/attachments, concerning the FBI's development of a strategic policy relating to surveillance challenges posed by emerging technologies. This material also includes assessments and opinions concerning surveillance challenges faced by the FBI and the law enforcement community, as well as various recommendations, proposals, and advice on multi-point strategies or actions FBI should, or could, adopt, pursue, or consider in order to resolve these challenges.

94.     The material includes internal discussions between FBI and DOJ on proposals to change

policy, legislation, resources, and FBI operational techniques/procedures as well as detailed

identification, analysis, and discussion of technical, legal, policy, and resource impediments to

FBI electronic intercept operations.  Thus, material that contains or was prepared in connection

with the formulation of opinions, advice, evaluations, deliberations, policy formulation,

proposals, conclusions or recommendations may properly be withheld.  Release of this type of

information would have an inhibitive effect upon the development of policy and administrative

direction of an agency because it would chill the full and frank discussion between agency

personnel regarding a decision.  If agency personnel knew that their preliminary opinions,

evaluations and comments would be released for public consumption, they might be more

circumspect in what they put in writing, and thereby, impede a candid discussion of the issues

surrounding a decision. Accordingly, the FBI has properly withheld this information pursuant to

Exemption (b)(5).

95.     Exemptions (b)(6) and (b)(7)(C).  At times in conjunction with (b)(2), Exemptions

(b)(6), and (b)(7)(C) have been asserted in Category 1B documents to protect the names, and

identifying information of FBI Special Agents (SAs) who were responsible for conducting,

supervising, and/or maintaining the investigative activities reported in these records, or who were

consulted on sensitive internal FBI strategic developmental projects (e.g., National Electronic

Surveillance Strategy).  The SAs mentioned did not choose their assignments.  The publicity

associated with the release of these SAs' identities, in connection with a particular investigation,

or internal developmental project, could trigger hostility toward a particular employee, or

pressure of attempted bribery, to obtain intelligence.  Publicity, adverse or otherwise, regarding

any particular investigation conducted by SAs may seriously impair the SAs effectiveness in

conducting future investigations, or consultations.  This privacy consideration also protects SAs

from unnecessary, unofficial questioning as to the conduct of an investigation, or internal

developmental project, whether or not they are currently employed by the FBI.   The names, and

identifying information of FBI Professional Support personnel are also withheld in Category 1B

documents pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).

Professional Support personnel are assigned to handle tasks related to official criminal

investigations, and/or internal developmental projects (e.g., National Electronic Surveillance

Strategy), as reflected in the documents responsive to Plaintiff's request.  They were, and

possibly are, in positions of access to information regarding official law enforcement

investigations, and special developmental projects, and therefore could become targets of

harassing inquiries for unauthorized access to investigations, or developmental projects, if their

identities were released, similar to those harms articulated previously for SAs.  These

Professional Support personnel maintain substantial privacy interests in not having their

identities disclosed.  Accordingly, the FBI has properly withheld this information pursuant to

Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).

96.     Exemptions (b)(6) and (b)(7)(C).  At times Exemption (b)(6), and (b)(7)(C) have been

asserted in Category 1B documents to protect the names of Congressional staff members.

Summary briefings prepared by OCA staff members after meetings with Congressman, Senators,

and/or their congressional staff representative, list congressional staffers that were involved with

discussions concerning FBI budget requests and the sharing of information on topics such as

"Going Dark Initiative." Publicity (adverse or otherwise) regarding any internal FBI strategic

developmental projects (e.g., National Electronic Surveillance Strategy) that these congressional

staffers may be requested to provide input on, may seriously prejudice their effectiveness in

helping on other developmental projects.  The privacy consideration is also to protect these

federal employees as individuals, from unnecessary, unofficial questioning as to the course, and

their knowledge, of national security developmental projects, whether or not they are currently

employed by the Congress.  These employees may have to give input on the development of

48

strategic plans, like developing ways to enhance ELSUR capabilities through legislative amendments. They come into contact with all strata of society. The publicity associated with the release of these congressional staffers involved with an internal FBI strategic developmental project, could trigger hostility toward a particular employee to obtain intelligence. There is no public interest to be served by disclosing the identities of these employees, and/or contractors, to the public. Thus, disclosure of this information would constitute a "clearly unwarranted and unwarranted invasion of their personal privacy." Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C).

97.     Exemption (b)(7)(E). Exemption (b)(7)(E) has been asserted in Category 1B documents to protect law enforcement records that would disclose techniques and procedures for law enforcement investigations or prosecutions, and that would disclose guidelines for law enforcement investigations and prosecutions. Plaintiff's requests seeks information concerning the law enforcement technique(s) of electronic or communications surveillance focused on problems which hamper FBI's ability to successfully intercept communications systems and networks, and details on preventing the FBI from "Going Dark." The responsive material details difficulties encountered by law enforcement in conducting electronic surveillance and discusses possible operational, legal, and procedural changes to the use, or enhancement of, investigative techniques that would ensure ELSUR capabilities are effective and productive. Accordingly, the release of this detailed information about surveillance techniques and associated problems or vulnerabilities would provide violators a road map for successful law enforcement circumvention. Criminal and terrorist elements would gain valuable insight about the conduct of law enforcement surveillance operations and the exploitation of capability weaknesses that would enable them to structure their criminal enterprise and terrorist formulating communications in a manner to evade lawful intercept and/or thwart investigative efforts. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(E).

49

**CATEGORY 1C - FBI OPERATIONAL TECHNOLOGY DIVISION (OTD) RESPONSE, SECTIONS 1 AND 3 (CARDOZO)**

98.    Category 1C contains 229 responsive Bates pages consisting of mostly internal FBI e-mail chains w/attachments, and a few FBI talking points/discussion papers related to defining "Going Dark" and the need to preserve lawful intercept capabilities.  These e-mails chains w/attachments discuss the background development of various talking points, discussion papers, and slide presentations on the FBI's Science and Technology Branch's "Going Dark Initiative" (also referred to as the National Electronic Surveillance Strategy) to highlight to various internal and external audiences the surveillance challenges faced by the FBI and the Law Enforcement community.  In addition, the e-mail participant's were tasked to search for a variety of recommendations, proposals, and advice on multi-point strategies, or actions FBI should, or could, adopt, pursue, or consider to resolve such challenges.  Of these 229 Bates pages, 227 pages released in part, and 2 released in full.

99.    Exemption (b)(2).  At times in conjunction with (b)(6), and (b)(7)(C), Exemption (b)(2) has been asserted in Category 1C documents to protect internal, non-public telephone numbers associated with particular FBI personnel.  These internal, non-public telephone numbers are used by FBI personnel while they are working on significant national security and criminal investigations.  Disclosure of these internal, non-public telephone numbers could subject these individuals to harassing telephone calls, which could disrupt official business (including impeding the ability of Special Agents to conduct and conclude functions related to the law enforcement investigations in a timely manner).  With the narrowing of the application of Exemption (b)(2) to those records which relate to employee relations and human resource issues, the FBI has determined that, in those instances where Exemption (b)(2) has been asserted in conjunction with Exemption (b)(7)(E), the use of Exemption (b)(2) is now withdrawn.  Accordingly, because disclosure of these internal, non-public telephone numbers could impede the FBI's effectiveness and may risk circumvention of the law, the FBI has properly withheld this

50

information pursuant to Exemption (b)(2), at times in conjunction with (b)(6) and (b)(7)(C).

100.  Exemptions (b)(6) and (b)(7)(C).  At times in conjunction with (b)(2), Exemptions (b)(6), and (b)(7)(C) have been asserted in Category 1C documents to protect the names and identifying information of FBI Special Agents (SAs) who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in these records, or who were consulted on sensitive internal FBI strategic developmental projects (e.g., National Electronic Surveillance Strategy). The SAs mentioned did not choose their assignments. The publicity associated with the release of these SAs' identities, in connection with a particular investigation, or internal developmental project, could trigger hostility toward a particular employee, or pressure of attempted bribery, to obtain intelligence. Publicity, adverse or otherwise, regarding any particular investigation conducted by SAs may seriously impair the SAs effectiveness in conducting future investigations, or consultations. This privacy consideration also protects SAs from unnecessary, unofficial questioning as to the conduct of an investigation, or internal developmental project, whether or not they are currently employed by the FBI.  The names of FBI Professional Support personnel are also withheld in Category 1C documents pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2). Professional Support personnel are assigned to handle tasks related to official criminal investigations, and/or internal developmental projects (e.g., National Electronic Surveillance Strategy), as reflected in the documents responsive to Plaintiff's request. They were, and possibly are, in positions of access to information regarding official law enforcement investigations, and special internal strategic developmental projects, and therefore could become targets of harassing inquiries for unauthorized access to investigations, or internal developmental projects, if their identities were released, similar to those harms articulated previously for SAs. These Professional Support personnel maintain substantial privacy interests in not having their identities disclosed. Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6) and

51

(b)(7)(C), at times in conjunction with (b)(2).

101.    Exemptions (b)(6)and (b)(7)(C).  At times Exemptions (b)(6), and (b)(7)(C) have also been asserted in Category 1C documents to protect the names of personnel from the Department of Justice (DOJ), Assistant United States Attorneys (AUSA), and contractors working for the FBI.  Publicity (adverse or otherwise) regarding any particular investigation they have been assigned, or internal FBI developmental project (e.g., National Electronic Surveillance Strategy) they may be contracted to help develop, may seriously prejudice their effectiveness in conducting other investigations, or developmental projects.  The privacy consideration is also to protect these federal employees, and/or contractors, as individuals, from unnecessary, unofficial questioning as to the course of an investigation or internal developmental project, whether or not they are currently employed by the FBI as contractors, or with Other Government Agencies (OGA's).  These employees may have to conduct official inquiries into violations of National Security, or help develop strategic plans, like developing ways to enhance ELSUR capabilities.  They come into contact with all strata of society, conducing searches, research, and making inquiries, all of which result in reasonable but nonetheless serious disturbances to people and their lives.  It is possible for an individual targeted by these OGA's to carry a grudge which may last for years, and to seek revenge on the investigators and other federal employees involved in a particular investigation.  Foreign governments, or criminal enterprises may threaten FBI contractors searching for intelligence that may benefit their countries or criminal enterprises.  The publicity associated with the release of these OGA employee's, and/or contractors identities, in connection with a particular investigation, or developmental project, could trigger hostility toward a particular employee, or future threat to obtain intelligence.  There is no public interest to be served by disclosing the identities of these employees, and/or contractors, to the public.  Thus, disclosure of this information would constitute a "clearly unwarranted and unwarranted invasion of their personal privacy."  Accordingly, the FBI has properly withheld this information pursuant

52

1

2 to Exemptions (b)(6) and (b)(7)(C).

3

4 102. Exemptions (b)(6) and (b)(7)(C). In addition, at times Exemption (b)(6), and (b)(7)(C)

5 have been asserted in Category 1C documents to protect the names and/or identifying

6 information of third-party individuals who were of investigative interest to the FBI and/or other

7 law enforcement agencies. Identifying information withheld concerning these third parties

8 includes addresses, dates of birth, social security numbers, and other personal information. Any

9 link to a law enforcement investigation carries a strong negative connotation and a stigma.

10 Release of the identities of these individuals to the public could subject them to harassment or

11 embarrassment, as well as undue public attention. The FBI has determined that these individuals

12 maintain a substantial privacy interest in not having their identities disclosed. In making a

13 determination whether to release the names and personal information concerning these third

14 parties, the public's interest in disclosure was balanced against the individual's right to privacy.

15 The FBI determined that this information would not enlighten the public on how the FBI

16 conducts its internal operations and investigations. Accordingly, the FBI concluded that the

17 disclosure of this information would constitute a "clearly unwarranted and unwarranted invasion

18 of their personal privacy," and has properly withheld this information pursuant to Exemptions

19 (b)(6) and (b)(7)(C).

20 103. Exemption (b)(7)(D). At times in conjunction with (b)(1), Exemption (b)(7)(D) has been

21 asserted in Category 1C documents to withhold information provided to the FBI by

22 commercial/private companies and other non-government entities under circumstances from

23 which an assurance of confidentiality may be implied. During the course of the FBI's

24 intelligence investigations, certain commercial/private companies provided information to the

25 FBI relating to the subjects of these investigations. To disclose the fact that these companies

26 provided information to the FBI during the course of an investigation could harm the commercial

27

28                                        53

1

2   interests of these enterprises by deterring the public from employing their services. In addition,

3   such a disclosure has wider implications. If the FBI disclosed the identities of confidential

4   sources that provide information to the FBI on a continuing basis, that revelation would have a

5   chilling effect on the activities and cooperation of other current or potential future FBI

6   confidential sources. Accordingly, the FBI has properly withheld this information pursuant to

7   Exemption (b)(7)(D), at times in conjunction with (b)(1).

8

9   104.   Exemption (b)(7)(E).   Exemption (b)(7)(E) has been asserted in Category 1C documents

10   to protect law enforcement records that would disclose techniques and procedures for law

11   enforcement investigations or prosecutions, and that would disclose guidelines for law

12   enforcement investigations or prosecutions. Plaintiff's requests seeks information concerning the

13   law enforcement technique(s) of electronic or communications surveillance focused on problems

14   which hamper FBI's ability to successfully intercept communications systems and networks, and

15   details on preventing the FBI from "Going Dark." The responsive material details difficulties

16   encountered by law enforcement in conducting electronic surveillance and discusses possible

17   operational, legal, and procedural changes to the use, or enhancement of, investigative techniques

18   that would ensure ELSUR capabilities are effective and productive. Accordingly, the release of

19   this detailed information about surveillance techniques and associated problems or vulnerabilities

20   would provide violators a road map for successful law enforcement circumvention. Criminal and

21   terrorist elements would gain valuable insight about the conduct of law enforcement surveillance

22   operations and the exploitation of capability weaknesses that would enable them to structure their

23   criminal enterprise and terrorist formulating communications in a manner to evade lawful

24   intercept and/or thwart investigative efforts. Accordingly, the FBI has properly withheld this

25   information pursuant to Exemption (b)(7)(E).

26   **CATEGORY 1D - FBI OFFICE OF GENERAL COUNSEL (OGC) RESPONSE**

27   **(CARDOZO)**

28                                              54

105.    Category 1D contains 183 responsive Bates pages consisting of internal e-mail chains between FBI personnel, and the FBI OGC staff, forwarding talking points and discussion papers asking for legal review and consultation related to finalizing the National Lawful Intercept Strategy Whitepaper (also known as "Going Dark Initiative "). The material also contained deliberative talking points and discussion papers related to the FBI's strategic policy development process concerning surveillance challenges posed by emerging technologies, and to prepare FBI leadership and personnel for internal strategy meetings and/or guide discussion of FBI participants in the consideration/formulation of strategies or initiatives to address emerging technology issues. These pages include assessments and opinions related to the surveillance challenges faced by the FBI and the law enforcement community as well as various recommendations, proposals, and advice on multi-point strategies or actions FBI should, or could, adopt, pursue, or consider in order to resolve these challenges. The material includes internal discussions between FBI and DOJ on proposals to change policy, legislation, resources, and FBI operational techniques/procedures as well as detailed identification, analysis, and discussion of technical, legal, policy, and resource impediments to FBI electronic intercept operations. Of these 183 Bates pages, 87 pages were withheld in full, 85 pages released in part, and 11 released in full.

106.    Exemption (b)(2). At times in conjunction with (b)(6), and (b)(7)(C), Exemption (b)(2) has been asserted in Category 1D documents to protect internal, non-public telephone numbers of FBI personnel. These internal, non-public telephone numbers are used by FBI personnel while they are working on significant national security and criminal investigations. Disclosure of these internal, non-public telephone numbers could subject these individuals to harassing telephone calls, which could disrupt official business (including impeding the ability of Special Agents to conduct and conclude functions related to the law enforcement investigations in a timely manner). With the narrowing of the application of Exemption (b)(2) to those records which

relate to employee relations and human resource issues, the FBI has determined that, in those

instances where Exemption (b)(2) has been asserted in conjunction with Exemption (b)(7)(E), the

use of Exemption (b)(2) is now withdrawn. Accordingly, because disclosure of these internal,

non-public telephone numbers could impede the FBI's effectiveness and may risk circumvention

of the law, the FBI has properly withheld this information pursuant to Exemption (b)(2), at times

in conjunction with (b)(6) and (b)(7)(C).

107.    Exemption (b)(5). Exemption (b)(5) has been asserted in 148 of the 183 Category 1D

documents to protect the deliberative process privilege. The deliberative process privilege

protects the internal deliberations of an agency by exempting from release recommendations,

drafts, analyses, speculation and other non-factual information prepared in anticipation of agency

decision-making. The general purpose of the deliberative process privilege is to prevent injury to

the quality of agency decisions. The protected material contained draft deliberative talking

points and discussion papers related to the FBI's strategic policy development process

concerning surveillance challenges posed by emerging technologies, and were being developed to

help prepare FBI leadership and personnel for internal strategy meetings and/or guide discussion

of FBI participants in the consideration/formulation of strategies or initiatives to address

emerging technology issues. The material also included internal discussions between FBI and

DOJ on proposals to change policy, legislation, resources, and FBI operational

techniques/procedures as well as detailed identification, analysis, and discussion of technical,

legal, policy, and resource impediments to FBI electronic intercept operations.

108.    These pages also include assessments and opinions related to the surveillance challenges

faced by the FBI and the law enforcement community as well as various recommendations,

proposals, and advice on multi-point strategies or actions FBI should, or could, adopt, pursue, or

consider in order to resolve these challenges. Thus, material that contains or was prepared in

connection with the formulation of opinions, advice, evaluations, deliberations, policy

formulation, proposals, conclusions or recommendations may properly be withheld. Release of this type of information would have an inhibitive effect upon the development of policy and administrative direction of an agency because it would chill the full and frank discussion between agency personnel regarding a decision. If agency personnel knew that their preliminary opinions, evaluations and comments would be released for public consumption, they might be more circumspect in what they put in writing, and thereby, impede a candid discussion of the issues surrounding a decision. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(5).

109.    Exemptions (b)(6) and (b)(7)(C). At times in conjunction with (b)(2), Exemptions (b)(6), and (b)(7)(C) have been asserted in Category 1D documents to protect the names and identifying information of FBI Special Agents (SAs) who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in these records, or who were consulted on sensitive internal FBI strategic developmental projects (e.g., National Electronic Surveillance Strategy). The SAs mentioned did not choose their assignments. The publicity associated with the release of these SAs' identities, in connection with a particular investigation, or internal developmental project, could trigger hostility toward a particular employee, or pressure of attempted bribery, to obtain intelligence. Publicity, adverse or otherwise, regarding any particular investigation conducted by SAs may seriously impair the SAs effectiveness in conducting future investigations, or consultations. This privacy consideration also protects SAs from unnecessary, unofficial questioning as to the conduct of an investigation, or internal developmental project, whether or not they are currently employed by the FBI. The names of FBI Professional Support personnel are also withheld in Category 1C documents pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2). Professional Support personnel are assigned to handle tasks related to official criminal investigations, and/or internal developmental projects, as reflected in the documents responsive to Plaintiff's request. They

were, and possibly are, in positions of access to information regarding official law enforcement investigations, and special internal strategic developmental projects (e.g., National Electronic Surveillance Strategy), and therefore could become targets of harassing inquiries for unauthorized access to investigations, or developmental projects, if their identities were released, similar to those harms articulated previously for SAs. These Professional Support personnel maintain substantial privacy interests in not having their identities disclosed. Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).

110.    <u>Exemptions (b)(6) and (b)(7)(C)</u>. At times Exemptions (b)(6), and (b)(7)(C) have also been asserted in Category 1D documents to protect the names of budgetary personnel from the Department of Justice (DOJ). Publicity (adverse or otherwise) regarding any particular investigation they have been assigned, or internal FBI developmental project (e.g., National Electronic Surveillance Strategy) they may be instructed to help develop legal and budgetary advice on, may seriously prejudice their effectiveness in conducting other investigations, or internal FBI developmental projects. The privacy consideration is also to protect these federal employees, as individuals, from unnecessary, unofficial questioning as to the course of an investigation or internal developmental project, whether or not they are currently with another government agency. The publicity associated with the release of these OGA employee's, in connection with a particular investigation, or internal developmental project they are advising on, could trigger hostility toward a particular employee, or future threat to obtain intelligence. There is no public interest to be served by disclosing the identities of these employees to the public. Thus, disclosure of this information would constitute a "clearly unwarranted and unwarranted invasion of their personal privacy." Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6), and (b)(7)(C).

111.    <u>Exemption (b)(7)(E)</u>. Exemption (b)(7)(E) has been asserted in Category 1D documents

58

to protect law enforcement records which that disclose techniques and procedures for law enforcement investigations or prosecutions, and that would disclose guidelines for law enforcement investigations or prosecutions. Plaintiff's requests seeks information concerning the law enforcement technique(s) of electronic or communications surveillance focused on problems which hamper FBI's ability to successfully intercept communications systems and networks, and details on preventing the FBI from "Going Dark." The responsive material details difficulties encountered by law enforcement in conducting electronic surveillance and discusses possible operational, legal, and procedural changes to the use, or enhancement of, investigative techniques that would ensure ELSUR capabilities are effective and productive. Accordingly, the release of this detailed information about surveillance techniques and associated problems or vulnerabilities would provide violators a road map for successful law enforcement circumvention. Criminal and terrorist elements would gain valuable insight about the conduct of law enforcement surveillance operations and the exploitation of capability weaknesses that would enable them to structure their criminal enterprise and terrorist formulating communications in a manner to evade lawful intercept and/or thwart investigative efforts. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(E).

## CATEGORY 1E - FBI OPERATIONAL TECHNOLOGY DIVISION (OTD) RESPONSE, SECTION 2 (CARDOZO)

112.    Category 1E contains 296 responsive Bates pages consisting of internal e-mail chains w/attachments between FBI personnel, and deliberative talking points and discussion papers concerning the FBI's strategic policy development process relating to surveillance challenges posed by emerging technologies, monthly OTD accomplishment reports, status reports on the 'Going Dark Initiative,' and contractual paperwork with an external contractor. The deliberative talking points and discussion papers related to the FBI's strategic policy development process concerning surveillance challenges posed by emerging technologies. These pages include

1

2   background development of talking points, discussion papers and slide presentations on the FBI's

3   Science and Technology Branch's "Going Dark Initiative" (also known as the National

4   Electronic Surveillance Strategy) to highlight to various internal and external audiences the

5   surveillance challenges faced by the FBI and the law enforcement community, as well as various

6   recommendations, proposals, and advice on multi-point strategies, or actions FBI should, or

7   could, adopt, pursue, or consider to resolve such challenges.  The material includes internal

8   discussions between FBI and DOJ on proposals to change policy, legislation, resources, and FBI

9   operational techniques/procedures as well as detailed identification, analysis, and discussion of

10  technical, legal, policy, and resource impediments to FBI electronic intercept operations.  Of

11  these 296 Bates pages, 250 pages have been withheld in full, 40 pages released in part, and 6

12  pages released in full.

13  113.    Exemption (b)(1).  At times Exemption (b)(1) has been asserted in Category 1E

14  documents to withhold information that is properly classified.  The information withheld (b)(1) is

15  currently and properly classified under E.O. 13256 at the Secret level and is exempt from

16  disclosure pursuant to E.O. 13526, § 1.4, category (c) intelligence activities (including covert

17  action), intelligence sources or methods, and category (d) foreign relations, or foreign activities

18  of the United States, including confidential sources, as the unauthorized disclosure of this

19  information could reasonably be expected to cause serious damage to the national security of the

20  United States.

21  114.    The information withheld in Category 1E documents, pursuant to Exemption (b)(1),

22  consists of classified procedures and methods of intelligence-gathering utilized by the FBI to

23  gather intelligence information.  An intelligence activity or method has two characteristics.  First,

24  the intelligence activity and information generated by it is needed by U.S.

25  Intelligence/Counterintelligence agencies to carry out their missions.  Second, confidentiality

26  must be maintained with respect to the activity if the viability, productivity, and usefulness of

27

28                                           60

that information is to be preserved.  The classification redactions have been asserted to protect from disclosure information that would reveal the actual intelligence activities utilized by the FBI against specific targets of foreign counterintelligence investigations or operations; or disclosure of intelligence gathering capabilities of the activities directed at specific targets.  The intelligence activities detailed in the withheld information are effective means for the FBI to gather, store, or disseminate intelligence information.  The criteria applied and priorities assigned in these records are used in the FBI's present intelligence or counterintelligence investigations in accordance with the Attorney General's guidelines on FBI intelligence or counterintelligence investigations.

115.     The information in these Category 1E documents concerning intelligence activities is very specific in nature and known to very few individuals.  Disclosure of the specific information which describes these intelligence activities would reveal that they are still used by the FBI today to gather intelligence information, and could reasonably be expected to cause serious damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discover the current intelligence activities used; (2) disclosure would reveal or determine the criteria used--and priorities assigned to--current intelligence or counterintelligence investigations; (3) disclosure would reveal the Intelligence Community's (IC's) continual sensitive work creating a decentralized communication medium which would aid in facilitating the sharing of information and enhance collaboration efforts across the IC;  and (4) disclosure will highlight the exact data collection and ELSUR capabilities shortfalls that the IC are encountering during National Security investigations due to technology advancements in communication system platforms, and encryption applications.  Hostile entities could then develop countermeasures which could severely disrupt the FBI's intelligence-gathering capabilities.  This would severely damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws. The FBI protected the identity of intelligence sources, or methods,  specific to intelligence activities, because disclosure reasonably could be expected to cause serious damage

to the national security.

116. Exemption (b)(1). In addition, information withheld pursuant to Exemption (b)(1) in these Category 1E documents has also been found to affect the foreign relations of the United States, and much like foreign government information, this relationship and/or activities, does not lose its sensitivity with the passage of time. The delicate liaisons established between and among the United States and foreign governments could be severely damaged should the United States disclose such information from these investigations. As a result, such information must be handled with care so as to not jeopardize the fragile relationships which exist among the United States and certain foreign governments. The unauthorized disclosure of information concerning foreign relations or foreign activities of the United States can reasonably be expected to lead to diplomatic or economic retaliation against the United States; identify the target, scope or time frame of intelligence activities of the United States in or about a foreign country, which may result in the curtailment or cessation of these activities; enable hostile entities to assess United States intelligence-gathering activities in or about a foreign country and devise countermeasures against these activities; or compromise cooperative foreign sources which may jeopardize their safety and curtail the flow of information from these sources. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(1).

117. Exemption (b)(2). At times in conjunction with (b)(6), and (b)(7)(C), Exemption (b)(2) has been asserted in Category 1E documents to protect internal, non-public telephone numbers of FBI personnel. These internal, non-public telephone numbers are used by FBI personnel while they are working on significant national security and criminal investigations. Disclosure of these internal, non-public telephone numbers could subject these individuals to harassing telephone calls, which could disrupt official business (including impeding the ability of Special Agents to conduct and conclude functions related to the law enforcement investigations in a timely

manner). With the narrowing of the application of Exemption (b)(2) to those records which relate to employee relations and human resource issues, the FBI has determined that, in those instances where Exemption (b)(2) has been asserted in conjunction with Exemption (b)(7)(E), the use of Exemption (b)(2) is now withdrawn. Accordingly, because disclosure of these internal, non-public telephone numbers could impede the FBI's effectiveness and may risk circumvention of the law, the FBI has properly withheld this information pursuant to Exemption (b)(2), at times in conjunction with (b)(6) and (b)(7)(C).

118.    Exemption (b)(4). Exemption (b)(4) has been asserted in Category 1E documents to protect confidential trade secrets and commercial or financial information obtained from a corporation or electronic communication service provider. This exemption is intended to protect the interests of both the government and submitters of information. Its very existence encourages submitters to voluntarily furnish useful commercial or financial information to the government and provides the government with an assurance that required submissions will be reliable. The exemption also affords protection to those submitters who are required to furnish commercial or financial information to the government by safeguarding them from the competitive disadvantages that could result from disclosure. In this case, Exemption (b)(4) has been asserted to protect proprietary contractual information provided by an FBI contractor. Specifically, the contractor submitted a draft proposal describing the scope of work that it would perform on behalf of the FBI's Operational Technology Division ("OTD") for its "FBI Going Dark Initiative Electronic Surveillance Analyst Project." The contractual documents also contain cost projections associated with implementing the project. The release of proprietary contractual information would impair the FBI's ability to obtain similar products or services from this, and other contractors in the future. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(4).

119.    Exemption (b)(5). Exemption (b)(5) has been asserted in 225 of the 296 Category 1E

documents to protect the deliberative process privilege. The deliberative process privilege

protects the internal deliberations of an agency by exempting from release recommendations,

drafts, analyses, speculation and other non-factual information prepared in anticipation of agency

decision-making. The general purpose of the deliberative process privilege is to prevent injury to

the quality of agency decisions. The protected material contained draft deliberative talking

points and discussion papers concerning the FBI's strategic policy development process relating

to surveillance challenges posed by emerging technologies, and status reports on the 'Going Dark

Initiative.' The deliberative talking points and discussion papers pertain to the FBI's strategic

policy development process concerning surveillance challenges posed by emerging technologies.

These pages include background development of talking points, discussion papers and slide

presentations on the FBI's Science and Technology Branch's "Going Dark Initiative" (also

known as the National Electronic Surveillance Strategy) to highlight to various internal and

external audiences the surveillance challenges faced by the FBI and the law enforcement

community, as well as various recommendations, proposals, and advice on proposed multi-point

strategies, or actions FBI should, or could, adopt, pursue, or consider to resolve such challenges.

120.    The material includes internal discussions between FBI and DOJ on proposals to change

policy, legislation, resources, and FBI operational techniques/procedures as well as detailed

identification, analysis, and discussion of technical, legal, policy, and resource impediments to

FBI electronic intercept operations. Thus, material that contains or was prepared in connection

with the formulation of opinions, advice, evaluations, deliberations, policy formulation,

proposals, conclusions or recommendations, may properly be withheld. Release of this type of

information would have an inhibitive effect upon the development of policy and administrative

direction of an agency because it would chill the full and frank discussion between agency

personnel regarding a decision. If agency personnel knew that their preliminary opinions,

evaluations and comments would be released for public consumption, they might be more

circumspect in what they put in writing, and thereby, impede a candid discussion of the issues surrounding a decision. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(5).

121.   Exemptions (b)(6) and (b)(7)(C).  At times in conjunction with (b)(2), Exemptions (b)(6), and (b)(7)(C) have been asserted in Category 1E documents to protect the names and identifying information of FBI Special Agents (SAs) who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in these records, or who were consulted on sensitive internal strategic developmental projects (e.g., National Electronic Surveillance Strategy).  The SAs mentioned did not choose their assignments.  The publicity associated with the release of these SAs' identities, in connection with a particular investigation, or internal developmental project, could trigger hostility toward a particular employee, or pressure of attempted bribery, to obtain intelligence.  Publicity, adverse or otherwise, regarding any particular investigation conducted by SAs may seriously impair the SAs effectiveness in conducting future investigations, or consultations.  This privacy consideration also protects SAs from unnecessary, unofficial questioning as to the conduct of an investigation, or internal developmental project, whether or not they are currently employed by the FBI.  The names of FBI Professional Support personnel are also withheld in Category 1E documents pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).  Professional Support personnel are assigned to handle tasks related to official criminal investigations, and/or internal strategic developmental projects (e.g., National Electronic Surveillance Strategy), as reflected in the documents responsive to plaintiff's request.  They maintain substantial privacy interests in not having their identities disclosed.  Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).

122.    Exemptions (b)(6) and (b)(7)(C).  At times Exemptions (b)(6), and (b)(7)(C) have also been asserted in Category 1E documents to protect the names and identifying information of third parties that were merely mentioned in the documents responsive to plaintiff's request.  These individuals are not of investigative interest to the FBI.  Release of this type of information about private citizens, without notarized authorizations permitting such a release violates individuals legitimate privacy interests.  If the FBI disclosed their names and/or other personal information, the disclosure would reveal that these third parties were at one time connected with an FBI investigation, or internal developmental project, in some way.  Disclosure of their identities could subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them.  Thus, the FBI determined that these individuals' privacy interests outweighed any public interest in disclosure, and that disclosure of the names and/or identifying information of the third parties merely mentioned would constitute a "clearly unwarranted and unwarranted invasion of personal privacy."  Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6), and (b)(7)(C).

123.    Exemptions (b)(6) and (b)(7)(C).  In addition, at times Exemptions (b)(6), and (b)(7)(C) have been asserted in Category 1E documents to protect the names of auditing personnel from the Defense Contract Audit Agency (DCAA), and contractors working for the FBI.  Publicity (adverse or otherwise) regarding any particular investigation or contract they have been assigned to audit, or internal FBI developmental project (e.g., National Electronic Surveillance Strategy) they may be contracted to help develop, may seriously prejudice their effectiveness in conducting other investigations, audits, or developmental projects.  The privacy consideration is also to protect these federal employees, and/or contractors, as individuals, from unnecessary, unofficial questioning as to the course of an investigation, audit, or developmental project, whether or not they are currently employed by the FBI as contractors, or with another government agencies.  These employees may have to conduct official audits of sensitive programs, or help develop

66

strategic plans, like developing ways to enhance ELSUR capabilities.  They come into contact with all strata of society, conducing searches, research, and making inquiries, all of which result in reasonable but nonetheless serious disturbances to people and their lives.  Foreign governments, or criminal enterprises may threaten FBI contractors, or DCAA auditors, searching for intelligence that may benefit their countries or criminal enterprises.  The publicity associated with the release of these OGA employee's, and/or contractors identities, in connection with a particular investigation, audit, or developmental project, could trigger hostility toward a particular employee, or future threat to obtain intelligence.  There is no public interest to be served by disclosing the identities of these employees, and/or contractors, to the public.  Thus, disclosure of this information would constitute a "clearly unwarranted and unwarranted invasion of their personal privacy."  Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6), and (b)(7)(C).

124.   Exemption (b)(7)(D).  At times in conjunction with (b)(1), Exemption (b)(7)(D) has been asserted in Category 1E documents to withhold information provided to the FBI by commercial/private companies and other non-government entities under circumstances from which an assurance of confidentiality may be implied.  During the course of the FBI's intelligence investigations, certain commercial/private companies provided information to the FBI relating to the subjects of these investigations.  To disclose the fact that these companies provided information to the FBI during the course of an investigation could harm the commercial interests of these enterprises by deterring the public from employing their services.  In addition, such a disclosure has wider implications.  If the FBI disclosed the identities of confidential sources that provide information to the FBI on a continuing basis, that revelation would have a chilling effect on the activities and cooperation of other current or potential future FBI confidential sources.  Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(D), at times in conjunction with (b)(1).

67

125.   Exemption (b)(7)(D).  In addition, at times in conjunction with (b)(1), Exemption (b)(7)(D) has been asserted in Category 1E documents to withhold information provided to the FBI by a foreign government and/or foreign law enforcement entity under an express assurance of confidentiality according to the Foreign Government Information Classification Guide #1 (G-1 Guide), issued in accordance with E.O. 13526, Information Security Oversight Office (ISOO), the FBI Security Policy Manual, and the designated Original Classification Authority (OCA) of the Executive Assistant Director, National Security Branch.  During the course of the FBI's intelligence investigations it received information from a foreign government regarding on-going investigations.  The FBI has many agreements with foreign governments under which security and/or criminal law enforcement information is exchanged.  The agreements specify the extent of confidentiality requested by the respective foreign government entity.  In this case, the FBI has express confidentiality agreements with this foreign government and/or foreign law enforcement entity which provided information to the FBI during the conduct of intelligence investigations. The FBI's agreements with this law enforcement entity provides express assurance that the FBI will not disclose their identity, as well as the information that they provided to the FBI.  If the FBI were to disclose the identities and the information provided by foreign law enforcement entities under an express assurance of confidentiality, such a disclosure would have a chilling effect on the FBI's relationship with these entities.  Furthermore, the disclosure would have a chilling effect on the FBI's relationship with other foreign law enforcement agencies which have entered into similar agreements with the FBI.  Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(D), at times in conjunction with (b)(1).

126.   Exemption (b)(7)(E).  Exemption (b)(7)(E) has been asserted in Category 1E documents to protect law enforcement records that would disclose techniques and procedures for law enforcement investigations or prosecutions, and that would disclose guidelines for law enforcement investigations and prosecutions.  Plaintiff's requests seeks information concerning

the law enforcement technique(s) of electronic or communications surveillance focused on problems which hamper FBI's ability to successfully intercept communications systems and networks, and details on preventing the FBI from "Going Dark." The responsive material details difficulties encountered by law enforcement in conducting electronic surveillance and discusses possible operational, legal, and procedural changes to the use, or enhancement of, investigative techniques that would ensure ELSUR capabilities are effective and productive. Accordingly, the release of this detailed information about surveillance techniques and associated problems or vulnerabilities would provide violators a road map for successful law enforcement circumvention. Criminal and terrorist elements would gain valuable insight about the conduct of law enforcement surveillance operations and the exploitation of capability weaknesses that would enable them to structure their criminal enterprise and terrorist formulating communications in a manner to evade lawful intercept and/or thwart investigative efforts. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(E).

## CATEGORY 1F - FBI OPERATIONAL TECHNOLOGY DIVISION (OTD) RESPONSE, SECTION 4 (CARDOZO)

127.    Category 1F contains 135 responsive Bates pages consisting of internal e-mails w/attachments that discuss the background development of various talking points, discussion papers, and slide presentations on the FBI's Science and Technology Branch's "Going Dark Initiative" (also known as the National Electronic Surveillance Strategy) to highlight to various internal and external audiences the surveillance challenges faced by the FBI and the law enforcement community. In addition, the e-mail participants were tasked to search for a variety of recommendations, proposals, and advice on multi-point strategies, or actions FBI should, or could, adopt, pursue, or consider to resolve such challenges. The e-mails show how the identification, analysis, and review of technical, legal, policy, and resource impediments to the

69

FBI's electronic intercept operations led to the development of a five-prong strategic approach to address the identified lawful intercept capability gap.

128. The material also includes draft talking points presentations that were developed to outline this five prong strategic approach. The strategic approach includes: 1) modernization/amendment of existing laws (e.g, CALEA), regulations, and assistance mandates, 2) enhancing authorities to protect industry proprietary and Law Enforcement (LE) sensitive lawful intercept information, equipment and techniques, 3) enhancing LE agencies coordination leveraging technical expertise of FBI with other LE entities, 4) enhancing lawful intercept cooperation between communications industry and LEA's with a "One Voice" approach, and 5) seeking new federal funding to bolster lawful intercept capabilities. The material includes a discussion paper that highlighted instances where technology has, or is, still impacting the ability of the FBI's DITU to perform lawful intercepts, and finally, the material includes monthly accomplishment report templates that were being developed by OTD to highlight all significant accomplishments of the OTD Division programs, and not just the 'Going Dark' initiative. Of these 135 Bates pages, 116 pages have been withheld in full, 15 pages released in part, and 4 pages released in full.

129. Exemption (b)(1). At times Exemption (b)(1) has been asserted in Category 1F documents to withhold information that is properly classified. The information withheld is currently and properly classified under E.O. 13256 at the Secret level and is exempt from disclosure pursuant to E.O. 13526, § 1.4, category (c) intelligence activities (including covert action), intelligence sources or methods, as the unauthorized disclosure of this information could reasonably be expected to cause serious damage to the national security of the United States.

130. The information withheld in Category 1F douments, pursuant to Exemption (b)(1), consists of classified procedures and methods of intelligence-gathering utilized by the FBI to

1

2    gather intelligence information.   An intelligence activity or method has two characteristics.

3    First, the intelligence activity and information generated by it is needed by U.S.

4    Intelligence/Counterintelligence agencies to carry out their missions.  Second, confidentiality

5    must be maintained with respect to the activity if the viability, productivity, and usefulness of

6    that information is to be preserved.  The classification redactions have been asserted to protect

7    from disclosure information that would reveal the actual intelligence activities utilized by the FBI

8    against specific targets of foreign counterintelligence investigations or operations; or disclosure

9    of intelligence gathering capabilities of the activities directed at specific targets.  The intelligence

10   activities detailed in the withheld information are effective means for the FBI to gather, store, or

11   disseminate intelligence information.  The criteria applied and priorities assigned in these records

12   are used in the FBI's present intelligence or counterintelligence investigations in accordance with

13   the Attorney General's guidelines on FBI intelligence or counterintelligence investigations.

14

15   131.    The information in these Category 1F documents concerning intelligence activities is very

16   specific in nature and known to very few individuals.  Disclosure of the specific information

17   which describes these intelligence activities would reveal that they are still used by the FBI today

18   to gather intelligence information, and could reasonably be expected to cause serious damage to

19   the national security for the following reasons: (1) disclosure would allow hostile entities to

20   discover the current intelligence activities used; (2) disclosure would reveal or determine the

21   criteria used--and priorities assigned to--current intelligence or counterintelligence investigations;

22   (3) disclosure would reveal the Intelligence Community's (IC's) continual sensitive work creating

23   a decentralized communication medium which would aid in facilitating the sharing of

24   information and enhance collaboration efforts across the IC; and (4) disclosure will highlight the

25   exact data collection and ELSUR capabilities shortfalls that the IC are encountering during

26   National Security investigations due to technology advancements in communication system

27   platforms, and encryption applications.  Hostile entities could then develop countermeasures

28                                          71

which could severely disrupt the FBI's intelligence-gathering capabilities.  This would severely damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws.  The FBI protected the identity of intelligence sources, or methods,  specific to intelligence activities, because disclosure reasonably could be expected to cause serious damage to the national security. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(1).

132.    Exemption (b)(5).  Exemption (b)(5) has been asserted in Category 1F documents to protect the deliberative process privilege.  The deliberative process privilege protects the internal deliberations of an agency by exempting from release recommendations, drafts, analyses, speculation and other non-factual information prepared in anticipation of agency decision-making.  The general purpose of the deliberative process privilege is to prevent injury to the quality of agency decisions.  The protected material contained draft deliberative talking points and discussion papers concerning the FBI's strategic policy development process relating to surveillance challenges posed by emerging technologies, and status reports on the 'Going Dark Initiative.'  The deliberative talking points and discussion papers pertain to the FBI's strategic policy development process concerning surveillance challenges posed by emerging technologies.  These pages include background development of talking points, discussion papers and slide presentations on the FBI's Science and Technology Branch's "Going Dark Initiative" (also known as the National Electronic Surveillance Strategy) to highlight to various internal and external audiences the surveillance challenges faced by the FBI and the law enforcement community, as well as various recommendations, proposals, and advice on proposed multi-point strategies, or actions FBI should, or could, adopt, pursue, or consider to resolve such challenges.

133.    The material includes internal discussions between FBI and DOJ on proposals to change policy, legislation, resources, and FBI operational techniques/procedures as well as detailed identification, analysis, and discussion of technical, legal, policy, and resource impediments to

FBI electronic intercept operations.   Thus, material that contains or was prepared in connection with the formulation of opinions, advice, evaluations, deliberations, policy formulation, proposals, conclusions or recommendations, may properly be withheld.  Release of this type of information would have an inhibitive effect upon the development of policy and administrative direction of an agency because it would chill the full and frank discussion between agency personnel regarding a decision.  If agency personnel knew that their preliminary opinions, evaluations and comments would be released for public consumption, they might be more circumspect in what they put in writing, and thereby, impede a candid discussion of the issues surrounding a decision.   Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(5).

134.    Exemptions (b)(6) and (b)(7)(C).  At times in conjunction with (b)(2), Exemptions (b)(6), and (b)(7)(C) have been asserted in Category 1F documents to protect the names and identifying information of FBI Special Agents (SAs) who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in these records, or who were consulted on sensitive internal developmental projects (e.g., National Electronic Surveillance Strategy). The SAs mentioned did not choose their assignments.  The publicity associated with the release of these SAs' identities, in connection with a particular investigation, or internal developmental project, could trigger hostility toward a particular employee, or pressure of attempted bribery, to obtain intelligence.  Publicity, adverse or otherwise, regarding any particular investigation conducted by SAs may seriously impair the SAs effectiveness in conducting future investigations, or consultations.  This privacy consideration also protects SAs from unnecessary, unofficial questioning as to the conduct of an investigation, or internal developmental project, whether or not they are currently employed by the FBI.   The names of FBI Professional Support personnel are also withheld in Category 1F documents pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).  Professional Support personnel are assigned to

handle tasks related to official criminal investigations, and/or sensitive internal developmental projects (e.g., National Electronic Surveillance Strategy), as reflected in the documents responsive to plaintiff's request. They were, and possibly are, in maintain substantial privacy interests in not having their identities disclosed. Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).

135.    Exemption (b)(7)(E).  Exemption (b)(7)(E) has been asserted in Category 1F documents to protect law enforcement records that would disclose techniques and procedures for law enforcement investigations or prosecutions, and that would disclose guidelines for law enforcement investigations and prosecutions.  Plaintiff's requests seeks information concerning the law enforcement technique(s) of electronic or communications surveillance focused on problems which hamper FBI's ability to successfully intercept communications systems and networks, and details on preventing the FBI from "Going Dark." The responsive material details difficulties encountered by law enforcement in conducting electronic surveillance and discusses possible operational, legal, and procedural changes to the use, or enhancement of, investigative techniques that would ensure ELSUR capabilities are effective and productive.  Accordingly, the release of this detailed information about surveillance techniques and associated problems or vulnerabilities would provide violators a road map for successful law enforcement circumvention.  Criminal and  terrorist elements would gain valuable insight about the conduct of law enforcement surveillance operations and the exploitation of capability weaknesses that would enable them to structure their criminal enterprise and terrorist formulating communications in a manner to evade lawful intercept and/or thwart investigative efforts.  Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(E).

## CATEGORY 2A - FBI OPERATIONAL TECHNOLOGY DIVISION (OTD) RESPONSE, SECTIONs 1-3 (LYNCH)

74

136.    Category 2A contains 148 responsive Bates pages consisting of internal e-mail chains between FBI divisions, and talking points and discussion paper presentations related to the FBI's strategic policy development process concerning surveillance challenges posed by emerging technologies.  The FBI talking points presentations related to defining "Going Dark" and the need to preserve lawful intercept capabilities.  The draft presentations were being developed for multiple internal and external audiences.  The main presentation under development was titled, "Going Dark Initiative: Closing the National Security ELSUR Gap."  The presentation defined "Going Dark," showed how ELSUR gaps impacted national security, detailed CALEA shortfalls, and offered possible solutions to close the ELSUR gap.  The material included a discussion paper titled, "Going Dark: Evolution in Mobile Technology and Potential Collection Issues."  The paper highlights how new services and technology advancements in the wireless communications industry are developing faster than law enforcement can develop lawful technical intercept solutions.  The e-mails summarize meetings concerning legal, technical, legislative, and communication industry challenges that are limiting the effectiveness of lawful ELSUR intercept capabilities.  Some of the e-mails discuss proposed legislative amendments to CALEA to improve intercept capabilities, and to make industry compliance easier.  One e-mail chain outlines a recent article concerning cable roaming agreements between interconnecting Wi-Fi services, and how this might relate to "Going Dark."  Of these 148 Bates pages, 67 pages have been withheld in full, 58 pages released in part, and 23 pages released in full.

137.    Exemption (b)(1).  At times Exemption (b)(1) has been asserted in Category 2A documents to withhold information that is properly classified.  The information withheld (b)(1) is currently and properly classified under E.O. 13256 at the SECRET level and is exempt from disclosure pursuant to E.O. 13526, § 1.4, category (c) intelligence activities (including covert action), intelligence sources or methods, and category (d) foreign relations, or foreign activities of the United States, including confidential sources, as the unauthorized disclosure of this

information could reasonably be expected to cause serious damage to the national security of the United States.

138.    The information withheld pursuant to Exemption (b)(1) for Category 2A documents consists of classified procedures and methods of intelligence-gathering utilized by the FBI to gather intelligence information.   An intelligence activity or method has two characteristics. First, the intelligence activity and information generated by it is needed by U.S. Intelligence/Counterintelligence agencies to carry out their missions.  Second, confidentiality must be maintained with respect to the activity if the viability, productivity, and usefulness of that information is to be preserved.  The classification redactions have been asserted to protect from disclosure information that would reveal the actual intelligence activities utilized by the FBI against specific targets of foreign counterintelligence investigations or operations; or disclosure of intelligence gathering capabilities of the activities directed at specific targets.  The intelligence activities detailed in the withheld information are effective means for the FBI to gather, store, or disseminate intelligence information.  The criteria applied and priorities assigned in these records are used in the FBI's present intelligence or counterintelligence investigations in accordance with the Attorney General's guidelines on FBI intelligence or counterintelligence investigations.

139.    The information in these Category 2A documents concerning intelligence activities is very specific in nature and known to very few individuals.  Disclosure of the specific information which describes these intelligence activities would reveal that they are still used by the FBI today to gather intelligence information, and could reasonably be expected to cause serious damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discover the current intelligence activities used; (2) disclosure would reveal or determine the criteria used--and priorities assigned to--current intelligence or counterintelligence investigations; (3) disclosure would reveal the Intelligence Community's (IC's) continual sensitive work creating

a decentralized communication medium which would aid in facilitating the sharing of information and enhance collaboration efforts across the IC; and (4) disclosure will highlight the exact data collection and ELSUR capabilities shortfalls that the IC are encountering during National Security investigations due to technology advancements in communication system platforms, and encryption applications.  Hostile entities could then develop countermeasures which could severely disrupt the FBI's intelligence-gathering capabilities.  This would severely damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws.  The FBI protected the identity of intelligence sources, or methods, specific to intelligence activities, because disclosure reasonably could be expected to cause serious damage to the national security. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(1).

140.    Exemption (b)(1).  In addition, information withheld pursuant to Exemption (b)(1) in these Category 2A documents has also been found to affect the foreign relations of the United States, and much like foreign government information, this relationship and/or activities, does not lose its sensitivity with the passage of time.  The delicate liaisons established between and among the United States and foreign governments could be severely damaged should the United States disclose such information from these investigations.  As a result, such information must be handled with care so as to not jeopardize the fragile relationships which exist among the United States and certain foreign governments. The unauthorized disclosure of information concerning foreign relations or foreign activities of the United States can reasonably be expected to lead to diplomatic or economic retaliation against the United States; identify the target, scope or time frame of intelligence activities of the United States in or about a foreign country, which may result in the curtailment or cessation of these activities; enable hostile entities to assess United States intelligence-gathering activities in or about a foreign country and devise countermeasures against these activities; or compromise cooperative foreign sources which may jeopardize their

safety and curtail the flow of information from these sources. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(1).

141.   Exemption (b)(2).   At times in conjunction with (b)(6), and (b)(7)(C), Exemption (b)(2) has been asserted in Category 2A documents to protect internal, non-public telephone numbers of FBI personnel.   These internal, non-public telephone numbers are used by FBI personnel while they are working on significant national security and criminal investigations.   Disclosure of these internal, non-public telephone numbers could subject these individuals to harassing telephone calls, which could disrupt official business (including impeding the ability of Special Agents to conduct and conclude functions related to the law enforcement investigations in a timely manner).   With the narrowing of the application of Exemption (b)(2) to those records which relate to employee relations and human resource issues, the FBI has determined that, in those instances where Exemption (b)(2) has been asserted in conjunction with Exemption (b)(7)(E), the use of Exemption (b)(2) is now withdrawn.   Accordingly, because disclosure of these internal, non-public telephone numbers could impede the FBI's effectiveness and may risk circumvention of the law, the FBI has properly withheld this information pursuant to Exemption (b)(2), at times in conjunction with (b)(6) and (b)(7)(C).

142.   Exemption (b)(3).   At times in conjunction with (b)(1), Exemption (b)(3) has been asserted in Category 2A documents to withhold information pursuant to 18 U.S.C. § 2516, which protects from disclosure information pertaining to the authorization of interception of wire, oral, or electronic communications.   The Attorney General may authorize an application to a Federal Judge, requesting to intercept wire or oral communications by the FBI when such interception may provide or has provided evidence of a crime, e.g., Charter 37 (Espionage); Charter 90 (Protection of Trade Secrets); and Chapter 105 (Sabotage).   Where documents at issue contain information, that, if disclosed, would reveal information pertaining to the authorization of

78

interception of wire, oral, or electronic communications, that information is protected from disclosure by Exemption (b)(3), at times in conjunction with Exemption (b)(1).

143. Exemption (b)(3). In addition, at times in conjunction with (b)(1), Exemption (b)(3) has been asserted in Category 2A documents to withhold information pursuant to 18 U.S.C. § 3123(d), the Pen Register Act, which protects from disclosure information pertaining to certain court "order(s) authorizing or approving the installation and use of a pen register or a trap and trace device;" and information pertaining to "the existence of the pen register or trap and trace device or the existence of the investigation." Where documents at issue contain information, that, if disclosed, would reveal the existence or use of a pen register or trap and trace device, or reveal the existence of an investigation involving a pen register or trap and trace device, that information is protected from disclosure by Exemption (b)(3), at times in conjunction with Exemption (b)(1).

144. Exemption (b)(5). Exemption (b)(5) has been asserted in Category 2A documents to protect the deliberative process privilege. The deliberative process privilege protects the internal deliberations of an agency by exempting from release recommendations, drafts, analyses, speculation and other non-factual information prepared in anticipation of agency decision-making. The general purpose of the deliberative process privilege is to prevent injury to the quality of agency decisions. The protected material contained FBI talking points presentations related to defining "Going Dark" and the need to preserve lawful intercept capabilities. The draft presentations were being developed for multiple internal and external audiences. The main presentation under development was titled, "Going Dark Initiative: Closing the National Security ELSUR Gap." The presentation defined "Going Dark," showed how ELSUR gaps impacted national security, detailed CALEA shortfalls, and offered possible solutions to close the ELSUR gap. The e-mails summarize meetings concerning legal, technical, legislative, and

communication industry challenges that are limiting the effectiveness of lawful ELSUR intercept capabilities. Some of the e-mails discuss proposed legislative amendments to CALEA to improve intercept capabilities, and to make industry compliance easier.

145.    The material in Category 2A includes internal discussions between FBI and DOJ on proposals to change policy, legislation, resources, and FBI operational techniques/procedures as well as detailed identification, analysis, and discussion of technical, legal, policy, and resource impediments to FBI electronic intercept operations.   Thus, material that contains or was prepared in connection with the formulation of opinions, advice, evaluations, deliberations, policy formulation, proposals, conclusions or recommendations, may properly be withheld. Release of this type of information would have an inhibitive effect upon the development of policy and administrative direction of an agency because it would chill the full and frank discussion between agency personnel regarding a decision.  If agency personnel knew that their preliminary opinions, evaluations and comments would be released for public consumption, they might be more circumspect in what they put in writing, and thereby, impede a candid discussion of the issues surrounding a decision.

146.    Exemptions (b)(6) and (b)(7)(C).  At times in conjunction with (b)(2), Exemptions (b)(6), and (b)(7)(C) have been asserted in Category 1F documents to protect the names and identifying information of FBI Special Agents (SAs) who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in these records, or who were consulted on sensitive internal developmental projects (e.g., National Electronic Surveillance Strategy). The SAs mentioned did not choose their assignments.  The publicity associated with the release of these SAs' identities, in connection with a particular investigation, or internal developmental project, could trigger hostility toward a particular employee, or pressure of attempted bribery, to obtain intelligence.  Publicity, adverse or otherwise, regarding any particular investigation conducted by SAs may seriously impair the SAs effectiveness in conducting future

investigations, or consultations.  This privacy consideration also protects SAs from unnecessary, unofficial questioning as to the conduct of an investigation, or internal developmental project, whether or not they are currently employed by the FBI.   The names of FBI Professional Support personnel are also withheld in Category 1F documents pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).  Professional Support personnel are assigned to handle tasks related to official criminal investigations, and/or sensitive internal developmental projects (e.g., National Electronic Surveillance Strategy), as reflected in the documents responsive to plaintiff's request.  They maintain substantial privacy interests in not having their identities disclosed.  Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).

147.    Exemptions (b)(6) and (b)(7)(C).  At times Exemptions (b)(6), and (b)(7)(C) have also been asserted in Category 2A documents to protect the names of personnel from the Criminal Division (CRM), Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), Drug Enforcement Administration (DEA), National Security Division (NSD), Justice Management Division (JMD), Office of Deputy Attorney General (ODAG), Executive Office for United States Attorney (USAEO), Assistant United States Attorneys (AUSA), and contractors working for the FBI. Publicity (adverse or otherwise) regarding any particular investigation they have been assigned, or internal FBI developmental project (e.g., National Electronic Surveillance Strategy) they may be contracted to help develop, may seriously prejudice their effectiveness in conducting other investigations, or developmental projects.  The privacy consideration is also to protect these federal employees, and/or contractors, as individuals, from unnecessary, unofficial questioning as to the course of an investigation or internal developmental project, whether or not they are currently employed by the FBI as contractors, or with Other Government Agencies (OGA's). These employees may have to conduct official inquiries into violations of National Security, or help develop strategic plans, like developing ways to enhance ELSUR capabilities.  They come

into contact with all strata of society, conducing searches, research, and making inquiries, all of which result in reasonable but nonetheless serious disturbances to people and their lives.  It is possible for an individual targeted by these OGA's to carry a grudge which may last for years, and to seek revenge on the investigators and other federal employees involved in a particular investigation.  Foreign governments, or criminal enterprises may threaten FBI contractors searching for intelligence that may benefit their countries or criminal enterprises.  The publicity associated with the release of these OGA employee's, and/or contractors identities, in connection with a particular investigation, or internal developmental project, could trigger hostility toward a particular employee, or future threat to obtain intelligence.  There is no public interest to be served by disclosing the identities of these employees, and/or contractors, to the public.  Thus, disclosure of this information would constitute a "clearly unwarranted and unwarranted invasion of their personal privacy."  Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6), and (b)(7)(C).

148.    Exemptions (b)(6) and (b)(7)(C).  In addition, at times Exemptions (b)(6), and (b)(7)(C) have been asserted in Category 2A documents to protect the names and/or identifying information of third-party individuals who were of investigative interest to the FBI and/or other law enforcement agencies.  Identifying information withheld concerning these third parties includes addresses, dates of birth, social security numbers, and other personal information.  Any link to a law enforcement investigation carries a strong negative connotation and a stigma.  Release of the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention.  The FBI has determined that these individuals maintain a substantial privacy interest in not having their identities disclosed.  In making a determination whether to release the names and personal information concerning these third parties, the public's interest in disclosure was balanced against the individual's right to privacy.  The FBI determined that this information would not enlighten the public on how the FBI

conducts its internal operations and investigations. The FBI concluded that the disclosure of this information would constitute a "clearly unwarranted and unwarranted invasion of their personal privacy." Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6), and (b)(7)(C).

149.    Exemption (b)(7)(A). Exemption (b)(7)(A) exempts from disclosure records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings. Exemption (b)(7)(A), at times in conjunction with (b)(1), has been asserted in Category 2A documents to protect information that either summarize, discuss, or relate to FBI criminal cases which remain in an open or active status. The release of such information would reveal the scope, direction, nature and pace of the investigations as well as reveal information that could harm prospective and/or ongoing government prosecutions in these matters. If the information is released, the individuals and/or entities, who are of investigative interest in the cases could use the information to develop alibis, take steps to circumvent the law, create factitious defenses or intimidate, harass or harm potential witnesses. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(A), at times in conjunction with (b)(1).

150.    Exemption (b)(7)(D). At times in conjunction with (b)(1), Exemption (b)(7)(D) has been asserted in Category 2A documents to withhold information provided to the FBI by a foreign government and/or foreign law enforcement entity under an express assurance of confidentiality according to the Foreign Government Information Classification Guide #1 (G-1 Guide), issued in accordance with E.O. 13526, Information Security Oversight Office (ISOO), the FBI Security Policy Manual, and the designated Original Classification Authority (OCA) of the Executive Assistant Director, National Security Branch. During the course of the FBI's intelligence investigations it received information from a foreign government regarding on-going

83

investigations. The FBI has many agreements with foreign governments under which security and/or criminal law enforcement information is exchanged. The agreements specify the extent of confidentiality requested by the respective foreign government entity. In this case, the FBI has express confidentiality agreements with this foreign government and/or foreign law enforcement entity which provided information to the FBI during the conduct of intelligence investigations. The FBI's agreements with this law enforcement entity provides express assurance that the FBI will not disclose their identity, as well as the information that they provided to the FBI. If the FBI were to disclose the identities and the information provided by foreign law enforcement entities under an express assurance of confidentiality, such a disclosure would have a chilling effect on the FBI's relationship with these entities. Furthermore, the disclosure would have a chilling effect on the FBI's relationship with other foreign law enforcement agencies which have entered into similar agreements with the FBI. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(D), at times in conjunction with (b)(1).

151. Exemption (b)(7)(E). Exemption (b)(7)(E) has been asserted in Category 2A documents to protect law enforcement records that would disclose techniques and procedures for law enforcement investigations or prosecutions, and that would disclose guidelines for law enforcement investigations and prosecutions. Plaintiff's requests seeks information concerning the law enforcement technique(s) of electronic or communications surveillance focused on problems which hamper FBI's ability to successfully intercept communications systems and networks, and details on preventing the FBI from "Going Dark." The responsive material details difficulties encountered by law enforcement in conducting electronic surveillance and discusses possible operational, legal, and procedural changes to the use, or enhancement of, investigative techniques that would ensure ELSUR capabilities are effective and productive. Accordingly, the release of this detailed information about surveillance techniques and associated problems or vulnerabilities would provide violators a road map for successful law enforcement

circumvention. Criminal and terrorist elements would gain valuable insight about the conduct of law enforcement surveillance operations and the exploitation of capability weaknesses that would enable them to structure their criminal enterprise and terrorist formulating communications in a manner to evade lawful intercept and/or thwart investigative efforts.

### CATEGORY 2B - FBI CYBER DIVISION (CD) RESPONSE (LYNCH)

152.    Category 2B contains 19 responsive Bates pages consisting of 2 internal e-mail chains between FBI divisions discussing proposals to solve ELSUR and encryption shortfalls, and deciding criteria for an Intelligence Assessment Report. The first e-mail chain seeks information from a recently issued pen trap and trace order, and the second e-mail chain mentions that the Going Dark Working Group (GDWG) is seeking examples of investigations where CALEA shortfalls and communication service companies' technological advances have hampered the collection of lawful intercepts. The Intelligence Assessment Report titled, "Going Dark: Encryption and the Associated Issues Facing Law Enforcement,"discusses software- and hardware-based encryption deployment challenges that hinder both authorized collection and analysis. Of these 19 Bates pages, 18 pages have been withheld in full, and 1 page released in part.

153.    Exemption (b)(1). At times Exemption (b)(1) has been asserted in Category 2B documents to withhold information that is properly classified. The information withheld (b)(1) is currently and properly classified under E.O. 13256 at the SECRET level and is exempt from disclosure pursuant to E.O. 13526, § 1.4, category (c) intelligence activities (including covert action), intelligence sources or methods, as the unauthorized disclosure of this information could

reasonably be expected to cause serious damage to the national security of the United States.

154.    The information withheld pursuant to Exemption (b)(1) for Category 2B documents consists of classified procedures and methods of intelligence-gathering utilized by the FBI to gather intelligence information.   An intelligence activity or method has two characteristics. First, the intelligence activity and information generated by it is needed by U.S. Intelligence/Counterintelligence agencies to carry out their missions.  Second, confidentiality must be maintained with respect to the activity if the viability, productivity, and usefulness of that information is to be preserved.  The classification redactions have been asserted to protect from disclosure information that would reveal the actual intelligence activities utilized by the FBI against specific targets of foreign counterintelligence investigations or operations; or disclosure of intelligence gathering capabilities of the activities directed at specific targets.  The intelligence activities detailed in the withheld information are effective means for the FBI to gather, store, or disseminate intelligence information.  The criteria applied and priorities assigned in these records are used in the FBI's present intelligence or counterintelligence investigations in accordance with the Attorney General's guidelines on FBI intelligence or counterintelligence investigations.

155.    The information in these Category 2B documents concerning intelligence activities is very specific in nature and known to very few individuals.  Disclosure of the specific information which describes these intelligence activities would reveal that they are still used by the FBI today

to gather intelligence information, and could reasonably be expected to cause serious damage to

the national security for the following reasons: (1) disclosure would allow hostile entities to

discover the current intelligence activities used; (2) disclosure would reveal or determine the

criteria used--and priorities assigned to--current intelligence or counterintelligence investigations;

(3) disclosure would reveal the Intelligence Communities (IC's) continual sensitive work creating

a decentralized communication medium which would aid in facilitating the sharing of

information and enhance collaboration efforts across the IC; and (4) disclosure will highlight the

exact data collection and ELSUR capabilities shortfalls that the IC are encountering during

National Security investigations due to technology advancements in communication system

platforms, and encryption applications. Hostile entities could then develop countermeasures

which could severely disrupt the FBI's intelligence-gathering capabilities. This would severely

damage the FBI's efforts to detect and apprehend violators of the United States' national security

and criminal laws. The FBI protected the identity of intelligence sources, or methods, specific to

intelligence activities, because disclosure reasonably could be expected to cause serious damage

to the national security. Accordingly, the FBI has properly withheld this information pursuant to

Exemption (b)(1).

156.    Exemption (b)(2). At times in conjunction with (b)(6), and (b)(7)(C), Exemption (b)(2)

has been asserted in Category 2B documents to protect internal, non-public telephone numbers of

FBI personnel. These internal, non-public telephone numbers are used by FBI personnel while

they are working on significant national security and criminal investigations. Disclosure of these

internal, non-public telephone numbers could subject these individuals to harassing telephone

calls, which could disrupt official business (including impeding the ability of Special Agents to

conduct and conclude functions related to the law enforcement investigations in a timely

manner). With the narrowing of the application of Exemption (b)(2) to those records which

relate to employee relations and human resource issues, the FBI has determined that, in those

instances where Exemption (b)(2) has been asserted in conjunction with Exemption (b)(7)(E), the

use of Exemption (b)(2) is now withdrawn. Accordingly, because disclosure of these internal,

non-public telephone numbers could impede the FBI's effectiveness and may risk circumvention

of the law, the FBI has properly withheld this information pursuant to Exemption (b)(2), at times

in conjunction with (b)(6) and (b)(7)(C).

157.    Exemption (b)(3). At times in conjunction with (b)(1), Exemption (b)(3) has been

asserted in Category 2B documents to withhold information pursuant to 18 U.S.C. § 3123(d), the

Pen Register Act, which protects from disclosure information pertaining to certain court "order(s)

authorizing or approving the installation and use of a pen register or a trap and trace devise;" and

information pertaining to "the existence of the pen register or trap and trace device or the

existence of the investigation." Where documents at issue contain information, that, if disclosed,

would reveal the existence or use of a pen register or trap and trace device, or reveal the

existence of an investigation involving a pen register or trap and trace device, that information is

1
2    protected from disclosure by Exemption (b)(3), at times in conjunction with Exemption (b)(1).
3
4    158.    Exemption (b)(3).  In addition, at times in conjunction with (b)(1), Exemption (b)(3) has
5    been asserted in Category 2B documents to withhold information pursuant to 50 U.S.C. § 1806,
6
7    which protects from disclosure information pertaining to the use of FISA information acquired
8    from electronic surveillance.  Where documents at issue contain information, that, if disclosed,
9    would reveal the use of FISA information acquired from electronic surveillance, that information
10
11   is protected from disclosure by both Exemption (b)(3), at times in conjunction with Exemption
12   (b)(1).
13
14   159.    Exemption (b)(5).  Exemption (b)(5) has been asserted in 17 of the 19 Category 2B
15   documents to protect the deliberative process privilege.  The deliberative process privilege
16   protects the internal deliberations of an agency by exempting from release recommendations,
17
18   drafts, analyses, speculation and other non-factual information prepared in anticipation of agency
19   decision-making.  The general purpose of the deliberative process privilege is to prevent injury to
20   the quality of agency decisions.   The protected material consisted of 2 internal e-mail chains
21   between FBI divisions, and discusses proposals to solve ELSUR and encryption shortfalls, and
22   deciding criteria for an Intelligence Assessment Report.  The first e-mail chain seeks information
23
24   from a recently issued pen trap and trace order, and the second e-mail chain mentions that the
25   Going Dark Working Group (GDWG) is seeking examples of investigations where CALEA
26   shortfalls and communication service companies' technological advances have hampered the
27
28                                                89

1

2  collection of lawful intercepts. The Intelligence Assessment Report titled, "Going Dark:

3  Encryption and the Associated Issues Facing Law Enforcement,"discusses software- and

4

5  hardware-based encryption deployment challenges that hinder both authorized collection and

6  analysis.

7

8  160.    Thus, material that contains or was prepared in connection with the formulation of

9  opinions, advice, evaluations, deliberations, policy formulation, proposals, conclusions or

10  recommendations, may properly be withheld. Release of this type of information would have an

11  inhibitive effect upon the development of policy and administrative direction of an agency

12  because it would chill the full and frank discussion between agency personnel regarding a

13
14  decision. If agency personnel knew that their preliminary opinions, evaluations and comments

15  would be released for public consumption, they might be more circumspect in what they put in

16  writing, and thereby, impede a candid discussion of the issues surrounding a decision.

17

18  161.    Exemptions (b)(6) and (b)(7)(C). At times in conjunction with (b)(2), Exemptions (b)(6),

19  and (b)(7)(C) have been asserted in Category 2B documents to protect the names and identifying

20  information of FBI Special Agents (SAs) who were responsible for conducting, supervising,

21
22  and/or maintaining the investigative activities reported in these records, or who were consulted

23  on sensitive internal developmental projects (e.g., National Electronic Surveillance Strategy).

24  The SAs mentioned did not choose their assignments. The publicity associated with the release

25  of these SAs' identities, in connection with a particular investigation, or internal developmental

26
27  project, could trigger hostility toward a particular employee, or pressure of attempted bribery, to

28

1

2   obtain intelligence. Publicity, adverse or otherwise, regarding any particular investigation

3   conducted by SAs may seriously impair the SAs effectiveness in conducting future

4

5   investigations, or consultations. This privacy consideration also protects SAs from unnecessary,

6   unofficial questioning as to the conduct of an investigation, or internal developmental project,

7

8   whether or not they are currently employed by the FBI. The names of FBI Professional Support

9   personnel are also withheld in Category 2B documents pursuant to Exemptions (b)(6) and

10  (b)(7)(C), at times in conjunction with (b)(2). Professional Support personnel are assigned to

11  handle tasks related to official criminal investigations, and/or internal developmental projects

12
    (e.g., National Electronic Surveillance Strategy), as reflected in the documents responsive to
13

14  plaintiff's request. They maintain substantial privacy interests in not having their identities

15  disclosed. Accordingly, the FBI has properly withheld this information pursuant to Exemptions

16  (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).
17
    162.   Exemptions (b)(6) and (b)(7)(C).  At times Exemptions (b)(6), and (b)(7)(C) have also
18

19  been asserted in Category 2B documents to protect the names and identifying information of

20  third parties that were merely mentioned in the documents responsive to plaintiff's request.

21  These individuals are not of investigative interest to the FBI. Release of this type of information

22
    about private citizens, without notarized authorizations permitting such a release violates
23

24  individuals legitimate privacy interests. If the FBI disclosed their names and/or other personal

25  information, the disclosure would reveal that these third parties were at one time connected with

26  an FBI investigation in some way. Disclosure of their identities could subject these individuals

27

28                                          91

to possible harassment or criticism and focus derogatory inferences and suspicion on them.

Thus, the FBI determined that these individuals' privacy interests outweighed any public interest

in disclosure, and that disclosure of the names and/or identifying information of the third parties

merely mentioned would constitute a "clearly unwarranted and unwarranted invasion of personal

privacy." Accordingly, the FBI has properly withheld this information pursuant to Exemptions

(b)(6) and (b)(7)(C).

163.    Exemptions (b)(6)and (b)(7)(C). In addition, at times Exemptions (b)(6), and (b)(7)(C)

have been asserted in Category 2B documents to protect the name of a employee from the

Criminal Division (DOJ/CRM). Publicity (adverse or otherwise) regarding any particular

investigation they have been assigned, or internal FBI developmental project (e.g., National

Electronic Surveillance Strategy) they may have consulted on during development, may seriously

prejudice their effectiveness in conducting other investigations, or internal developmental

projects. The privacy consideration is also to protect this federal employee, as an individual,

from unnecessary, unofficial questioning as to the course of an investigation or internal

developmental project, whether or not they are currently with another government agency. This

employee may have to conduct official inquiries into violations of National Security, or help

develop strategic plans, like developing ways to enhance ELSUR capabilities. They come into

contact with all strata of society, conducing searches, research, and making inquiries, all of which

result in reasonable but nonetheless serious disturbances to people and their lives. It is possible

for an individual targeted by this OGA to carry a grudge which may last for years, and to seek revenge on the investigators and the federal employee involved in a particular investigation. Foreign governments, or criminal enterprises may threaten this OGA employee searching for intelligence that may benefit their countries or criminal enterprises. The publicity associated with the release of this OGA employee identity, in connection with a particular investigation, or developmental project, could trigger hostility toward a particular employee, or future threat to obtain intelligence. There is no public interest to be served by disclosing the identity of this employee to the public. Thus, disclosure of this information would constitute a "clearly unwarranted and unwarranted invasion of their personal privacy." Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C).

164.    Exemption (b)(7)(E). Exemption (b)(7)(E) has been asserted in Category 1E documents to protect law enforcement records that would disclose techniques and procedures for law enforcement investigations or prosecutions, and that would disclose guidelines for law enforcement investigations and prosecutions. Plaintiff's requests seeks information concerning the law enforcement technique(s) of electronic or communications surveillance focused on problems which hamper FBI's ability to successfully intercept communications systems and networks, and details on preventing the FBI from "Going Dark." The responsive material details difficulties encountered by law enforcement in conducting electronic surveillance and discusses possible operational, legal, and procedural changes to the use, or enhancement of, investigative

techniques that would ensure ELSUR capabilities are effective and productive. Accordingly, the

release of this detailed information about surveillance techniques and associated problems or

vulnerabilities would provide violators a road map for successful law enforcement

circumvention. Criminal and terrorist elements would gain valuable insight about the conduct of

law enforcement surveillance operations and the exploitation of capability weaknesses that would

enable them to structure their criminal enterprise and terrorist formulating communications in a

manner to evade lawful intercept and/or thwart investigative efforts. Accordingly, the FBI has

properly withheld this information pursuant to Exemption (b)(7)(E).

## CATEGORY 2C - FBI COUNTER TERRORISM DIVISION (CTD) RESPONSE (LYNCH)

165.    Category 2C contains 16 responsive Bates pages consisting of 4 internal e-mail chains

between FBI divisions, and 4 talking points presentations/papers. One of the e-mail chains

discusses the difficulty the FBI was having with a certain cellular communications provider

concerning a lawful intercept order. The first talking points presentation details the most

frequently asked questions relating to the collection, interpretation, and preservation of

intelligence data provided by an Internet Service Provider (ISP) in response to either a FISA

order, NSL, and/or search warrant. The second talking points presentation is in the form of a 2

page "User Guide" on how to read User, History, and Messaging Shorthand provided by a certain

ISP. The third presentation is a 1 page talking points summary report that defines what a social

networking company is, and what can or cannot be obtained with a NSL/Subpoena. Finally, the

fourth talking points paper consists of 4 pages of a summary notes from an FBI employee on his interpretation of the frequently asked questions and answers concerning collection, interpreting, and preservation of data provided by ISP's in response to a FISA order, NSL, and/or search warrant. Of these 16 Bates pages, 7 pages have been withheld in full, 8 pages released in part, and 1 page released in full.

166.    Exemption (b)(2).  At times in conjunction with (b)(6), and (b)(7)(C), Exemption (b)(2) has been asserted in Category 2C documents to protect internal, non-public telephone numbers of FBI personnel.  These internal, non-public telephone numbers are used by FBI personnel while they are working on significant national security and criminal investigations.  Disclosure of these internal, non-public telephone numbers could subject these individuals to harassing telephone calls, which could disrupt official business (including impeding the ability of Special Agents to conduct and conclude functions related to the law enforcement investigations in a timely manner).  With the narrowing of the application of Exemption (b)(2) to those records which relate to employee relations and human resource issues, the FBI has determined that, in those instances where Exemption (b)(2) has been asserted in conjunction with Exemption (b)(7)(E), the use of Exemption (b)(2) is now withdrawn.  Accordingly, because disclosure of these internal, non-public telephone numbers could impede the FBI's effectiveness and may risk circumvention of the law, the FBI has properly withheld this information pursuant to Exemption (b)(2), at times in conjunction with (b)(6) and (b)(7)(C).

167.    Exemptions (b)(6) and (b)(7)(C).  At times in conjunction with (b)(2), Exemptions (b)(6), and (b)(7)(C) have been asserted in Category 2C documents to protect the names and identifying information of FBI Special Agents (SAs) who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in these records, or who were consulted on sensitive developmental projects (e.g., National Electronic Surveillance Strategy).  The SAs mentioned did not choose their assignments.  The publicity associated with the release of these SAs' identities, in connection with a particular investigation, or internal developmental project, could trigger hostility toward a particular employee, or pressure of attempted bribery, to obtain intelligence.  Publicity, adverse or otherwise, regarding any particular investigation conducted by SAs may seriously impair the SAs effectiveness in conducting future investigations, or consultations.  This privacy consideration also protects SAs from unnecessary, unofficial questioning as to the conduct of an investigation, or internal developmental project, whether or not they are currently employed by the FBI.  The names of FBI Professional Support personnel are also withheld in Category 2C documents pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).  Professional Support personnel are assigned to handle tasks related to official criminal investigations, and/or developmental projects (e.g., National Electronic Surveillance Strategy), as reflected in the documents responsive to plaintiff's request.  They maintain substantial privacy interests in not having their identities disclosed.  Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).

168.    Exemptions (b)(6) and (b)(7)(C).  Exemptions (b)(6), and (b)(7)(C) have also been asserted in a Category 2C document to protect the name and identifying information of a corporate legal officer in the communication industry that was merely mentioned in a document responsive to plaintiff's request.  This individual was not of investigative interest to the FBI, but was identified in connection with an ELSUR compliance legal issue.  Release of this type of information about private citizens, without notarized authorizations permitting such a release violates individuals legitimate privacy interests.  If the FBI disclosed their names and/or other personal information, the disclosure would reveal that these third parties were at one time connected with an FBI investigation, or developmental project, in some way.  Disclosure of their identities could subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them.

169.    The FBI also examined the record at issue to determine whether there was any public interest that outweighed the substantial privacy interests of the corporate employee merely mentioned in the responsive records.  The FBI could not identify any discernible public interest. In particular, the FBI could not determine how the disclosure of the name, and/or identifying information of this individual would shed any light on the operations and activities of the FBI. Thus, the FBI determined that this individuals' privacy interests outweighed any public interest in disclosure, and that disclosure of the name and/or identifying information of this third party merely mentioned would constitute a "clearly unwarranted and unwarranted invasion of personal

1

2  privacy." The FBI properly withheld this information pursuant to Exemptions (b)(6) and

3

4  (b)(7)(C).

5  170.    Exemption (b)(7)(E).  Exemption (b)(7)(E) has been asserted in Category 2C documents

6

7  to protect law enforcement records that would disclose techniques and procedures for law

8  enforcement investigations or prosecutions, and that would disclose guidelines for law

9  enforcement investigations and prosecutions.  Plaintiff's requests seeks information concerning

10

11  the law enforcement technique(s) of electronic or communications surveillance focused on

12  problems which hamper FBI's ability to successfully intercept communications systems and

13  networks, and details on preventing the FBI from "Going Dark."  The responsive material details

14

15  difficulties encountered by law enforcement in conducting electronic surveillance and discusses

16  possible operational, legal, and procedural changes to the use, or enhancement of, investigative

17  techniques that would ensure ELSUR capabilities are effective and productive.  Accordingly, the

18

19  release of this detailed information about surveillance techniques and associated problems or

20  vulnerabilities would provide violators a road map for successful law enforcement

21  circumvention.  Criminal and terrorist elements would gain valuable insight about the conduct of

22

23  law enforcement surveillance operations and the exploitation of capability weaknesses that would

24  enable them to structure their criminal enterprise and terrorist formulating communications in a

25  manner to evade lawful intercept and/or thwart investigative efforts.  Accordingly, the FBI has

26

27  properly withheld this information pursuant to Exemption (b)(7)(E).

28                                            98

## CATEGORY 2D - FBI OFFICE OF THE GENERAL COUNSEL (OGC) RESPONSE (LYNCH)

171.    Category 2D contains 35 responsive Bates pages consisting of internal e-mail chains (many partly classified) between FBI divisions, and a talking point paper.  These e-mails summarize meetings concerning legal, technical, legislative proposals, and communication industry challenges that are limiting the effectiveness of lawful ELSUR intercept capabilities.  A majority of the e-mails discuss challenges working with foreign based communication service providers, how peer to peer applications will continue to erode the FBI's ELSUR capabilities due to the level of encryption, and exchange process that is very secure, and how expanding technological advancements and multiple communication service platforms have highlighted CALEA shortfalls.  2 of the email chains discuss the development of a talking points paper for Director Mueller concerning cooperation and assistance efforts provided by ISP's, and legal and technological issues that have effected FBI investigations.  The talking points paper was prepared for Director Mueller and details the cooperation and assistance provided by ISP's and how legal and technical issues have effected FBI Investigations (case examples provided).  Of these 35 Bates pages, 2 pages have been withheld in full, 32 pages released in part, and 1 page released in full.

172.    Exemption (b)(1).  At times Exemption (b)(1) has been asserted in Category 2D documents to withhold information that is properly classified.  The information withheld (b)(1) is currently and properly classified under E.O. 13256 at the SECRET level and is exempt from disclosure pursuant to E.O. 13526, § 1.4, category (c) intelligence activities (including covert

action), intelligence sources or methods, and category (d) foreign relations, or foreign activities

of the United States, including confidential sources, as the unauthorized disclosure of this

information could reasonably be expected to cause serious damage to the national security of the

United States.

173.   The information withheld pursuant to Exemption (b)(1) for Category 2D documents

consists of classified procedures and methods of intelligence-gathering utilized by the FBI to

gather intelligence information.   An intelligence activity or method has two characteristics.

First, the intelligence activity and information generated by it is needed by U.S.

Intelligence/Counterintelligence agencies to carry out their missions.  Second, confidentiality

must be maintained with respect to the activity if the viability, productivity, and usefulness of

that information is to be preserved.  The classification redactions have been asserted to protect

from disclosure information that would reveal the actual intelligence activities utilized by the FBI

against specific targets of foreign counterintelligence investigations or operations; or disclosure

of intelligence gathering capabilities of the activities directed at specific targets.  The intelligence

activities detailed in the withheld information are effective means for the FBI to gather, store, or

disseminate intelligence information.  The criteria applied and priorities assigned in these records

are used in the FBI's present intelligence or counterintelligence investigations in accordance with

the Attorney General's guidelines on FBI intelligence or counterintelligence investigations.

174.   The information in these Category 2D documents concerning intelligence activities is

very specific in nature and known to very few individuals.  Disclosure of the specific information

which describes these intelligence activities would reveal that they are still used by the FBI today to gather intelligence information, and could reasonably be expected to cause serious damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discover the current intelligence activities used; (2) disclosure would reveal or determine the criteria used--and priorities assigned to--current intelligence or counterintelligence investigations; (3) disclosure would reveal the Intelligence Community's (IC's) continual sensitive work creating a decentralized communication medium which would aid in facilitating the sharing of information and enhance collaboration efforts across the IC; and (4) disclosure will highlight the exact data collection and ELSUR capabilities shortfalls that the IC are encountering during National Security investigations due to technology advancements in communication system platforms, and encryption applications. Hostile entities could then develop countermeasures which could severely disrupt the FBI's intelligence-gathering capabilities. This would severely damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws. The FBI protected the identity of intelligence sources, or methods, specific to intelligence activities, because disclosure reasonably could be expected to cause serious damage to the national security. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(1).

175. Exemption (b)(1). In addition, information withheld pursuant to Exemption (b)(1) in these Category 2D documents has also been found to affect the foreign relations of the United States, and much like foreign government information, this relationship and/or activities, does

not lose its sensitivity with the passage of time.  The delicate liaisons established between and among the United States and foreign governments could be severely damaged should the United States disclose such information from these investigations.  As a result, such information must be handled with care so as to not jeopardize the fragile relationships which exist among the United States and certain foreign governments. The unauthorized disclosure of information concerning foreign relations or foreign activities of the United States can reasonably be expected to lead to diplomatic or economic retaliation against the United States; identify the target, scope or time frame of intelligence activities of the United States in or about a foreign country, which may result in the curtailment or cessation of these activities; enable hostile entities to assess United States intelligence-gathering activities in or about a foreign country and devise countermeasures against these activities; or compromise cooperative foreign sources which may jeopardize their safety and curtail the flow of information from these sources. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(1).

176.   Exemption (b)(2).  At times in conjunction with (b)(6), and (b)(7)(C), Exemption (b)(2) has been asserted in Category 2D documents to protect internal, non-public telephone numbers of FBI personnel.  These internal, non-public telephone numbers are used by FBI personnel while they are working on significant national security and criminal investigations.  Disclosure of these internal, non-public telephone numbers could subject these individuals to harassing telephone calls, which could disrupt official business (including impeding the ability of Special Agents to conduct and conclude functions related to the law enforcement investigations in a timely

manner).  With the narrowing of the application of Exemption (b)(2) to those records which relate to employee relations and human resource issues, the FBI has determined that, in those instances where Exemption (b)(2) has been asserted in conjunction with Exemption (b)(7)(E), the use of Exemption (b)(2) is now withdrawn.  Accordingly, because disclosure of these internal, non-public telephone numbers could impede the FBI's effectiveness and may risk circumvention of the law, the FBI has properly withheld this information pursuant to Exemption (b)(2), at times in conjunction with (b)(6) and (b)(7)(C).

177.    Exemption (b)(3).  In conjunction with (b)(1), Exemption (b)(3) has been asserted in a Category 2D document to withhold information pursuant to 18 U.S.C. § 3123(d), the Pen Register Act, which protects from disclosure information pertaining to certain court "order(s) authorizing or approving the installation and use of a pen register or a trap and trace devise;" and information pertaining to "the existence of the pen register or trap and trace device or the existence of the investigation."  Where documents at issue contain information, that, if disclosed, would reveal the existence or use of a pen register or trap and trace device, or reveal the existence of an investigation involving a pen register or trap and trace device, that information is protected from disclosure by Exemption (b)(3), at times in conjunction with Exemption (b)(1).

178.    Exemption (b)(5).  Exemption (b)(5) has been asserted in 32 of the 35 Category 2D documents to protect the deliberative process privilege.  The deliberative process privilege protects the internal deliberations of an agency by exempting from release recommendations,

drafts, analyses, speculation and other non-factual information prepared in anticipation of agency

decision-making. The general purpose of the deliberative process privilege is to prevent injury to

the quality of agency decisions. The protected material contained draft deliberative e-mail

chains, and a talking points paper related to the FBI's strategic policy development process

concerning surveillance challenges posed by emerging technologies. The e-mails summarize

meetings concerning legal, technical, legislative proposals, and communication industry

challenges that are limiting the effectiveness of lawful ELSUR intercept capabilities. A majority

of the e-mails discuss challenges working with foreign based communication service providers,

how peer to peer applications will continue to erode the FBI's ELSUR capabilities due to the

level of encryption, and exchange process that is very secure, and how expanding technological

advancements and multiple communication service platforms have highlighted CALEA

shortfalls. The deliberative talking points paper, which was prepared for Director Mueller,

discusses details of the cooperation and assistance provided by ISP's and how legal and technical

issues have effected FBI Investigations.

179.    Thus, material that contains or was prepared in connection with the formulation of

opinions, advice, evaluations, deliberations, policy formulation, proposals, conclusions or

recommendations, may properly be withheld. Release of this type of information would have an

inhibitive effect upon the development of policy and administrative direction of an agency

because it would chill the full and frank discussion between agency personnel regarding a

decision. If agency personnel knew that their preliminary opinions, evaluations and comments would be released for public consumption, they might be more circumspect in what they put in writing, and thereby, impede a candid discussion of the issues surrounding a decision.

Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(5).

180.    Exemptions (b)(6) and (b)(7)(C). At times in conjunction with (b)(2), Exemptions (b)(6), and (b)(7)(C) have been asserted in Category 2D documents to protect the names and identifying information of FBI Special Agents (SAs) who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in these records, or who were consulted on sensitive internal developmental projects (e.g., National Electronic Surveillance Strategy). The SAs mentioned did not choose their assignments. The publicity associated with the release of these SAs' identities, in connection with a particular investigation, or internal developmental project, could trigger hostility toward a particular employee, or pressure of attempted bribery, to obtain intelligence. Publicity, adverse or otherwise, regarding any particular investigation conducted by SAs may seriously impair the SAs effectiveness in conducting future investigations, or consultations. This privacy consideration also protects SAs from unnecessary, unofficial questioning as to the conduct of an investigation, or internal developmental project, whether or not they are currently employed by the FBI. The names of FBI Professional Support personnel are also withheld in Category 2D documents pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2). Professional Support personnel are assigned to handle tasks related to official criminal investigations, and/or

developmental projects (e.g., National Electronic Surveillance Strategy), as reflected in the documents responsive to plaintiff's request. They maintain substantial privacy interests in not having their identities disclosed. Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).

181.    Exemptions (b)(6) and (b)(7)(C).  In addition, in conjunction with (b)(7)(D), and (b)(1), Exemptions (b)(6), and (b)(7)(C) have been asserted in Category 2D documents to withhold the names and identifying information of intelligence officers of a Foreign Intelligence Agency who provided tactical advice and intelligence concening on-going investigations.  The confidentiality of the identities of these foreign intelligence officers is given under an express assurance of confidentiality according to the Foreign Government Information Classification Guide #1 (G-1 Guide), issued in accordance with E.O. 13526, Information Security Oversight Office (ISOO), the FBI Security Policy Manual, and the designated Original Classification Authority (OCA) of the Executive Assistant Director, National Security Branch.  During the course of the FBI's intelligence investigations it received information from intelligence officers of a foreign government regarding on-going investigations.  The FBI has many agreements with foreign governments under which security and/or criminal law enforcement information is exchanged.  The agreements specify the extent of confidentiality requested by the respective foreign government entity.  In this case, the FBI has express confidentiality agreements with this foreign government and/or foreign law enforcement entity which provided information to the FBI during the conduct of intelligence investigations, to protect the identity of its intelligence officers.  The

FBI's agreements with this law enforcement entity provides express assurance that the FBI will not disclose their identity, the identity of their intelligence officers, as well as the information that they provided to the FBI. If the FBI were to disclose the identities of these foreign governments, the names of their intelligence officers, and the information provided by foreign law enforcement entities under an express assurance of confidentiality, such a disclosure would have a chilling effect on the FBI's relationship with these entities. Furthermore, the disclosure would have a chilling effect on the FBI's relationship with other foreign law enforcement agencies which have entered into similar agreements with the FBI. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(6), and (b)(7)(C), in conjunction with (b)(7)(D), and (b)(1).

182.    Exemption (b)(7)(A). Exemption (b)(7)(A) exempts from disclosure records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings. Exemption (b)(7)(A), at times in conjunction with (b)(1), has been asserted in Category 2D documents to protect information that either summarize, discuss, or relate to FBI criminal cases which remain in an open or active status. The release of such information would reveal the scope, direction, nature and pace of the investigations as well as reveal information that could harm prospective and/or ongoing government prosecutions in these matters. If the information is released, the individuals and/or entities, who are of investigative interest in the cases could use the information to develop alibis, take steps to circumvent the law,

create factitious defenses or intimidate, harass or harm potential witnesses.  Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(A), at times in conjunction with (b)(1).

183.    Exemption (b)(7)(D).  Exemption (b)(7)(D) has been asserted in Category 2D documents to withhold information provided to the FBI by commercial/private companies and other non-government entities under circumstances from which an assurance of confidentiality may be implied.  During the course of the FBI's intelligence investigations, certain commercial/private companies provided information to the FBI relating to the subjects of these investigations.  To disclose the fact that these companies provided information to the FBI during the course of an investigation could harm the commercial interests of these enterprises by deterring the public from employing their services.  In addition, such a disclosure has wider implications.  If the FBI disclosed the identities of confidential sources that provide information to the FBI on a continuing basis, that revelation would have a chilling effect on the activities and cooperation of other current or potential future FBI confidential sources.  Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(D).

184.    Exemption (b)(7)(D).  In addition, at times in conjunction with (b)(1), Exemption (b)(7)(D) has been asserted in Category 2D documents to withhold information provided to the FBI by a foreign government and/or foreign law enforcement entity under an express assurance of confidentiality according to the Foreign Government Information Classification Guide #1 (G-1 Guide), issued in accordance with E.O. 13526, Information Security Oversight Office (ISOO),

the FBI Security Policy Manual, and the designated Original Classification Authority (OCA) of the Executive Assistant Director, National Security Branch. During the course of the FBI's intelligence investigations it received information from a foreign government regarding on-going investigations. The FBI has many agreements with foreign governments under which security and/or criminal law enforcement information is exchanged. The agreements specify the extent of confidentiality requested by the respective foreign government entity. In this case, the FBI has express confidentiality agreements with this foreign government and/or foreign law enforcement entity which provided information to the FBI during the conduct of intelligence investigations. The FBI's agreements with this law enforcement entity provides express assurance that the FBI will not disclose their identity, as well as the information that they provided to the FBI. If the FBI were to disclose the identities and the information provided by foreign law enforcement entities under an express assurance of confidentiality, such a disclosure would have a chilling effect on the FBI's relationship with these entities. Furthermore, the disclosure would have a chilling effect on the FBI's relationship with other foreign law enforcement agencies which have entered into similar agreements with the FBI. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(D), at times in conjunction with (b)(1).

185.    Exemption (b)(7)(E). Exemption (b)(7)(E) has been asserted in Category 2D documents to protect law enforcement records that would disclose techniques and procedures for law enforcement investigations or prosecutions, and that would disclose guidelines for law enforcement investigations and prosecutions. Plaintiff's requests seeks information concerning

1

2   the law enforcement technique(s) of electronic or communications surveillance focused on

3   problems which hamper FBI's ability to successfully intercept communications systems and

4   networks, and details on preventing the FBI from "Going Dark."  The responsive material details

5   difficulties encountered by law enforcement in conducting electronic surveillance and discusses

6   possible operational, legal, and procedural changes to the use, or enhancement of, investigative

7   techniques that would ensure ELSUR capabilities are effective and productive.  Accordingly, the

8   release of this detailed information about surveillance techniques and associated problems or

9   vulnerabilities would provide violators a road map for successful law enforcement

10  circumvention.  Criminal and terrorist elements would gain valuable insight about the conduct of

11  law enforcement surveillance operations and the exploitation of capability weaknesses that would

12  enable them to structure their criminal enterprise and terrorist formulating communications in a

13  manner to evade lawful intercept and/or thwart investigative efforts.  Accordingly, the FBI has

14  properly withheld this information pursuant to Exemption (b)(7)(E).

15  **CATEGORY 2E - FBI COUNTER-INTELLIGENCE (CID) RESPONSE (LYNCH)**

16  186.     Category 2E contains 72 responsive Bates pages consisting of internal e-mail chains

17  (many classified) between FBI divisions and/or FBI field offices involved in mostly pending

18  investigations, a discussion paper, and a mostly classified Electronic Communication (EC).  The

19  internal e-mail discussions summarize meetings concerning technical ELSUR challenges that are

20  limiting the effectiveness of lawful ELSUR intercept capabilities, and proposed legislative

solutions.  The mostly pending investigations outlined in the e-mails highlight ELSUR

limitations and the need to preserve lawful intercept capabilities by amending CALEA,

improving cooperation and assistance from communication service providers, and developing

advanced investigative techniques.  A 2 page discussion paper summarizes new technological

advances in the Voice-over-IP network (VoIP) services that limit ELSUR capabilities. Finally, an

internal EC, concerning a classified investigation, discusses the issues concerning a Voice-over

Internet Protocol (VoIP) service provider and possible involvement with foreign entities.  Of

these 72 Bates pages, 36 pages have been withheld in full, 31 pages released in part, and 5 pages

released in full.

187.    Exemption (b)(1).  At times Exemption (b)(1) has been asserted in Category 2E

documents to withhold information that is properly classified.  The information withheld (b)(1) is

currently and properly classified under E.O. 13256 at the SECRET level and is exempt from

disclosure pursuant to E.O. 13526, § 1.4, category (c) intelligence activities (including covert

action), intelligence sources or methods, as the unauthorized disclosure of this information could

reasonably be expected to cause serious damage to the national security of the United States.

188.    The information withheld pursuant to Exemption (b)(1) for Category 2E documents

consists of classified procedures and methods of intelligence-gathering utilized by the FBI to

gather intelligence information.   An intelligence activity or method has two characteristics.

First, the intelligence activity and information generated by it is needed by U.S.

Intelligence/Counterintelligence agencies to carry out their missions. Second, confidentiality

must be maintained with respect to the activity if the viability, productivity, and usefulness of

that information is to be preserved. The classification redactions have been asserted to protect

from disclosure information that would reveal the actual intelligence activities utilized by the FBI

against specific targets of foreign counterintelligence investigations or operations; or disclosure

of intelligence gathering capabilities of the activities directed at specific targets. The intelligence

activities detailed in the withheld information are effective means for the FBI to gather, store, or

disseminate intelligence information. The criteria applied and priorities assigned in these records

are used in the FBI's present intelligence or counterintelligence investigations in accordance with

the Attorney General's guidelines on FBI intelligence or counterintelligence investigations.

189.    The information in these Category 2E documents concerning intelligence activities is very

specific in nature and known to very few individuals. Disclosure of the specific information

which describes these intelligence activities would reveal that they are still used by the FBI today

to gather intelligence information, and could reasonably be expected to cause serious damage to

the national security for the following reasons: (1) disclosure would allow hostile entities to

discover the current intelligence activities used; (2) disclosure would reveal or determine the

criteria used--and priorities assigned to--current intelligence or counterintelligence investigations;

(3) disclosure would reveal the Intelligence Communities (IC's) continual sensitive work creating

a decentralized communication medium which would aid in facilitating the sharing of

information and enhance collaboration efforts across the IC; and (4) disclosure will highlight the

exact data collection and ELSUR capabilities shortfalls that the IC are encountering during

National Security investigations due to technology advancements in communication system

platforms, and encryption applications.  Hostile entities could then develop countermeasures

which could severely disrupt the FBI's intelligence-gathering capabilities.  This would severely

damage the FBI's efforts to detect and apprehend violators of the United States' national security

and criminal laws.  The FBI protected the identity of intelligence sources, or methods,  specific to

intelligence activities, because disclosure reasonably could be expected to cause serious damage

to the national security. Accordingly, the FBI has properly withheld this information pursuant to

Exemption (b)(1).

190.    Exemption (b)(2).  At times in conjunction with (b)(6), and (b)(7)(C), Exemption (b)(2)

has been asserted in Category 2E documents to protect internal, non-public telephone numbers of

FBI personnel.  These internal, non-public telephone numbers are used by FBI personnel while

they are working on significant national security and criminal investigations.  Disclosure of these

internal, non-public telephone numbers could subject these individuals to harassing telephone

calls, which could disrupt official business (including impeding the ability of Special Agents to

conduct and conclude functions related to the law enforcement investigations in a timely

manner).  With the narrowing of the application of Exemption (b)(2) to those records which

relate to employee relations and human resource issues, the FBI has determined that, in those

instances where Exemption (b)(2) has been asserted in conjunction with Exemption (b)(7)(E), the

use of Exemption (b)(2) is now withdrawn.  Accordingly, because disclosure of these internal,

non-public telephone numbers could impede the FBI's effectiveness and may risk circumvention

of the law, the FBI has properly withheld this information pursuant to Exemption (b)(2), at times

in conjunction with (b)(6) and (b)(7)(C).

191.   Exemption (b)(3).  At times in conjunction with (b)(1), Exemption (b)(3) has been

asserted in Category 2E documents to withhold information pursuant to 18 U.S.C. § 2516, which

protects from disclosure information pertaining to the authorization of interception of wire, oral,

or electronic communications.  The Attorney General may authorize an application to a Federal

Judge, requesting to intercept wire or oral communications by the FBI when such interception

may provide or has provided evidence of a crime, e.g., Charter 37 (Espionage); Charter 90

(Protection of Trade Secrets); and Chapter 105 (Sabotage).  Where documents at issue contain

information, that, if disclosed, would reveal information pertaining to the authorization of

interception of wire, oral, or electronic communications, that information is protected from

disclosure by Exemption (b)(3), at times in conjunction with Exemption (b)(1).

192.   Exemption (b)(5).  Exemption (b)(5) has been asserted in Category 2E documents to

protect the deliberative process privilege.  The deliberative process privilege protects the internal

deliberations of an agency by exempting from release recommendations, drafts, analyses,

speculation and other non-factual information prepared in anticipation of agency decision-making. The general purpose of the deliberative process privilege is to prevent injury to the quality of agency decisions. The protected material contained deliberative discussions in internal e-mail chains (many classified) between FBI divisions and/or FBI field offices involved in mostly pending investigations. The internal e-mail discussions summarize meetings concerning technical ELSUR and legal challenges that are limiting the effectiveness of lawful ELSUR intercept capabilities, and proposed legislative solutions. The mostly pending investigations outlined in the e-mails highlight ELSUR limitations and discussions on preserving lawful intercept capabilities by proposing amendments to CALEA, improving cooperation and assistance from communication service providers, and developing advanced investigative techniques.

193.    Thus, material that contains or was prepared in connection with the formulation of opinions, advice, evaluations, deliberations, policy formulation, proposals, conclusions or recommendations, may properly be withheld. Release of this type of information would have an inhibitive effect upon the development of policy and administrative direction of an agency because it would chill the full and frank discussion between agency personnel regarding a decision. If agency personnel knew that their preliminary opinions, evaluations and comments would be released for public consumption, they might be more circumspect in what they put in writing, and thereby, impede a candid discussion of the issues surrounding a decision. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(5).

194.   Exemptions (b)(6) and (b)(7)(C).  At times in conjunction with (b)(2), Exemptions (b)(6), and (b)(7)(C) have been asserted in Category 2E documents to protect the names and identifying information of FBI Special Agents (SAs) who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in these records, or who were consulted on sensitive internal developmental projects (e.g., National Electronic Surveillance Strategy). The SAs mentioned did not choose their assignments.  The publicity associated with the release of these SAs' identities, in connection with a particular investigation, or internal developmental project, could trigger hostility toward a particular employee, or pressure of attempted bribery, to obtain intelligence.  Publicity, adverse or otherwise, regarding any particular investigation conducted by SAs may seriously impair the SAs effectiveness in conducting future investigations, or consultations.  This privacy consideration also protects SAs from unnecessary, unofficial questioning as to the conduct of an investigation, or developmental project, whether or not they are currently employed by the FBI.   The names of FBI Professional Support personnel are also withheld in Category 2E documents pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).  Professional Support personnel are assigned to handle tasks related to official criminal investigations, and/or developmental projects (e.g., National Electronic Surveillance Strategy), as reflected in the documents responsive to plaintiff's request. They maintain substantial privacy interests in not having their identities disclosed.  Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).

195.    Exemptions (b)(6) and (b)(7)(C).   At times Exemptions (b)(6), and (b)(7)(C) have also

been asserted in Category 2E documents to protect the names and identifying information of third

parties that were merely mentioned in the documents responsive to plaintiff's request.   These

individuals are not of investigative interest to the FBI.   Release of this type of information about

private citizens, without notarized authorizations permitting such a release violates individuals

legitimate privacy interests.   If the FBI disclosed their names and/or other personal information,

the disclosure would reveal that these third parties were at one time connected with an FBI

investigation, or developmental project, in some way.   Disclosure of their identities could subject

these individuals to possible harassment or criticism and focus derogatory inferences and

suspicion on them.   Thus, the FBI determined that these individuals' privacy interests outweighed

any public interest in disclosure, and that disclosure of the names and/or identifying information

of the third parties merely mentioned would constitute a "clearly unwarranted and unwarranted

invasion of personal privacy."   Accordingly, the FBI has properly withheld this information

pursuant to Exemptions (b)(6) and (b)(7)(C).

196.    Exemptions (b)(6) and (b)(7)(C).   At times Exemptions (b)(6), and (b)(7)(C) have also

been asserted in Category 2E documents to protect the names of personnel from the National

Security Division (NSD), several Assistant United States Attorney's (AUSA), and contractors

working for the FBI.   Publicity (adverse or otherwise) regarding any particular investigation they

have been assigned, or internal FBI developmental project (e.g., National Electronic Surveillance

Strategy) they may be contracted to help develop, may seriously prejudice their effectiveness in

117

conducting other investigations, or developmental projects.  The privacy consideration is also to

protect these federal employees, and/or contractors, as individuals, from unnecessary, unofficial

questioning as to the course of an investigation or internal developmental project, whether or not

they are currently employed by the FBI as contractors, or with Other Government Agencies

(OGA's).  These employees may have to conduct official inquiries into violations of National

Security, or help develop strategic plans, like developing ways to enhance ELSUR capabilities.

They come into contact with all strata of society, conducing searches, research, and making

inquiries, all of which result in reasonable but nonetheless serious disturbances to people and

their lives.  It is possible for an individual targeted by these OGA's to carry a grudge which may

last for years, and to seek revenge on the investigators and other federal employees involved in a

particular investigation.  Foreign governments, or criminal enterprises may threaten FBI

contractors searching for intelligence that may benefit their countries or criminal enterprises.

The publicity associated with the release of these OGA employee's, and/or contractors identities,

in connection with a particular investigation, or developmental project, could trigger hostility

toward a particular employee, or future threat to obtain intelligence.  There is no public interest to

be served by disclosing the identities of these employees, and/or contractors, to the public.  Thus,

disclosure of this information would constitute a "clearly unwarranted and unwarranted invasion

of their personal privacy."  Accordingly, the FBI has properly withheld this information pursuant

to Exemptions (b)(6), and (b)(7)(C).

118

197.   <u>Exemptions (b)(6) and (b)(7)(C)</u>.  At times Exemptions (b)(6), and (b)(7)(C) have also

been asserted in Category 2E documents to protect the names and/or identifying information of

third-party individuals who were of investigative interest to the FBI and/or other law enforcement

agencies.  Identifying information withheld concerning these third parties includes addresses,

dates of birth, social security numbers, and other personal information.  Any link to a law

enforcement investigation carries a strong negative connotation and a stigma.  Release of the

identities of these individuals to the public could subject them to harassment or embarrassment,

as well as undue public attention.  Accordingly, the FBI has determined that these individuals

maintain a substantial privacy interest in not having their identities disclosed.  In making a

determination whether to release the names and personal information concerning these third

parties, the public's interest in disclosure was balanced against the individual's right to privacy.

The FBI determined that this information would not enlighten the public on how the FBI

conducts its internal operations and investigations.  Accordingly, the FBI concluded that the

disclosure of this information would constitute a "clearly unwarranted and unwarranted invasion

of their personal privacy."  Accordingly, the FBI has properly withheld this information pursuant

to Exemptions (b)(6), and (b)(7)(C).

198.   <u>Exemptions (b)(6) and (b)(7)(C)</u>.  In addition, at times Exemptions (b)(6), and (b)(7)(C),

in conjunction with (b)(1), have also been asserted in Category 2E documents to protect the

names and identifying information of corporate personnel in the communication industry that

were mentioned in an internal EC, concerning a classified investigation, which discussed

119

confidential intelligence concerning a Voice-over Internet Protocol (VoIP) network service provider, and its possible involvement with foreign entities. Release of this type of information about private citizens, without notarized authorizations permitting such a release violates individuals legitimate privacy interests. If the FBI disclosed their names and/or other personal information, the disclosure would reveal that these third parties were at one time connected with an FBI investigation in some way. Disclosure of their identities could subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them.

199. The FBI also examined the records at issue to determine whether there was any public interest that outweighed the substantial privacy interests of the corporate employees mentioned in the responsive records. The FBI could not identify any discernible public interest. In particular, the FBI could not determine how the disclosure of the names, and/or identifying information of these individuals would shed any light on the operations and activities of the FBI. Thus, the FBI determined that these individuals' privacy interests outweighed any public interest in disclosure, and that disclosure of the names and/or identifying information of these third parties mentioned would constitute a "clearly unwarranted and unwarranted invasion of personal privacy." The FBI properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C), in conjunction with (b)(1).

200.    Exemption (b)(7)(A).   Exemption (b)(7)(A) exempts from disclosure records or

information compiled for law enforcement purposes, but only to the extent that the production of

such law enforcement records or information . . . could reasonably be expected to interfere with

enforcement proceedings.   Exemption (b)(7)(A), at times in conjunction with (b)(1), has been

asserted in Category 2E documents to protect information that either summarize, discuss, or

relate to FBI criminal cases which remain in an open or active status.   The release of such

information would reveal the scope, direction, nature and pace of the investigations as well as

reveal information that could harm prospective and/or ongoing government prosecutions in these

matters.   If the information is released, the individuals and/or entities, who are of investigative

interest in the cases could use the information to develop alibis, take steps to circumvent the law,

create factitious defenses or intimidate, harass or harm potential witnesses.   Accordingly, the FBI

has properly withheld this information pursuant to Exemption (b)(7)(A), at times in conjunction

with (b)(1).

201.    Exemption (b)(7)(D).   At times Exemption (b)(7)(D), in conjunction with (b)(1), has

been asserted in Category 2E documents to withhold information provided to the FBI by

commercial/private companies and other non-government entities under circumstances from

which an assurance of confidentiality may be implied.   During the course of the FBI's

intelligence investigations, certain commercial/private companies provided information to the

FBI relating to the subjects of these investigations.   To disclose the fact that these companies

provided information to the FBI during the course of an investigation could harm the commercial

interests of these enterprises by deterring the public from employing their services. In addition, such a disclosure has wider implications. If the FBI disclosed the identities of confidential sources that provide information to the FBI on a continuing basis, that revelation would have a chilling effect on the activities and cooperation of other current or potential future FBI confidential sources. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(D), in concunction with (b)(1).

202.    Exemption (b)(7)(E). Exemption (b)(7)(E) has been asserted in Category 2E documents to protect law enforcement records that would disclose techniques and procedures for law enforcement investigations or prosecutions, and that would disclose guidelines for law enforcement investigations and prosecutions. Plaintiff's requests seeks information concerning the law enforcement technique(s) of electronic or communications surveillance focused on problems which hamper FBI's ability to successfully intercept communications systems and networks, and details on preventing the FBI from "Going Dark." The responsive material details difficulties encountered by law enforcement in conducting electronic surveillance and discusses possible operational, legal, and procedural changes to the use, or enhancement of, investigative techniques that would ensure ELSUR capabilities are effective and productive. Accordingly, the release of this detailed information about surveillance techniques and associated problems or vulnerabilities would provide violators a road map for successful law enforcement circumvention. Criminal and terrorist elements would gain valuable insight about the conduct of

1

2  law enforcement surveillance operations and the exploitation of capability weaknesses that would

3
4  enable them to structure their criminal enterprise and terrorist formulating communications in a

5  manner to evade lawful intercept and/or thwart investigative efforts. Accordingly, the FBI has

6  properly withheld this information pursuant to Exemption (b)(7)(E).

7          **CATEGORY 2F - FBI OFFICE OF CONGRESSIONAL AFFAIRS (OCA) RESPONSE**
8                                          **(LYNCH)**

9  203.      Category 2F contains 77 responsive Bates pages consisting of talking points papers and/or
10
11 presentations, internal e-mails w/attachments between FBI personnel, congressional contact

12 summaries where amendments to CALEA were discussed, testimony by Director Mueller before

13 the Senate Committee on Intelligence, and information that was originally prepared by, and

14 obtained from, the DOJ, and was subsequently returned to the DOJ for direct response to

15 plaintiff. The talking points papers and/or presentations were developed on the following: 1)

16
17 defining 'Going Dark,' presenting case examples on how FBI ELSUR capabilities have been

18 effected, and offering possible solutions to enhance lawful intercept capabilities, 2) proposed

19 reforms presented by members of private industry and the privacy community concerning the

20 Electronic Communications Privacy Act of 1986 (ECPA), and 3) history of CALEA, summary of

21
22 different Federal Communication Council (FCC) orders that helped resolve some of CALEA's

23 shortfalls, and new proposals to amend CALEA through the legislative process to enhance

24 ELSUR capabilities. The internal e-mail chains show discussions that pertain to: 1) CALEA

25 limitations, and proposed amendments that will enhance ELSUR capabilities, 2) development of

26 'FBI Wikipedia' definitions on 'Going Dark,' 3) assessment and opinions related to surveillance

27

28                                          123

challenges faced by the FBI, and defining 'Going Dark,' 4) Operational Technology (OTD) statement of opposition to certain provisions of the COPS Improvement ACT-S167, and 5) an announcement of a closed HPSCI Committee hearing on the DOJ/Intel programs and budget. Of these 77 Bates pages, 70 pages have been withheld in full, and 7 pages released in part.

204.    Exemption (b)(1).  At times Exemption (b)(1) has been asserted in Category 2F documents to withhold information that is properly classified.  The information withheld (b)(1) is currently and properly classified under E.O. 13256 at the SECRET level and is exempt from disclosure pursuant to E.O. 13526, § 1.4, category (c) intelligence activities (including covert action), intelligence sources or methods, as the unauthorized disclosure of this information could reasonably be expected to cause serious damage to the national security of the United States.

205.    The information withheld pursuant to Exemption (b)(1) for Category 2F documents consists of classified procedures and methods of intelligence-gathering utilized by the FBI to gather intelligence information.   An intelligence activity or method has two characteristics. First, the intelligence activity and information generated by it is needed by U.S. Intelligence/Counterintelligence agencies to carry out their missions.  Second, confidentiality must be maintained with respect to the activity if the viability, productivity, and usefulness of that information is to be preserved.  The classification redactions have been asserted to protect from disclosure information that would reveal the actual intelligence activities utilized by the FBI against specific targets of foreign counterintelligence investigations or operations; or disclosure

124

of intelligence gathering capabilities of the activities directed at specific targets. The intelligence activities detailed in the withheld information are effective means for the FBI to gather, store, or disseminate intelligence information. The criteria applied and priorities assigned in these records are used in the FBI's present intelligence or counterintelligence investigations in accordance with the Attorney General's guidelines on FBI intelligence or counterintelligence investigations.

206.    The information in these Category 2F documents concerning intelligence activities is very specific in nature and known to very few individuals. Disclosure of the specific information which describes these intelligence activities would reveal that they are still used by the FBI today to gather intelligence information, and could reasonably be expected to cause serious damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discover the current intelligence activities used; (2) disclosure would reveal or determine the criteria used--and priorities assigned to--current intelligence or counterintelligence investigations; (3) disclosure would reveal the Intelligence Communities (IC's) continual sensitive work creating a decentralized communication medium which would aid in facilitating the sharing of information and enhance collaboration efforts across the IC; and (4) disclosure will highlight the exact data collection and ELSUR capabilities shortfalls that the IC are encountering during National Security investigations due to technology advancements in communication system platforms, and encryption applications. Hostile entities could then develop countermeasures which could severely disrupt the FBI's intelligence-gathering capabilities. This would severely

damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws. The FBI protected the identity of intelligence sources, or methods, specific to intelligence activities, because disclosure reasonably could be expected to cause serious damage to the national security. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(1).

207. Exemption (b)(2). In conjunction with (b)(6), and (b)(7)(C), Exemption (b)(2) has been asserted on a Category 2F document to protect internal, non-public telephone numbers of FBI personnel. These internal, non-public telephone numbers are used by FBI personnel while they are working on significant national security and criminal investigations. Disclosure of these internal, non-public telephone numbers could subject these individuals to harassing telephone calls, which could disrupt official business (including impeding the ability of Special Agents to conduct and conclude functions related to the law enforcement investigations in a timely manner). With the narrowing of the application of Exemption (b)(2) to those records which relate to employee relations and human resource issues, the FBI has determined that, in those instances where Exemption (b)(2) has been asserted in conjunction with Exemption (b)(7)(E), the use of Exemption (b)(2) is now withdrawn. Accordingly, because disclosure of these internal, non-public telephone numbers could impede the FBI's effectiveness and may risk circumvention of the law, the FBI has properly withheld this information pursuant to Exemption (b)(2), in conjunction with (b)(6) and (b)(7)(C).

126

208.    Exemption (b)(5).  Exemption (b)(5) has been asserted in 52 of 77 Category 2F

documents to protect the deliberative process privilege.  The deliberative process privilege

protects the internal deliberations of an agency by exempting from release recommendations,

drafts, analyses, speculation and other non-factual information prepared in anticipation of agency

decision-making.  The general purpose of the deliberative process privilege is to prevent injury to

the quality of agency decisions.   The protected material contained deliberative discussions

during the preparation of talking points papers and/or presentations, and e-mail chains

exchanging opinions, advice, proposals, and the making of recommendations.  The deliberative

exchange included discussions on FBI ELSUR capabilities shortfalls, and prposed solutions to

enhance lawful intercept capabilities, the proposed reforms presented by members of private

industry and the privacy community concerning the Electronic Communications Privacy Act of

1986 (ECPA), opposition to certain provisions of the COPS Improvement ACT-S167, and the

history of CALEA, summary of different Federal Communication Council (FCC) orders that

helped resolve some of CALEA's shortfalls, and new proposals to amend CALEA through the

legislative process to enhance ELSUR capabilities.

209.    Thus, material that contains or was prepared in connection with the formulation of

opinions, advice, evaluations, deliberations, policy formulation, proposals, conclusions or

recommendations, may properly be withheld.  Release of this type of information would have an

inhibitive effect upon the development of policy and administrative direction of an agency

because it would chill the full and frank discussion between agency personnel regarding a

decision.  If agency personnel knew that their preliminary opinions, evaluations and comments would be released for public consumption, they might be more circumspect in what they put in writing, and thereby, impede a candid discussion of the issues surrounding a decision. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(5).

210.    Exemption (b)(5).  In addition, Exemption (b)(5) has been asserted in 2 of the 77 Category 2F documents to protect material covered by the attorney-client privilege.  These 2 pages pertained to the internal legal discusion as the FBI and DOJ developed an opposition statement against certain provisions of the COPS Improvement ACT-S167.  The attorney-client privilege is appropriately asserted when legal advice of any kind is sought from a professional legal adviser in his or her capacity as such, and the communications relating to that purpose are made in confidence by the client.  The communications are permanently protected from disclosure by the client or by the legal adviser unless the attorney-client protection is waived. This privilege encompasses confidential communications made to the attorney not only by decision-making personnel but also by lower-echelon employees who possess information relevant to an attorney's advice-rendering function.  Disclosure of the two-way communications between DOJ attorneys and their clients would impede the full disclosure of all of the information that relates to the client's reasons for seeking legal advice, which is necessary if the professional mission is to be accomplished.  Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(5).

211.     Exemptions (b)(6) and (b)(7)(C).  At times in conjunction with (b)(2), Exemptions (b)(6), and (b)(7)(C) have been asserted in Category 2F documents to protect the names and identifying information of FBI Special Agents (SAs) who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in these records, or who were consulted on sensitive internal developmental projects (e.g., National Electronic Surveillance Strategy).  The SAs mentioned did not choose their assignments.  The publicity associated with the release of these SAs' identities, in connection with a particular investigation, or internal developmental project, could trigger hostility toward a particular employee, or pressure of attempted bribery, to obtain intelligence.  Publicity, adverse or otherwise, regarding any particular investigation conducted by SAs may seriously impair the SAs effectiveness in conducting future investigations, or consultations.  This privacy consideration also protects SAs from unnecessary, unofficial questioning as to the conduct of an investigation, or developmental project, whether or not they are currently employed by the FBI.   The names of FBI Professional Support personnel are also withheld in Category 2F documents pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).  Professional Support personnel are assigned to handle tasks related to official criminal investigations, and/or developmental projects (e.g., National Electronic Surveillance Strategy), as reflected in the documents responsive to plaintiff's request.  They maintain substantial privacy interests in not having their identities disclosed.  Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(2).

212.    Exemptions (b)(6) and (b)(7)(C).  In addition, Exemption (b)(6), and (b)(7)(C) have been

asserted in a Category 2F document to protect the name of a Congressional staff member, and a

representative of the DOJ.   Summary briefings prepared by OCA staff members after meetings

with Congressman, Senators, and/or their congressional staff representative, list congressional

staffers, and other participants, that were involved with discussions, which in this case concerned

the need to update CALEA, especially in the area of VoIP devices and technology.   Publicity

(adverse or otherwise) regarding any internal FBI developmental projects (e.g., National

Electronic Surveillance Strategy), and legislative strategy to make amendments to outdated laws,

that these congressional staffers, and DOJ representative, may be requested to provide input on,

may seriously prejudice their effectiveness in helping on other developmental projects, and

legislative strategies.   The privacy consideration is also to protect these federal employees as

individuals, from unnecessary, unofficial questioning as to the course, and their knowledge, of

national security developmental projects, or legislative strategies, whether or not they are

currently employed by the Congress.   These employees may have to give input on the

development of strategic plans, like developing ways to enhance ELSUR capabilities through

legislative amendments.   They come into contact with all strata of society.   The publicity

associated with the release of these congressional staffers involved with an FBI developmental

project, could trigger hostility toward a particular employee to obtain intelligence.   There is no

public interest to be served by disclosing the identities of these employees to the public.   Thus,

1

2   disclosure of this information would constitute a "clearly unwarranted and unwarranted invasion

3
4   of their personal privacy." Accordingly, the FBI has properly withheld this information pursuant

5   to Exemptions (b)(6) and (b)(7)(C).

6

7   213.    Exemption (b)(7)(E). Exemption (b)(7)(E) has been asserted in Category 2F documents

8   to protect law enforcement records that would disclose techniques and procedures for law

9   enforcement investigations or prosecutions, and that would disclose guidelines for law

10
    enforcement investigations and prosecutions. Plaintiff's requests seeks information concerning
11

12  the law enforcement technique(s) of electronic or communications surveillance focused on

13  problems which hamper FBI's ability to successfully intercept communications systems and

14
    networks, and details on preventing the FBI from "Going Dark." The responsive material details
15

16  difficulties encountered by law enforcement in conducting electronic surveillance and discusses

17  possible operational, legal, and procedural changes to the use, or enhancement of, investigative

18
    techniques that would ensure ELSUR capabilities are effective and productive. Accordingly, the
19

20  release of this detailed information about surveillance techniques and associated problems or

21  vulnerabilities would provide violators a road map for successful law enforcement

22
    circumvention. Criminal and terrorist elements would gain valuable insight about the conduct of
23

24  law enforcement surveillance operations and the exploitation of capability weaknesses that would

25  enable them to structure their criminal enterprise and terrorist formulating communications in a

26

27

28                                              131

manner to evade lawful intercept and/or thwart investigative efforts. Accordingly, the FBI has

properly withheld this information pursuant to Exemption (b)(7)(E).

## CATEGORY 2G - FBI DIRECTORS OFFICE (DO) UNCLASSIFIED CD RESPONSE (LYNCH)

214.    Category 2G contains 436 responsive Bates pages consisting of talking points papers

and/or presentations, internal e-mails w/attachments between FBI personnel, and information (34

Bates pages) that was originally prepared by, and obtained from, the DOJ, DHS, and DEA, and

was subsequently returned to each agency for direct response to plaintiff.   383 of the responsive

Bates pages are multiple draft talking points papers and/or presentations titled: 1) "Law

Enforcement's Need for Lawful Intercept Capabilities," 2) "Preservation of Lawful Intercepts:

Challenges and Potential Solutions," 3) "Going Dark: Problems and Proposals," 4) "Closing the

National Security ELSUR Gap," and/or 5) "Going Dark: Talking Points." These presentations

present the FBI's strategic policy development process concerning surveillance challenges posed

by emerging technologies. The presentations were being developed to highlight to various

internal and external audiences the surveillance challenges faced by the FBI and the law

enforcement community, as well as various recommendations, proposals, legislative initiatives

(i.e., amending CALEA), and advice on multi-point strategies, or actions FBI should, or could,

adopt, pursue, or consider to resolve such challenges. 17 responsive Bates pages are internal e-

mail discussions, which pertain to: 1) September 2010 New York Times story on 'Going Dark,'

seeking new law enforcement regulations for the Internet, and telecommunications carriers

having technical difficulties implementing lawful intercept court orders, and having 'Talking

Points' ready for FBI leadership to answer questions, 2) September 2010 Washington Post article on 'Going Dark,' and amending CALEA, and 3) 'Going Dark' case examples showing technological advances out pacing law enforcement's ability to perform lawful intercepts. Of these 436 Bates pages, 421 pages have been withheld in full, 14 pages released in part, and 1 page released in full.

215.    Exemption (b)(5).  Exemption (b)(5) has been asserted in 388 of 436 Category 2G documents to protect the deliberative process privilege.  The deliberative process privilege protects the internal deliberations of an agency by exempting from release recommendations, drafts, analyses, speculation and other non-factual information prepared in anticipation of agency decision-making.  The general purpose of the deliberative process privilege is to prevent injury to the quality of agency decisions.   The protected material contained deliberative discussion on the preparation of talking points papers and/or presentations, and e-mail chains exchanging opinions, advice, proposals, the making of recommendations.  These presentations present the FBI's strategic policy development process concerning surveillance challenges posed by emerging technologies.  The presentations were being developed to highlight to various internal and external audiences the surveillance challenges faced by the FBI and the law enforcement community, as well as various recommendations, proposals, legislative initiatives (i.e., amending CALEA), and advice on multi-point strategies, or actions FBI should, or could, adopt, pursue, or consider to resolve such challenges.

216.    Thus, material that contains or was prepared in connection with the formulation of opinions, advice, evaluations, deliberations, policy formulation, proposals, conclusions or recommendations, may properly be withheld.  Release of this type of information would have an inhibitive effect upon the development of policy and administrative direction of an agency because it would chill the full and frank discussion between agency personnel regarding a decision.  If agency personnel knew that their preliminary opinions, evaluations and comments would be released for public consumption, they might be more circumspect in what they put in writing, and thereby, impede a candid discussion of the issues surrounding a decision. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(5).

217.    Exemptions (b)(6) and (b)(7)(C).  At times in conjunction with (b)(2), Exemptions (b)(6), and (b)(7)(C) have been asserted in Category 2G documents to protect the names and identifying information of FBI Special Agents (SAs) who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in these records, or who were consulted on sensitive internal developmental projects (e.g., National Electronic Surveillance Strategy). The SAs mentioned did not choose their assignments.  The publicity associated with the release of these SAs' identities, in connection with a particular investigation, or internal developmental project, could trigger hostility toward a particular employee, or pressure of attempted bribery, to obtain intelligence.  Publicity, adverse or otherwise, regarding any particular investigation conducted by SAs may seriously impair the SAs effectiveness in conducting future investigations, or consultations.  This privacy consideration also protects SAs from unnecessary,

unofficial questioning as to the conduct of an investigation, or developmental project, whether or

not they are currently employed by the FBI.   The names of FBI Professional Support personnel

are also withheld in Category 2G documents pursuant to Exemptions (b)(6) and (b)(7)(C), at

times in conjunction with (b)(2).  Professional Support personnel are assigned to handle tasks

related to official criminal investigations, and/or developmental projects (e.g., National

Electronic Surveillance Strategy), as reflected in the documents responsive to plaintiff's request.

They maintain substantial privacy interests in not having their identities disclosed.  Accordingly,

the FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C), at

times in conjunction with (b)(2).

218.    Exemptions (b)(6) and (b)(7)(C).  At times Exemptions (b)(6), and (b)(7)(C) have also

been asserted in Category 2G documents to protect the names and identifying information of

third parties that were merely mentioned in the documents responsive to plaintiff's request.

These individuals are not of investigative interest to the FBI.  Release of this type of information

about private citizens, without notarized authorizations permitting such a release violates

individuals legitimate privacy interests.  If the FBI disclosed their names and/or other personal

information, the disclosure would reveal that these third parties were at one time connected with

an FBI investigation, or internal developmental project, in some way.  Disclosure of their

identities could subject these individuals to possible harassment or criticism and focus derogatory

inferences and suspicion on them.  Thus, the FBI determined that these individuals' privacy

interests outweighed any public interest in disclosure, and that disclosure of the names and/or

1

2   identifying information of the third parties merely mentioned would constitute a "clearly

3   unwarranted and unwarranted invasion of personal privacy." Accordingly, the FBI has properly

4

5   withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C).

6

7   219.   Exemptions (b)(6) and (b)(7)(C).  In addition, at times Exemptions (b)(6), and (b)(7)(C)

8   have also been asserted in Category 2G documents to protect the names of personnel from the

9   Drug Enforcement Administration (DEA), Office of Deputy Attorney General (ODAG), Office

10  of Legal Policy (OLP), and contractors working for the FBI.  Publicity (adverse or otherwise)

11

12  regarding any particular investigation they have been assigned, or internal FBI developmental

13  project (e.g., National Electronic Surveillance Strategy) they may be contracted to help develop,

14  may seriously prejudice their effectiveness in conducting other investigations, or developmental

15

16  projects.  The privacy consideration is also to protect these federal employees, and/or contractors,

17  as individuals, from unnecessary, unofficial questioning as to the course of an investigation or

18  developmental project, whether or not they are currently employed by the FBI as contractors, or

19

20  with Other Government Agencies (OGA's).  These employees may have to conduct official

21  inquiries into violations of National Security, or help develop strategic plans, like developing

22  ways to enhance ELSUR capabilities.  They come into contact with all strata of society,

23

24  conducing searches, research, and making inquiries, all of which result in reasonable but

25  nonetheless serious disturbances to people and their lives.  It is possible for an individual targeted

26  by these OGA's to carry a grudge which may last for years, and to seek revenge on the

27

28                                  136

investigators and other federal employees involved in a particular investigation. Foreign

governments, or criminal enterprises may threaten FBI contractors searching for intelligence that

may benefit their countries or criminal enterprises. The publicity associated with the release of

these OGA employee's, and/or contractors identities, in connection with a particular

investigation, or developmental project, could trigger hostility toward a particular employee, or

future threat to obtain intelligence. There is no public interest to be served by disclosing the

identities of these employees, and/or contractors, to the public. Thus, disclosure of this

information would constitute a "clearly unwarranted and unwarranted invasion of their personal

privacy." Accordingly, the FBI has properly withheld this information pursuant to Exemptions

(b)(6), and (b)(7)(C).

220.    Exemption (b)(7)(D). Exemption (b)(7)(D) has been asserted in a Category 2G

document to withhold information provided to the FBI by a foreign government and/or foreign

law enforcement entity under an express assurance of confidentiality according to the Foreign

Government Information Classification Guide #1 (G-1 Guide), issued in accordance with E.O.

13526, Information Security Oversight Office (ISOO), the FBI Security Policy Manual, and the

designated Original Classification Authority (OCA) of the Executive Assistant Director, National

Security Branch. During the course of an FBI intelligence investigation it received information

from a foreign government regarding an investigation. The FBI has many agreements with

foreign governments under which security and/or criminal law enforcement information is

exchanged. The agreements specify the extent of confidentiality requested by the respective foreign government entity. In this case, the FBI has an express confidentiality agreement with this foreign government and/or foreign law enforcement entity which provided information to the FBI during the conduct of intelligence investigation. The FBI's agreements with this law enforcement entity provides express assurance that the FBI will not disclose their identity, as well as the information that they provided to the FBI. If the FBI were to disclose the identities and the information provided by foreign law enforcement entities under an express assurance of confidentiality, such a disclosure would have a chilling effect on the FBI's relationship with these entities. Furthermore, the disclosure would have a chilling effect on the FBI's relationship with other foreign law enforcement agencies which have entered into similar agreements with the FBI. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(D).

221.    Exemption (b)(7)(E). Exemption (b)(7)(E) has been asserted in Category 2G documents to protect law enforcement records that would disclose techniques and procedures for law enforcement investigations or prosecutions, and that would disclose guidelines for law enforcement investigations and prosecutions. Plaintiff's requests seeks information concerning the law enforcement technique(s) of electronic or communications surveillance focused on problems which hamper FBI's ability to successfully intercept communications systems and networks, and details on preventing the FBI from "Going Dark." The responsive material details difficulties encountered by law enforcement in conducting electronic surveillance and discusses

1

2   possible operational, legal, and procedural changes to the use, or enhancement of, investigative

3
    techniques that would ensure ELSUR capabilities are effective and productive.  Accordingly, the
4

5   release of this detailed information about surveillance techniques and associated problems or

6   vulnerabilities would provide violators a road map for successful law enforcement

7
    circumvention.  Criminal and terrorist elements would gain valuable insight about the conduct of
8

9   law enforcement surveillance operations and the exploitation of capability weaknesses that would

10  enable them to structure their criminal enterprise and terrorist formulating communications in a

11
    manner to evade lawful intercept and/or thwart investigative efforts.  Accordingly, the FBI has
12

13  properly withheld this information pursuant to Exemption (b)(7)(E).

14      **CATEGORY 2H - FBI DIRECTORS OFFICE (DO) CLASSIFIED CD RESPONSE**
15                              **(LYNCH)**

16  222.    Category 2H contains 438 responsive Bates pages  consisting of talking points papers

17
    and/or presentations, internal e-mails w/attachments between FBI personal, discussion papers,
18

19  and internal memorandums. 343 of the responsive Bates pages consist of multiple partly

20  classified draft talking points papers, and/or presentations titled: 1) "Going Dark Initiative:

21  Closing [Minimizing] the National Security ELSUR Gap," 2) "Preservation of Lawful Intercepts:

22  Challenges and Potential Solutions," 3) "National Security Proposal for NSA," 4) "Going Dark:

23
    Strengthening National Security by Minimizing the Electronic Surveillance Gap," 5) "Challenges
24

25  With Emerging Technologies," 6) "Going Dark: Law Enforcement's Need to Preserve Lawful

26  Intercept Capabilities," 7) "Make CALEA Implementation Easier for Service Providers," 8)

27

28                                      139

"Basics of CALEA: Who is Covered? Who is Not?" 9) "Going Dark: Q/A," 10) "FBI Efforts to

Protect Title III and FISA Capabilities," 11) "FBI Efforts to Preserve Electronic Surveillance

(ELSUR) Capabilities, 12) "Continued Problems with CALEA Implementation Despite the

FCC's Initial Efforts," 13) "Going Dark: Technology Gaps," and "Governments Need to

Preserve Lawful Intercept Capabilities." These draft presentations present the FBI's strategic

policy development process concerning surveillance challenges posed by emerging technologies.

The presentations were being developed to highlight to various internal and external audiences

the surveillance challenges faced by the FBI and the law enforcement community, as well as

various recommendations, proposals, legislative initiatives (i.e., amending CALEA), and advice

on multi-point strategies, or actions FBI should, or could, adopt, pursue, or consider to resolve

such challenges. 42 of the responsive Bates pages are internal e-mail chain discussions that

pertain to: 1) multiple FBI investigation case examples where communication industry technical

issues, and compliance questions are hampering implementing of lawful intercept orders, 2)

VoIP communication services, 3) draft 'Going Dark' talking point slide presentations, and 3)

meeting preparation, and subsequently follow-up summary, of the Capabilities Gaps Working

Group, where Going Dark legislative, and institutional proposals under consideration, and

ELSUR technological gaps were to be discussed. 42 of the responsive Bates pages are discussion

papers that detailed technical issues and impediments faced during many former and current FBI

investigations. Finally, 11 of the responsive Bates pages are part of a partly classified internal

memorandum, which outlined the ELSUR challenges law enforcement are encountering with

regard to emerging technologies, outline talking point development that defines 'Going Dark,'

1

2   and gives FBI investigation case examples showing how ELSUR limitations have hampered

3   these investigations. Of these 438 Bates pages, 429 pages have been withheld in full, and 9

4   pages released in part.

5

6   223.   Exemption (b)(1). At times Exemption (b)(1) has been asserted in Category 2H

7   documents to withhold information that is properly classified. The information withheld (b)(1) is

8   currently and properly classified under E.O. 13256 at the SECRET level and is exempt from

9   disclosure pursuant to E.O. 13526, § 1.4, category (c) intelligence activities (including covert

10  action), intelligence sources or methods, and category (d) foreign relations, or foreign activities

11  of the United States, including confidential sources, as the unauthorized disclosure of this

12  information could reasonably be expected to cause serious damage to the national security of the

13  United States.

14

15  224.   The information withheld pursuant to Exemption (b)(1) for Category 2H documents

16  consists of classified procedures and methods of intelligence-gathering utilized by the FBI to

17  gather intelligence information.   An intelligence activity or method has two characteristics.

18  First, the intelligence activity and information generated by it is needed by U.S.

19  Intelligence/Counterintelligence agencies to carry out their missions. Second, confidentiality

20  must be maintained with respect to the activity if the viability, productivity, and usefulness of

21  that information is to be preserved. The classification redactions have been asserted to protect

22  from disclosure information that would reveal the actual intelligence activities utilized by the FBI

23

24

25

26

27

28                              141

against specific targets of foreign counterintelligence investigations or operations; or disclosure

of intelligence gathering capabilities of the activities directed at specific targets. The intelligence

activities detailed in the withheld information are effective means for the FBI to gather, store, or

disseminate intelligence information. The criteria applied and priorities assigned in these records

are used in the FBI's present intelligence or counterintelligence investigations in accordance with

the Attorney General's guidelines on FBI intelligence or counterintelligence investigations.

225.    The information in these Category 2H documents concerning intelligence activities is

very specific in nature and known to very few individuals. Disclosure of the specific information

which describes these intelligence activities would reveal that they are still used by the FBI today

to gather intelligence information, and could reasonably be expected to cause serious damage to

the national security for the following reasons: (1) disclosure would allow hostile entities to

discover the current intelligence activities used; (2) disclosure would reveal or determine the

criteria used--and priorities assigned to--current intelligence or counterintelligence investigations;

(3) disclosure would reveal the Intelligence Community's (IC's) continual sensitive work creating

a decentralized communication medium which would aid in facilitating the sharing of

information and enhance collaboration efforts across the IC; and (4) disclosure will highlight the

exact data collection and ELSUR capabilities shortfalls that the IC are encountering during

National Security investigations due to technology advancements in communication system

platforms, and encryption applications. Hostile entities could then develop countermeasures

which could severely disrupt the FBI's intelligence-gathering capabilities. This would severely

damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws. The FBI protected the identity of intelligence sources, or methods, specific to intelligence activities, because disclosure reasonably could be expected to cause serious damage to the national security. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(1).

226.    Exemption (b)(1).  In addition, information withheld pursuant to Exemption (b)(1) in these Category 2H documents has also been found to affect the foreign relations of the United States, and much like foreign government information, this relationship and/or activities, does not lose its sensitivity with the passage of time. The delicate liaisons established between and among the United States and foreign governments could be severely damaged should the United States disclose such information from these investigations. As a result, such information must be handled with care so as to not jeopardize the fragile relationships which exist among the United States and certain foreign governments. The unauthorized disclosure of information concerning foreign relations or foreign activities of the United States can reasonably be expected to lead to diplomatic or economic retaliation against the United States; identify the target, scope or time frame of intelligence activities of the United States in or about a foreign country, which may result in the curtailment or cessation of these activities; enable hostile entities to assess United States intelligence-gathering activities in or about a foreign country and devise countermeasures against these activities; or compromise cooperative foreign sources which may jeopardize their safety and curtail the flow of information from these sources. Accordingly, the FBI has properly

withheld this information pursuant to Exemption (b)(1).

227.     Exemption (b)(3).  At times in conjunction with (b)(1), Exemption (b)(3) has been

asserted in Category 2H documents to withhold information pursuant to 18 U.S.C. § 3123(d), the

Pen Register Act, which protects from disclosure information pertaining to certain court "order(s)

authorizing or approving the installation and use of a pen register or a trap and trace devise;" and

information pertaining to "the existence of the pen register or trap and trace device or the

existence of the investigation."  Where documents at issue contain information, that, if disclosed,

would reveal the existence or use of a pen register or trap and trace device, or reveal the

existence of an investigation involving a pen register or trap and trace device, that information is

protected from disclosure by Exemption (b)(3), at times in conjunction with Exemption (b)(1).

228.     Exemption (b)(3).  At times in conjunction with (b)(1), Exemption (b)(3) has also been

asserted in Category 2H documents to withhold information pursuant to 50 U.S.C. § 1806, which

protects from disclosure information pertaining to the use of FISA information acquired from

electronic surveillance.  Where documents at issue contain information, that, if disclosed, would

reveal the use of FISA information acquired from electronic surveillance, that information is

protected from disclosure by both Exemption (b)(3), at times in conjunction with Exemption

(b)(1).

229.     Exemption (b)(3).  In addition, at times in conjunction with Exemption (b)(1), Exemption

144

(b)(3) has been asserted in Category 2H documents to withhold information pursuant to 18

U.S.C. § 2510, et. seq., Title III of the Omnibus Crime Control and Safe Streets Act, which

protects from disclosure information pertaining to wiretap requests and the contents of any wire,

oral, or electronic communication obtained through wiretaps.  Where documents at issue contain

information, that, if disclosed, would reveal, information pertaining to wiretap requests and the

contents of any wire, oral, or electronic communication obtained through wiretaps, that

information is protected from disclosure by both Exemption (b)(3), at times in conjunction with

Exemption (b)(1).

230.    Exemption (b)(5).  Exemption (b)(5) has been asserted in 408 of 438 Category 2H

documents to protect the deliberative process privilege.  The deliberative process privilege

protects the internal deliberations of an agency by exempting from release recommendations,

drafts, analyses, speculation and other non-factual information prepared in anticipation of agency

decision-making.  The general purpose of the deliberative process privilege is to prevent injury to

the quality of agency decisions.  The protected material contained draft presentations that

presented the FBI's strategic policy development process concerning surveillance challenges

posed by emerging technologies.  The presentations were being developed to highlight to various

internal and external audiences the surveillance challenges faced by the FBI and the law

enforcement community, as well as various recommendations, proposals, legislative initiatives

(i.e., amending CALEA), and advice on multi-point strategies, or actions FBI should, or could,

adopt, pursue, or consider to resolve such challenges.  The internal e-mail chain discussions

1

2   pertain to the 'Going Dark' legislative initiative to develope proposals on updating CALEA,

3
    compliance questions that are hampering implementing of lawful intercept orders, institutional
4

5   proposals under consideration, and ELSUR technological gaps and potential ways to solve the

6   weakening of the FBI's capablities to obtain lawful intercepts.

7

8   231.    Thus, material that contains or was prepared in connection with the formulation of

9   opinions, advice, evaluations, deliberations, policy formulation, proposals, conclusions or

10  recommendations, may properly be withheld.  Release of this type of information would have an

11
    inhibitive effect upon the development of policy and administrative direction of an agency
12

13  because it would chill the full and frank discussion between agency personnel regarding a

14  decision.  If agency personnel knew that their preliminary opinions, evaluations and comments

15  would be released for public consumption, they might be more circumspect in what they put in

16
    writing, and thereby, impede a candid discussion of the issues surrounding a decision.
17

18  Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(5).

19
    232.    Exemptions (b)(6) and (b)(7)(C).  At times in conjunction with (b)(2), Exemptions (b)(6),
20

21  and (b)(7)(C) have been asserted in Category 2H documents to protect the names and identifying

22  information of FBI Special Agents (SAs) who were responsible for conducting, supervising,

23
    and/or maintaining the investigative activities reported in these records, or who were consulted
24

25  on sensitive internal developmental projects (e.g., National Electronic Surveillance Strategy).

26  The SAs mentioned did not choose their assignments.  The publicity associated with the release

27

28                                        146

1

2   of these SAs' identities, in connection with a particular investigation, or internal developmental

3

4   project, could trigger hostility toward a particular employee, or pressure of attempted bribery, to

5   obtain intelligence.  Publicity, adverse or otherwise, regarding any particular investigation

6   conducted by SAs may seriously impair the SAs effectiveness in conducting future

7

8   investigations, or consultations.  This privacy consideration also protects SAs from unnecessary,

9   unofficial questioning as to the conduct of an investigation, or developmental project, whether or

10  not they are currently employed by the FBI.   The names of FBI Professional Support personnel

11

12  are also withheld in Category 2H documents pursuant to Exemptions (b)(6) and (b)(7)(C), at

13  times in conjunction with (b)(2).  Professional Support personnel are assigned to handle tasks

14  related to official criminal investigations, and/or developmental projects (e.g., National

15  Electronic Surveillance Strategy), as reflected in the documents responsive to plaintiff's request.

16

17  They maintain substantial privacy interests in not having their identities disclosed.  Accordingly,

18  the FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C), at

19  times in conjunction with (b)(2).

20

21  233.   Exemptions (b)(6) and (b)(7)(C).  At times Exemptions (b)(6), and (b)(7)(C) have also

22  been asserted in Category 2H documents to protect the names and personal identifiers of

23

24  contractors working for the FBI.  Publicity (adverse or otherwise) regarding any particular

25  internal FBI developmental project (e.g., National Electronic Surveillance Strategy) they may be

26  contracted to help develop, may seriously prejudice their effectiveness in conducting other

27

28                                                  147

developmental projects. The privacy consideration is also to protect these contractors, as

individuals, from unnecessary, unofficial questioning as to the course of a developmental project,

whether or not they are currently employed by the FBI as contractors. These contract employees

may have to help develop strategic plans, like developing ways to enhance ELSUR capabilities.

They come into contact with all strata of society, conducing searches, research, and making

inquiries, all of which result in reasonable but nonetheless serious disturbances to people and

their lives. Foreign governments, or criminal enterprises may threaten FBI contractors searching

for intelligence that may benefit their countries or criminal enterprises. The publicity associated

with the release of these contractors identities, in connection with a particular developmental

project, could trigger hostility toward a particular employee, or future threat to obtain

intelligence. There is no public interest to be served by disclosing the identities of these

contractors to the public. Thus, disclosure of this information would constitute a "clearly

unwarranted and unwarranted invasion of their personal privacy." Accordingly, the FBI has

properly withheld this information pursuant to Exemptions (b)(6), and (b)(7)(C).

234.  Exemptions (b)(6) and (b)(7)(C).  In addition, at times Exemptions (b)(6), and (b)(7)(C)

have been asserted in Category 2H documents to protect the names and/or identifying

information of third-party individuals who were of investigative interest to the FBI and/or other

law enforcement agencies. Identifying information withheld concerning these third parties

includes addresses, dates of birth, social security numbers, and other personal information. Any

link to a law enforcement investigation carries a strong negative connotation and a stigma.

Release of the identities of these individuals to the public could subject them to harassment or

embarrassment, as well as undue public attention.  The FBI has determined that these individuals

maintain a substantial privacy interest in not having their identities disclosed.  In making a

determination whether to release the names and personal information concerning these third

parties, the public's interest in disclosure was balanced against the individual's right to privacy.

The FBI determined that this information would not enlighten the public on how the FBI

conducts its internal operations and investigations.  The FBI concluded that the disclosure of this

information would constitute a "clearly unwarranted and unwarranted invasion of their personal

privacy."  Accordingly, the FBI has properly withheld this information pursuant to Exemptions

(b)(6), and (b)(7)(C).

235.   Exemption (b)(7)(A).  Exemption (b)(7)(A) exempts from disclosure records or

information compiled for law enforcement purposes, but only to the extent that the production of

such law enforcement records or information . . . could reasonably be expected to interfere with

enforcement proceedings.  Exemption (b)(7)(A), at times in conjunction with (b)(1), has been

asserted in Category 2H documents to protect information that either summarize, discuss, or

relate to FBI criminal cases which remain in an open or active status.  The release of such

information would reveal the scope, direction, nature and pace of the investigations as well as

reveal information that could harm prospective and/or ongoing government prosecutions in these

matters.  If the information is released, the individuals and/or entities, who are of investigative

149

1

2 interest in the cases could use the information to develop alibis, take steps to circumvent the law,

3 create factitious defenses or intimidate, harass or harm potential witnesses. Accordingly, the FBI

4

5 has properly withheld this information pursuant to Exemption (b)(7)(A), at times in conjunction

6 with (b)(1).

7

8 236.    Exemption (b)(7)(D).  At times Exemption (b)(7)(D) has been asserted in Category 2H

9 documents to withhold information provided to the FBI by commercial/private companies and

10 other non-government entities under circumstances from which an assurance of confidentiality

11 may be implied.  During the course of the FBI's intelligence investigations, certain

12
commercial/private companies provided information to the FBI relating to the subjects of these
13

14 investigations.  This information was especially needed in relation to criminal enterprises and/or

15 pornographic exploitation rings using anonymizes/encrytion services, and unmangaed VoIP

16 Communication services.  To disclose the fact that these companies provided information to the

17
FBI during the course of an investigation could harm the commercial interests of these
18

19 enterprises by deterring the public from employing their services.  In addition, such a disclosure

20 has wider implications.  If the FBI disclosed the identities of confidential sources that provide

21 information to the FBI on a continuing basis, that revelation would have a chilling effect on the

22
activities and cooperation of other current or potential future FBI confidential sources.
23

24 Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(D).

25 237.    Exemption (b)(7)(E).  Exemption (b)(7)(E) has been asserted in Category 2H documents

26

27 to protect law enforcement records that would disclose techniques and procedures for law

28                                        150

enforcement investigations or prosecutions, and that would disclose guidelines for law enforcement investigations and prosecutions. Plaintiff's requests seeks information concerning the law enforcement technique(s) of electronic or communications surveillance focused on problems which hamper FBI's ability to successfully intercept communications systems and networks, and details on preventing the FBI from "Going Dark." The responsive material details difficulties encountered by law enforcement in conducting electronic surveillance and discusses possible operational, legal, and procedural changes to the use, or enhancement of, investigative techniques that would ensure ELSUR capabilities are effective and productive. Accordingly, the release of this detailed information about surveillance techniques and associated problems or vulnerabilities would provide violators a road map for successful law enforcement circumvention. Criminal and terrorist elements would gain valuable insight about the conduct of law enforcement surveillance operations and the exploitation of capability weaknesses that would enable them to structure their criminal enterprise and terrorist formulating communications in a manner to evade lawful intercept and/or thwart investigative efforts. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(E).

### CATEGORY 2I - FBI DIRECT-REFERRAL RESPONSES TO PLAINTIFF - DEA REFERRALS (LYNCH)

238. Category 2I contains 259 responsive Bates pages consisting of talking points papers and/or presentations, discussion papers, a sample CALEA ELSUR Non-compliance Incident Report, the FY 2010 Budget at a Glance Report, an internet article, and meeting summary notes.

161 of the responsive Bates pages are talking points papers and/or presentations titled: 1) "Voice

over Internet Protocol (VoIP) Communications," 2) "Going Dark: Law Enforcement's Need to

Preserve Lawful Intercept Capabilities," 3) "State and Local Law Enforcement Challenges," 4)

"Technology Transfer Program: Office of National Drug Control Policy, Counterdrug

Technology Assessment Center," 5) "Going Dark: Update," and 6) "Going Dark: Preservation of

Lawful Intercept's Challenges and Potential Solutions."  These presentations present the FBI's

strategic policy development process concerning surveillance challenges posed by emerging

technologies.  The presentations were being developed to highlight to various internal and

external audiences the surveillance challenges faced by the FBI and the law enforcement

community, as well as various recommendations, proposals, legislative initiatives (i.e., amending

CALEA), and advice on multi-point strategies, or actions FBI should, or could, adopt, pursue, or

consider to resolve such challenges.  73 of the responsive Bates pages are discussion papers

titled: 1) "Obtaining Assistance with De-compressing Lawful Intercepted Blackberry

Communications, and Office of General Council (OGC) Recommendations," 2) "Whitepaper:

Law Enforcement's Need to Preserve Lawful Intercept Capabilities," 3) "Going Dark Problems

and Potential Solutions," and 4) "FBI CALEA Scope of Coverage Amendment Proposal."  3 of

the 259 Bates pages is a sample CALEA ELSUR Non-compliance Incident Report.  The

remaining 23 responsive Bates pages are an internet article titled: "FBI 'Going Dark' with New

Advanced Surveillance Program," a copy of the FBI FY 2010 budget request at a glance, and

1

2   summarized meeting notes from the June 25, 2009, Law Enforcement Executive Forum (LEEF).

3
    Of these 259 Bates pages 246 pages have been withheld in full, 3 pages released in part, and 10
4

5   released in full.

6

7   239.    Exemption (b)(2).  In conjunction with (b)(6), and (b)(7)(C), Exemption (b)(2) has been

8   asserted on Category 2I documents to protect internal, non-public telephone numbers of FBI

9   personnel.  These internal, non-public telephone numbers are used by FBI personnel while they

10
    are working on significant national security and criminal investigations.  Disclosure of these
11

12  internal, non-public telephone numbers could subject these individuals to harassing telephone

13  calls, which could disrupt official business (including impeding the ability of Special Agents to

14
    conduct and conclude functions related to the law enforcement investigations in a timely
15

16  manner).  With the narrowing of the application of Exemption (b)(2) to those records which

17  relate to employee relations and human resource issues, the FBI has determined that, in those

18
    instances where Exemption (b)(2) has been asserted in conjunction with Exemption (b)(7)(E), the
19

20  use of Exemption (b)(2) is now withdrawn.  Accordingly, because disclosure of these internal,

21  non-public telephone numbers could impede the FBI's effectiveness and may risk circumvention

22  of the law, the FBI has properly withheld this information pursuant to Exemption (b)(2), in

23
    conjunction with (b)(6) and (b)(7)(C).
24

25  240.    Exemption (b)(5).  Exemption (b)(5) has been asserted in 229 of 259 Category 2I

26
    documents to protect the deliberative process privilege.  The deliberative process privilege
27

28                                          153

protects the internal deliberations of an agency by exempting from release recommendations,

drafts, analyses, speculation and other non-factual information prepared in anticipation of agency

decision-making. The general purpose of the deliberative process privilege is to prevent injury to

the quality of agency decisions. The protected material contained draft presentations, discussion

papers, and summary notes from a LEEF meeting that presented the FBI's strategic policy

development process concerning surveillance challenges posed by emerging technologies. The

presentations, and discussion papers were being developed to highlight to various internal and

external audiences the surveillance challenges faced by the FBI and the law enforcement

community, as well as various recommendations, proposals, legislative initiatives (i.e., amending

CALEA), and advice on multi-point strategies, or actions FBI should, or could, adopt, pursue, or

consider to resolve such challenges. These recommendations, proposals, and legistative

initiatives were presented at the LEEF meeting.

241.    Thus, material that contains or was prepared in connection with the formulation of

opinions, advice, evaluations, deliberations, policy formulation, proposals, conclusions or

recommendations, may properly be withheld. Release of this type of information would have an

inhibitive effect upon the development of policy and administrative direction of an agency

because it would chill the full and frank discussion between agency personnel regarding a

decision. If agency personnel knew that their preliminary opinions, evaluations and comments

would be released for public consumption, they might be more circumspect in what they put in

1

2    writing, and thereby, impede a candid discussion of the issues surrounding a decision.

3
     Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(5).
4

5    242.    Exemption (b)(5).  In addition, Exemption (b)(5) has been asserted in 16 of the 259

6
7    Category 2I documents to protect material covered by the attorney-client privilege.  These 16

8    pages pertained to the internal legal discusion of proposed legal procedures needed to obtain

9
10   assistance with de-compressing compressed electronic data obtained from lawful intercepts from

11   a foreign manufacturer that has ownership of a proprietary algorithm used to send, receive, and

12   store electronic data on a communication device.  The attorney-client privilege is appropriately

13
14   asserted when legal advice of any kind is sought from a professional legal adviser in his or her

15   capacity as such, and the communications relating to that purpose are made in confidence by the

16   client.  The communications are permanently protected from disclosure by the client or by the

17
     legal adviser unless the attorney-client protection is waived.  This privilege encompasses
18
19   confidential communications made to the attorney not only by decision-making personnel but

20   also by lower-echelon employees who possess information relevant to an attorney's advice-

21   rendering function.  Disclosure of the two-way communications between DOJ attorneys and their

22
23   clients would impede the full disclosure of all of the information that relates to the client's

24   reasons for seeking legal advice, which is necessary if the professional mission is to be

25   accomplished.  Accordingly, the FBI has properly withheld this information pursuant to

26
     Exemption (b)(5).
27

28                                                    155

1

2   243.   Exemptions (b)(6) and (b)(7)(C).  At times in conjunction with (b)(2), Exemptions (b)(6),

3   and (b)(7)(C) have been asserted in Category 2I documents to protect the names and identifying

4

5   information of FBI Special Agents (SAs) who were responsible for conducting, supervising,

6   and/or maintaining the investigative activities reported in these records, or who were consulted

7   on sensitive internal developmental projects (e.g., National Electronic Surveillance Strategy).

8
    The SAs mentioned did not choose their assignments.  The publicity associated with the release
9

10  of these SAs' identities, in connection with a particular investigation, or internal developmental

11  project, could trigger hostility toward a particular employee, or pressure of attempted bribery, to

12
    obtain intelligence.  Publicity, adverse or otherwise, regarding any particular investigation
13

14  conducted by SAs may seriously impair the SAs effectiveness in conducting future

15  investigations, or consultations.  This privacy consideration also protects SAs from unnecessary,

16
    unofficial questioning as to the conduct of an investigation, or developmental project, whether or
17

18  not they are currently employed by the FBI.   The names of FBI Professional Support personnel

19  are also withheld in Category 2I documents pursuant to Exemptions (b)(6) and (b)(7)(C), at times

20
    in conjunction with (b)(2).  Professional Support personnel are assigned to handle tasks related to
21

22  official criminal investigations, and/or developmental projects (e.g., National Electronic

23  Surveillance Strategy), as reflected in the documents responsive to plaintiff's request.  They

24  maintain substantial privacy interests in not having their identities disclosed.  Accordingly, the

25
    FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C), at times
26

27  in conjunction with (b)(2).

28                                156

244.    Exemptions (b)(6) and (b)(7)(C).  At times Exemptions (b)(6), and (b)(7)(C) have also

been asserted in Category 2I documents to protect the names and identifying information of third

parties that were merely mentioned in the documents responsive to plaintiff's request.  These

individuals are not of investigative interest to the FBI.  Release of this type of information about

private citizens, without notarized authorizations permitting such a release violates individuals

legitimate privacy interests.  If the FBI disclosed their names and/or other personal information,

the disclosure would reveal that these third parties were at one time connected with an FBI

investigation, or developmental project, in some way.  Disclosure of their identities could subject

these individuals to possible harassment or criticism and focus derogatory inferences and

suspicion on them.  Thus, the FBI determined that these individuals' privacy interests outweighed

any public interest in disclosure, and that disclosure of the names and/or identifying information

of the third parties merely mentioned would constitute a "clearly unwarranted and unwarranted

invasion of personal privacy."  Accordingly, the FBI has properly withheld this information

pursuant to Exemptions (b)(6) and (b)(7)(C).

245.    Exemptions (b)(6) and (b)(7)(C).  At times Exemptions (b)(6), and (b)(7)(C) have also

been asserted in Category 2I documents to protect the names of personnel from the Bureau of

Alcohol, Tobacco, Firearms, and Explosives (ATF), Drug Enforcement Administration (DEA),

Immigration and Customs Enforcement (ICE), United States Marshals Service (USMS), and

United States Secret Service (USSS).  Publicity (adverse or otherwise) regarding any particular

FBI developmental project (e.g., National Electronic Surveillance Strategy) they may be

157

consulted to help develop, or Law Enforcement Executive Forum (LEEF) meeting where they brought their LE concerns for group discussion, may seriously prejudice their effectiveness in conducting other future developmental projects, or private discussion groups. The privacy consideration is also to protect these federal employees as individuals from unnecessary, unofficial questioning as to the course of an developmental project, or LE discussion topic, whether or not they are currently employed by or with Other Government Agencies (OGA's). These employees may have to conduct official inquiries into future violations of National Security, and help develop strategic plans, like developing ways to enhance ELSUR capabilities. They come into contact with all strata of society, conducing searches, research, and making inquiries, all of which result in reasonable but nonetheless serious disturbances to people and their lives. Foreign governments, or criminal enterprises may threaten these OGA's searching for intelligence that may benefit their countries or criminal enterprises. The publicity associated with the release of these OGA employee's identities, in connection with a particular investigation, developmental project, or LE discussion topic, could trigger hostility toward a particular employee, or future threat to obtain intelligence. There is no public interest to be served by disclosing the identities of these employees to the public. Thus, disclosure of this information would constitute a "clearly unwarranted and unwarranted invasion of their personal privacy." Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6), and (b)(7)(C).

246. <u>Exemptions (b)(6) and (b)(7)(C)</u>. In addition, at times Exemptions (b)(6), and (b)(7)(C) have also been asserted in Category 2I documents to protect the names and identifying information of local law and state law enforcement employees, such as employee's working with the Jefferson County Sheriff's Office Louisville, KY, National Sheriff's Association (NSA), San Jose Police Department, New York State Police, New Jersey State Police, San Bernardino Sherries Department, Las Vegas, Metro Police Department, International Association of Chefs of Police (IACP), Major Cities Chiefs (MCC), Fairfax County Police Department, Virginia, and DuPage County Sheriffs Office, Wheaton, IL. These employees were acting in their official capacity, and attended the Law Enforcement Executive Forum (LEEF), June 25, 2009, to discuss state and local law enforcement challenges relating to lawful intercepts, and technological advancements in the communication industry that are out-pacing LE intercept capabilities. The rationale for protecting the identities of FBI SAs discussed in ¶58-59, <u>supra</u>, applies with equal force to the names of these local and state law enforcement employees. Release of the identity of these law enforcement employees could subject these individuals to unnecessary and unwelcome harassment, and inquires into LE challenges, which would constitute an unwarranted invasion of privacy. The FBI could identify no discernible public interest in the disclosure of this information because the disclosure of the names of local and state law enforcement employees would not shed light on the operations and activities of the FBI. Accordingly, the FBI concluded that the disclosure of this information would constitute a clearly unwarranted and an unwarranted

invasion of their personal privacy.  The FBI properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C).

247.    Exemption (b)(7)(E).  At times Exemption (b)(7)(E) has been asserted in Category 2I documents to protect law enforcement records that would disclose techniques and procedures for law enforcement investigations or prosecutions, and that would disclose guidelines for law enforcement investigations and prosecutions.  Plaintiff's requests seeks information concerning the law enforcement technique(s) of electronic or communications surveillance focused on problems which hamper FBI's ability to successfully intercept communications systems and networks, and details on preventing the FBI from "Going Dark."  The responsive material details difficulties encountered by law enforcement in conducting electronic surveillance and discusses possible operational, legal, and procedural changes to the use, or enhancement of, investigative techniques that would ensure ELSUR capabilities are effective and productive.  Accordingly, the release of this detailed information about surveillance techniques and associated problems or vulnerabilities would provide violators a road map for successful law enforcement circumvention.  Criminal and terrorist elements would gain valuable insight about the conduct of law enforcement surveillance operations and the exploitation of capability weaknesses that would enable them to structure their criminal enterprise and terrorist formulating communications in a manner to evade lawful intercept and/or thwart investigative efforts.  Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(E).

1

2

3

## CATEGORY 2J - FBI DIRECT-REFERRAL RESPONSES TO PLAINTIFF - CRM REFERRALS (LYNCH)

4

248.     Category 2J contains 74 responsive Bates pages consisting of talking points papers and/or

5

6

presentations, discussion papers, and e-mails between FBI personnel, and contacts with OGA's.

7

59 of the responsive Bates pages are talking points papers and/or presentations titled: 1) "Going

8

Dark: Preservation of Lawful Intercept, Challenges and Potential Solutions," 2) "Going Dark:

9

Law Enforcement's Need to Preserve Lawful Intercept Capabilities," 3) "FBI Efforts to Preserve

10

Electronic Surveillance (ELSUR) Capabilities," 4) "Going Dark: The Going Dark Problem,

11

12

Congressional Briefing, Office of Hon. Lamar Smith (HJC)," and 5) "Going Dark: The Going

13

Dark Problem, Congressional Briefing, House and Senate Intelligence Committee Staff." These

14

presentations present the FBI's strategic policy development process concerning surveillance

15

challenges posed by emerging technologies. The presentations were being developed to highlight

16

to various internal and external audiences the surveillance challenges faced by the FBI and the

17

18

law enforcement community, as well as various recommendations, proposals, legislative

19

initiatives (i.e., amending CALEA), and advice on multi-point strategies, or actions FBI should,

20

or could, adopt, pursue, or consider to resolve such challenges.  10 of the responsive Bates pages

21

are discussion papers titled: 1) "FBI CALEA Scope of Coverage Amendment Proposal," and 2)

22

23

"FBI Transnational Threat Priorities." Finally, 4 of the responsive Bates pages are e-mails

24

between FBI personnel, and contacts at DEA, and OLP seeking input on ELSUR compliance

25

issues with communication service providers, and technical issues with private network providers

26

and access point entry.

27

28

249.    Exemption (b)(1).  At times Exemption (b)(1) has been asserted in Category 2J documents to withhold information that is properly classified.  The information withheld is currently and properly classified under E.O. 13256 at the Secret level and is exempt from disclosure pursuant to E.O. 13526, § 1.4, category (c) intelligence activities (including covert action), intelligence sources or methods, as the unauthorized disclosure of this information could reasonably be expected to cause serious damage to the national security of the United States.

250.    The information withheld in Category 2J douments, pursuant to Exemption (b)(1), consists of classified procedures and methods of intelligence-gathering utilized by the FBI to gather intelligence information.   An intelligence activity or method has two characteristics.  First, the intelligence activity and information generated by it is needed by U.S. Intelligence/Counterintelligence agencies to carry out their missions.  Second, confidentiality must be maintained with respect to the activity if the viability, productivity, and usefulness of that information is to be preserved.  The classification redactions have been asserted to protect from disclosure information that would reveal the actual intelligence activities utilized by the FBI against specific targets of foreign counterintelligence investigations or operations; or disclosure of intelligence gathering capabilities of the activities directed at specific targets.  The intelligence activities detailed in the withheld information are effective means for the FBI to gather, store, or disseminate intelligence information.  The criteria applied and priorities assigned in these records are used in the FBI's present intelligence or counterintelligence investigations in accordance with the Attorney General's guidelines on FBI intelligence or counterintelligence investigations.

251.    The information in these Category 1F documents concerning intelligence activities is very specific in nature and known to very few individuals.  Disclosure of the specific information which describes these intelligence activities would reveal that they are still used by the FBI today to gather intelligence information, and could reasonably be expected to cause serious damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discover the current intelligence activities used; (2) disclosure would reveal or determine the criteria used--and priorities assigned to--current intelligence or counterintelligence investigations; (3) disclosure would reveal the Intelligence Community's (IC's) continual sensitive work creating a decentralized communication medium which would aid in facilitating the sharing of information and enhance collaboration efforts across the IC; and (4) disclosure will highlight the exact data collection and ELSUR capabilities shortfalls that the IC are encountering during National Security investigations due to technology advancements in communication system platforms, and encryption applications.  Hostile entities could then develop countermeasures which could severely disrupt the FBI's intelligence-gathering capabilities.  This would severely damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws.  The FBI protected the identity of intelligence sources, or methods,  specific to intelligence activities, because disclosure reasonably could be expected to cause serious damage to the national security. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(1).

163

1

2    252.    Exemption (b)(5).  Exemption (b)(5) has been asserted in 69 of 74 Category 2J

3    documents to protect the deliberative process privilege.  The deliberative process privilege

4
     protects the internal deliberations of an agency by exempting from release recommendations,
5

6    drafts, analyses, speculation and other non-factual information prepared in anticipation of agency

7    decision-making.  The general purpose of the deliberative process privilege is to prevent injury to

8    the quality of agency decisions.  The protected material contained draft presentations that
9
     presented the FBI's strategic policy development process concerning surveillance challenges
10

11   posed by emerging technologies.  The presentations were being developed to highlight to various

12   internal and external audiences the surveillance challenges faced by the FBI and the law

13   enforcement community, as well as various recommendations, proposals, legislative initiatives
14
     (i.e., amending CALEA), and advice on multi-point strategies, or actions FBI should, or could,
15

16   adopt, pursue, or consider to resolve such challenges.  The internal e-mail chain discussions

17   pertain to ELSUR compliance questions that are hampering implementing of lawful intercept

18   orders, and ELSUR technological gaps and proposed solutions to solve the weakening of the
19
     FBI's capablities to obtain lawful intercepts.
20

21   253.    Exemptions (b)(6) and (b)(7)(C).  At times in conjunction with (b)(2), Exemptions (b)(6),

22
     and (b)(7)(C) have been asserted in Category 2J documents to protect the names and identifying
23

24   information of FBI Special Agents (SAs) who were responsible for conducting, supervising,

25   and/or maintaining the investigative activities reported in these records, or who were consulted

26   on sensitive developmental projects.  The SAs mentioned did not choose their assignments.  The

27

28                                              164

publicity associated with the release of these SAs' identities, in connection with a particular

investigation, or developmental project, could trigger hostility toward a particular employee, or

pressure of attempted bribery, to obtain intelligence.  Publicity, adverse or otherwise, regarding

any particular investigation conducted by SAs may seriously impair the SAs effectiveness in

conducting future investigations, or consultations.  This privacy consideration also protects SAs

from unnecessary, unofficial questioning as to the conduct of an investigation, or developmental

project, whether or not they are currently employed by the FBI.   The names of FBI Professional

Support personnel are also withheld in Category 2J documents pursuant to Exemptions (b)(6)

and (b)(7)(C), at times in conjunction with (b)(2).  Professional Support personnel are assigned to

handle tasks related to official criminal investigations, and/or developmental projects, as

reflected in the documents responsive to plaintiff's request.  They were, and possibly are, in

maintain substantial privacy interests in not having their identities disclosed.  Accordingly, the

FBI has properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C), at times

in conjunction with (b)(2).

254.     Exemptions (b)(6) and (b)(7)(C).  At times Exemptions (b)(6), and (b)(7)(C) have also

been asserted in Category 2J documents to protect the names of personnel from the Drug

Enforcement Administration (DEA), National Security Division (NSD), Office of Legal Policy

(OLP), and contractors working for the FBI.  Publicity (adverse or otherwise) regarding any

particular investigation they have been assigned, or internal FBI developmental project (e.g.,

165

1
2  National Electronic Surveillance Strategy) they may be contracted to help develop, may seriously
3
4  prejudice their effectiveness in conducting other investigations, or developmental projects. The
5  privacy consideration is also to protect these federal employees, and/or contractors, as
6  individuals, from unnecessary, unofficial questioning as to the course of an investigation or
7
8  developmental project, whether or not they are currently employed by the FBI as contractors, or
9  with Other Government Agencies (OGA's). These employees may have to conduct official
10 inquiries into violations of National Security, or help develop strategic plans, like developing
11
12 ways to enhance ELSUR capabilities. They come into contact with all strata of society,
13 conducing searches, research, and making inquiries, all of which result in reasonable but
14 nonetheless serious disturbances to people and their lives. It is possible for an individual targeted
15
16 by these OGA's to carry a grudge which may last for years, and to seek revenge on the
17 investigators and other federal employees involved in a particular investigation. Foreign
18
19 governments, or criminal enterprises may threaten FBI contractors searching for intelligence that
20 may benefit their countries or criminal enterprises. The publicity associated with the release of
21 these OGA employee's, and/or contractors identities, in connection with a particular
22
23 investigation, or developmental project, could trigger hostility toward a particular employee, or
24 future threat to obtain intelligence. There is no public interest to be served by disclosing the
25 identities of these employees, and/or contractors, to the public. Thus, disclosure of this
26
27 information would constitute a "clearly unwarranted and unwarranted invasion of their personal

28                                                    166

privacy." Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6), and (b)(7)(C).

255.    Exemptions (b)(6) and (b)(7)(C).  In addition, at times Exemptions (b)(6), and (b)(7)(C) have been asserted in Category 2J documents to protect the names and/or identifying information of third-party individuals who were of investigative interest to the FBI and/or other law enforcement agencies.  Identifying information withheld concerning these third parties includes addresses, dates of birth, social security numbers, and other personal information.  Any link to a law enforcement investigation carries a strong negative connotation and a stigma.  Release of the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention.  The FBI has determined that these individuals maintain a substantial privacy interest in not having their identities disclosed.  In making a determination whether to release the names and personal information concerning these third parties, the public's interest in disclosure was balanced against the individual's right to privacy.  The FBI determined that this information would not enlighten the public on how the FBI conducts its internal operations and investigations.  The FBI concluded that the disclosure of this information would constitute a "clearly unwarranted and unwarranted invasion of their personal privacy." Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6), and (b)(7)(C).

256.    Exemption (b)(7)(A).  Exemption (b)(7)(A) exempts from disclosure records or information compiled for law enforcement purposes, but only to the extent that the production of

such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings.   Exemption (b)(7)(A), at times in conjunction with (b)(1), has been asserted in Category 2J documents to protect information that either summarize, discuss, or relate to FBI criminal cases which remain in an open or active status.  The release of such information would reveal the scope, direction, nature and pace of the investigations as well as reveal information that could harm prospective and/or ongoing government prosecutions in these matters.  If the information is released, the individuals and/or entities, who are of investigative interest in the cases could use the information to develop alibis, take steps to circumvent the law, create factitious defenses or intimidate, harass or harm potential witnesses.  Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(A), at times in conjunction with (b)(1).

257.   Exemption (b)(7)(E).  At times Exemption (b)(7)(E) has been asserted in Category 2J documents to protect law enforcement records that would disclose techniques and procedures for law enforcement investigations or prosecutions, and that would disclose guidelines for law enforcement investigations and prosecutions.  Plaintiff's requests seeks information concerning the law enforcement technique(s) of electronic or communications surveillance focused on problems which hamper FBI's ability to successfully intercept communications systems and networks, and details on preventing the FBI from "Going Dark."  The responsive material details difficulties encountered by law enforcement in conducting electronic surveillance and discusses possible operational, legal, and procedural changes to the use, or enhancement of, investigative

techniques that would ensure ELSUR capabilities are effective and productive. Accordingly, the release of this detailed information about surveillance techniques and associated problems or vulnerabilities would provide violators a road map for successful law enforcement circumvention. Criminal and terrorist elements would gain valuable insight about the conduct of law enforcement surveillance operations and the exploitation of capability weaknesses that would enable them to structure their criminal enterprise and terrorist formulating communications in a manner to evade lawful intercept and/or thwart investigative efforts. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(E).

## CONCLUSION

258.    The FBI conducted a thorough search of the CRS, manual indices, and all FBIHQ divisions and offices most likely to possess responsive records. These searches combined produced a total of 2,662 responsive pages which 707 total pages have been released in full or in part to plaintiff. The FBI has processed and released all reasonably segregable information from the records responsive to plaintiff's requests to the FBI. The remaining responsive documents have been withheld pursuant to FOIA Exemptions 1, 2, 3, 4, 5, 6, 7(A), 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(2), (b)(3), (b)(4), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E). The FBI has carefully examined the responsive documents and has determined that the information withheld from plaintiff, if disclosed, could reasonably be expected to cause serious damage to the national security; disclose internal, non-public telephone numbers of particular

169

damage to the national security; disclose internal, non-public telephone numbers of particular

FBI employees; could violate federal statutes; disclose trade secrets and commercial or financial

information obtained from a corporation or electronic communication service providers [that are]

privileged or confidential; reveal inter-agency, and intra-agency documents under the deliberative

process privilege, and information protected by the attorney-client privilege; disclose the

existence of law enforcement records that are pending or under prospective law enforcement

proceedings; cause a "clearly unwarranted and unwarranted invasion of personal privacy; could

disclose the identities of and information provided by confidential sources; and disclose sensitive

investigative techniques and procedures. Accordingly, the FBI has released all reasonably

segregable, non-exempt information to plaintiff in response to its FOIA request.

259.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct, and that **Exhibits A through P** attached hereto are true and correct copies.

Executed this _____ day of February, 2012.


DAVID M. HARDY

Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, VA